1
2
3
4
5

> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

6

## UNITED STATES BANKRUPTCY COURT

7

## SOUTHERN DISTRICT OF CALIFORNIA

8
9

In re:
BRIARWOOD CAPITAL, LLC,
                    Debtor.

Case No. 10-02677-PB11

10
11

In re:
NICOLAS MARSCH III,
                    Debtor.

Case No. 10-02939-PB11

12
13

In re:
COLONY PROPERTIES INTERNATIONAL, LLC,
                    Debtor.

Case No. 10-02937-PB11

14
15

**In re:
COLONY PROPERTIES
INTERNATIONAL II, LLC,**
                    Debtor.

**Case No. 10-03361-PB11**

Chapter 11

16
17

**DISCLOSURE STATEMENT IN SUPPORT OF
JOINT CHAPTER 11 PLAN DATED AS OF NOVEMBER 8, 2010**

18
19
20
21

BEN H. LOGAN (S.B. # 071711)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

22
23
24

DANIEL M. PETROCELLI (S.B. # 097802)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone:    (310) 246-6850
Facsimile:    (310) 246-6679

25
26

 Counsel for Lennar Corporation and Lennar
Homes of California, Inc.

CHRISTOPHER CELENTINO (S.B. # 131688)
DUANE MORRIS LLP
101 West Broadway, Suite 900
San Diego, California 92101-8285
Telephone:    (619) 744-2246
Facsimile:    (619) 744-2201

 Counsel for Lennar Corporation and
Lennar Homes of California, Inc.

27
28

1

2

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     DISCLAIMER ................................................................................................. 9

III.    DESCRIPTION OF THE PLAN ..................................................................... 11

    A.      SUMMARY ......................................................................................... 11

        1.      Marsch and Briarwood ............................................................ 11

        2.      Colony I and Colony II ............................................................ 13

        3.      Release of Claims Against the Debtors and Against Lennar and KBR ..................................................................................... 14

    B.      CLASSES ............................................................................................. 14

        1.      Treatment of Administrative Expense Claims, and Priority Claims ....................................................................................... 15

        2.      Allowance of Administrative Expense Claims ........................ 16

        3.      Treatment of Allowed Administrative Expense Claims ................. 17

        4.      Treatment of Claims Under the Lennar Loan ........................... 17

        5.      Treatment of Claims Under the KBR Loan .............................. 17

        6.      Treatment of Priority Tax Claims ............................................ 17

    C.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................................................................ 18

        1.      Priority Claims Against Marsch (Class A-1) ........................... 18

        2.      Secured Claims Against Marsch (Class A-2) ........................... 18

        3.      General Unsecured Claims Against Marsch (Class A-3) ................. 20

        4.      Lennar and KBR Unsecured Claims Against Marsch (Class A-4) ............................................................................................. 22

        5.      Intercompany Claims Against Marsch (Class A-5) ...................... 23

        6.      Priority Claims Against Briarwood (Class B-1) ............................. 24

        7.      Secured Claims Against Briarwood (Class B-2) ........................ 24

        8.      General Unsecured Claims Against Briarwood (Class B-3) ............ 26

        9.      Lennar and KBR Unsecured Claims Against Briarwood (Class B-4) ............................................................................... 27

        10.     Intercompany Claims Against Briarwood (Class B-5) .................. 28

        11.     Interests in and Interest-Related Claims Against Briarwood (Class B-6) ............................................................................... 28

        12.     Priority Claims Against Colony I (Class C-1) .......................... 29

        13.     Secured Claims Against Colony I (Class C-2) .......................... 29

        14.     General Unsecured Claims Against Colony I (Class C-3) ............. 30

        15.     Intercompany Claims Against Colony I (Class C-4) .................. 31

# TABLE OF CONTENTS
(continued)

Page

16. Interests in and Interest-Related Claims Against Colony I (Class C-5) ...................................................................... 31

17. Priority Claims Against Colony II (Class D-1) ............................... 31

18. Secured Claims Against Colony II (Class D-2) .............................. 32

19. General Unsecured Claims Against Colony II (Class D-3) ............ 32

20. Intercompany Claims Against Colony II (Class D-4) ..................... 33

21. Interests and Interest-Related Claims Against Colony II (Class D-5) .................................................................................... 33

D. IMPLEMENTATION OF THE PLAN ..................................................... 34

   1. Reorganization of Colony I and II ..................................... 34

   2. The Marsch and Briarwood Estates ................................... 34

   3. Cancellation of Interests; Issuance of New Interests ....................... 35

   4. Assignment of Interest in HCC ......................................... 35

   5. Discharge of Trustees .......................................................... 35

   6. Preservation of All Rights of Action .................................. 35

E. CLAIMS AND DISTRIBUTIONS ........................................................... 36

   1. Time and Manner of Distributions ..................................... 36

      (a) Distributions With Respect to Administrative Claims .......... 36

      (b) Distributions with Respect to General Unsecured Claims ....................................................................... 36

   2. Resolution of Claims Disputes ........................................... 36

      (a) Reservation of Rights to Object to Claims ........................... 36

      (b) No Distributions Pending Allowance ................................. 37

      (c) Claim Estimation .............................................................. 37

   3. Bar Dates .............................................................................. 38

F. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................................................................... 38

G. RELEASES AND EXCULPATION ......................................................... 39

   1. Releases of Claims Against Lennar and KBR ................... 39

   2. Release of Inter-Company Claims ...................................... 41

   3. Exculpation and Limitation of Liability ............................ 41

H. DISCHARGES AND INJUNCTIONS ..................................................... 43

   1. Injunctions Against Interference with the Plan ................. 43

   2. Colony I and Colony II Discharge ..................................... 44

   3. No Briarwood Discharge ..................................................... 44

**TABLE OF CONTENTS**

(continued)

Page

4. Right to Oppose a Marsch Discharge; Preservation of Right to Assert that Certain Claims are Not Dischargeable........................... 44

IV. VOTING INSTRUCTIONS AND PROCEDURES ............................................. 45

V. THE DEBTORS, THEIR ASSETS AND LIABILITIES AND THEIR HISTORY OF LITIGATION................................................................. 49

A. The Bridges. ................................................................................ 50

1. The Williams Litigation and Acquisition of the Horizon Property ................................................................................ 50

2. Formation of Lennar Bridges and Acquisition of the Santa Fe Creek Property............................................................. 52

3. Development of the Property ............................................. 52

4. The Transfer to KRMW ..................................................... 53

5. Impact of the Superior Court's Statement of Decision in the Bridges Action on the Debtors' Asserted Interest in the Bridges. ............................................................................... 54

B. Real Property Located in Southern California ........................... 56

C. Colorado Property Owned by MRP. .......................................... 57

D. Other Assets that Marsch and Briarwood May Have Hidden or Transferred in Transactions that Might be Avoided for the Benefit of Creditors. ................................................................................. 66

E. Litigation with Lennar........................................................................ 70

1. Claims Asserted Against Lennar....................................... 70

(a) The Bridges Action - Briarwood Capital, LLC v. HCC Investors LLC, et al., Case No. GIC-877446....................... 70

(b) The McCrink Action - Briarwood Capital, LLC v. Lennar Land Partners II, et al., Case No. GIC 875457 ......... 72

(c) The HCC Action - Briarwood Capital, LLC v. HCC Investors LLC, Case No. 37-2009-00097749-CU-BC-CTL (complaint filed on September 3, 2009 in the San Diego Superior Court)............................................................. 74

2. Resolution of the Claims Asserted Against Lennar. .......... 75

3. Claims Asserted By Lennar Against the Debtors. ............. 76

(a) The Florida Action - Lennar Corporation, et. al. v. Briarwood Capital, LLC, et al., Case No. 08-55740 CA40 .................................................................................. 76

# TABLE OF CONTENTS
(continued)

| | | | | Page |
|---|---|---|---|---|---|
| | | (b) | The DLA Piper Cases - Lennar Homes of California, Inc. v. DLA Piper US LLP, et al., San Diego Superior Court Case No. 37-2008-00076811-CU-PN-CTL (the "DLA-1" case), and Lennar Homes of California, Inc., et al. v. DLA Piper US LLP, et al., San Diego Superior Court Case No. 37-2008-00092842-CU-PN-CTL (the "DLA-2" case) (collectively, the "DLA Piper Cases") | 79 |
| | F. | Transactions and Litigation with KBR | 81 |
| | | 1. | Transactions Between KBR and the Debtors | 81 |
| | | (a) | The Colony I and II Loan | 81 |
| | | (b) | The KRMW Investment | 84 |
| | | (c) | Non-Bankruptcy Litigation | 87 |
| | G. | Relations with 1st Pacific Bank and its Successor CNB | 89 |
| VI. | | SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES | 90 |
| | A. | The Bankruptcy Petitions | 90 |
| | B. | Stipulation for Relief From the Stay to Let the Bridges Action Proceed to Judgment | 91 |
| | C. | The Florida Action | 91 |
| | D. | Briarwood's Adversary Proceeding Against HCC Regarding Fees | 93 |
| | E. | The Chapter 11 Trustee Motions, the Appointment of an Examiner for Briarwood and the Appointment of Chapter 11 Trustees for Each of the Debtors | 94 |
| | | 1. | The Appointment of a Chapter 11 Trustee for Colony I and Colony II and the Appointment of an Examiner for Briarwood | 94 |
| | | 2. | The Report of the Briarwood Examiner | 96 |
| | | 3. | The Appointment of the Briarwood and Marsch Trustees | 97 |
| | | 4. | Marsch's Motion to Reconsider the Appointment of a Chapter 11 Trustee in his Personal Bankruptcy | 98 |
| | F. | The Two Adversary Proceedings Filed by KBR | 99 |
| | | 1. | The First KBR Adversary Proceeding | 99 |
| | | 2. | The Second Adversary Proceeding Filed by KBR | 100 |
| | | 3. | Resolution of the KBR Adversary Proceedings in the Plan | 101 |
| | G. | Applications to Retain Counsel for the Debtors in Possession and Counsel for the Trustees | 101 |
| | | 1. | Counsel for the Debtors in Possession | 101 |
| | | 2. | Counsel for the Chapter 11 Trustees | 103 |
| | H. | The Bankruptcy Court's Order Vacating its Earlier Claims Bar Date Order | 104 |
| | I. | Relief from the Stay with respect to the DLA Piper Cases | 105 |

**TABLE OF CONTENTS**
(continued)

**Page**

VII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ... 105

    A.    Feasibility of the Plan.................................................................... 105

    B.    Acceptance of the Plan. ............................................................... 106

    C.    Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative............................................................. 108

    D.    Best Interests Test. ..................................................................... 109

VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.................................................................................. 112

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN..... 113

X.    CONCLUSION ................................................................................. 117

I.    **INTRODUCTION**

This Disclosure Statement dated as of November 8, 2010 (as at any time amended, the "Disclosure Statement") is submitted in connection with the Joint Chapter 11 Plan, dated as of November 8, 2010 (as at any time amended, the "Plan").[1]

The Plan is a joint chapter 11 plan for four (4) debtors—Nicolas Marsch III ("Marsch") (Case No. 10-02939-PB11), Briarwood Capital, LLC ("Briarwood") (Case No. 10-02677-PB11), Colony Properties International, LLC ("Colony I") (Case No. 10-02937-PB11), and Colony Properties International II, LLC ("Colony II") (Case No. 10-03361-PB11) (each a "Debtor" and, collectively, the "Debtors").  The Debtors commenced their Chapter 11 Cases in February 2010. Subsequently, the Bankruptcy Court removed each of the Debtors from control of their estates and appointed chapter 11 trustees (the "Chapter 11 Trustees").  As explained below, the Bankruptcy Court ordered the appointment of the Chapter 11 Trustees because of a series of suspect transactions involving Marsch, the Bankruptcy Court's conclusion that it had "lost confidence in Marsch's capacity for candor and honesty," and the fact that a very high level of acrimony between the Debtors and their creditors meant that appointing trustees would be in the best interests of creditors and the estates.

The Plan is proposed by Lennar Corporation ("Lennar Corp.") and Lennar Homes of California, Inc. ("Lennar Homes" and, collectively with Lennar Corp. and HCC Investors, LLC ("HCC"), "Lennar").  The Plan is also supported by KBR Group, LLC ("KBR Group"), KBR Opportunity Fund I, LP ("KBR I") and KBR Opportunity Fund II, LP ("KBR II", and collectively with KBR Group, and KBR I, "KBR"), which has agreed with Lennar to seek confirmation of the Plan.  Lennar Homes, Lennar Corp. and KBR are sometimes referred to collectively herein as the "Plan Proponents."

The Plan Proponents are among the most substantial creditors of the Debtors.  Lennar's claims against Marsch and Briarwood total hundreds of millions of dollars in compensatory damages (exclusive of punitive damages), including: (i) $12,046,192 which the San Diego

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

1    Superior Court ruled in its Statement of Decision re Phase I (the "Statement of Decision") issued

2    in the Bridges Action (discussed in Sections V.A and V.E.1(a)) on September 30, 2010 is

3    owed  jointly and severally to Lennar by Marsch and Briarwood, (ii) more than $45 million in

4    attorneys' fees and costs in the Bridges Action which Lennar will be requesting from the Superior

5    Court pursuant to the Statement of Decision providing that attorneys' fees will be awarded to the

6    prevailing party and pursuant to statute, (iii) hundreds of millions of dollars of damages in

7    compensatory damages, fees and costs, in the Florida Action (discussed in Section V.E.3(a)) and

8    the DLA Piper Cases (discussed in Section V.E.3(b)) brought by Lennar against Marsch and

9    Briarwood, among others (the components of which are discussed in further detail in the

10    Disclosure Statement), and (iv) more than $300,000 in costs that were awarded to Lennar as the

11    prevailing party in the McCrink Action.  The bases for Lennar's claim are discussed in greater

12    detail in Section V.E below.

13        KBR asserts claims totaling approximately $12 million, consisting of: (i) in excess of  $5

14    million owed to KBR II by Marsch, Briarwood and KRMW that are secured by (a) Marsch's

15    membership interests in Colony I and Briarwood, (b) Colony I's membership interest in Colony II

16    and (iii) Marsch and Briarwood's purported claims in the Bridges Action, the McCrink Action

17    and under the operating agreement of HCC (the "HCC Operating Agreement"), and (ii)

18    approximately $7 million owed to KBR I by Colony I and Colony II jointly and severally.

19        The Schedules of Assets and Liabilities filed by the Debtors with the Bankruptcy Court

20    indicate that the Debtors' creditors other than Lennar and KBR are either: (i) secured creditors

21    with real estate collateral that those creditors have indicated should satisfy all or the vast majority

22    of their claims or where any deficiency claim will be waived by virtue of the non-judicial

23    foreclosure that the secured creditor has been authorized to pursue, (ii) debts owed among the

24    Debtors or entities controlled by a Debtor, or (iii) significantly smaller in magnitude than the

25    debts owed to Lennar and KBR.  For example, other than these claims and debt owed to Lennar

26    and KBR, Briarwood's Schedules list $10,315,000 of other debt—so that Lennar and KBR hold

27    approximately 99% of the total Claims in the Briarwood Case—and Marsch's Schedules list only

28

2

1   $11,211,000 of other debt—so that Lennar and KBR hold approximately 99% of the total Claims

2   in the Marsch Case.[2]

3         With respect to the Marsch and Briarwood Estates, the Plan provides that a Plan

4   Administrator will be appointed and Lennar will provide a loan of up to $750,000 to finance the

5   costs of administering the Estates and the efforts of the Plan Administrator to pursue assets

6   possibly transferred by Marsch and Briarwood as fraudulent conveyances or hidden by them, and

7   otherwise pursue Causes of Action of the Estates.  After repayment of the financing provided by

8   Lennar, any such collections for the benefit of the Marsch Estate will be distributed to creditors

9   with Allowed Claims against the Marsch Estate, and any such collections for the benefit of the

10  Briarwood Estate will be distributed to creditors with Allowed Claims against the Briarwood

11  Estate, except for Claims among the Debtors which will be released.

12        These possible sources of distributions to unsecured creditors of the Marsch and

13  Briarwood Estates include a variety of causes of action and claims, including claims the Marsch

14  Estate has against Mountain Resorts Properties, LLC ("MRP") related to loans that Marsch

15  asserts he made to MRP and Marsch's sale of the equity in MRP to www.degreefraud.com (an

16  affiliate of Barry Minkow) and Jeffrey Sachs on May 8, 2009 for what Marsch called a

17  "discount."  Lennar believes that these claims related to MRP (the "MRP Claims") may have

18  significant value.  **The Plan assures unsecured creditors of the Marsch estate that *at least***

19  **$450,000 will be realized for their benefit on account of the MRP Claims.[3]**  The Plan provides

20  that if within six (6) months of the Effective Date, the Plan Administrator has not received at least

21  $450,000 (net of costs and fees incurred after the Effective Date in pursuing the MRP Claims),

22  Lennar will pay any such shortfall to the Plan Administrator for distribution to unsecured

23  creditors with Allowed Claims against Marsch.  The Plan Administrator could well realize

24  substantially more than $450,000 (net of fees and costs) on the MRP Claims.  Thus, if after

25  

26  [2] According to the Debtors' Schedules there is substantial overlap between the creditors with
    Claims against Marsch and Briarwood.
27  [3] The Marsch Trustee has proposed settling the MRP Claims for only $425,000.  Lennar has filed
    an objection to this proposed settlement.  If, nonetheless, the MRP Claims are settled or resolved
28  prior to the Effective Date of the Plan, Lennar obviously will not guarantee a minimum recovery
    on the MRP Claims of $450,000.

DISCLOSURE STATEMENT

Lennar pays this minimum amount to the Plan Administrator for distribution to unsecured creditors with Allowed Claims against Marsch, the Plan Administrator realizes recoveries on the MRP Claims, the first proceeds will be used to repay Lennar the amount it paid (plus interest at 10% per annum) and the balance of any such proceeds will be used for distributions to creditors with Allowed unsecured Claims against Marsch.  According to the Debtors' Schedules, most creditors with Claims against Briarwood also have joint Claims against Marsch; thus, while this guarantee of a minimum recovery is only directly for the benefit of creditors with Claims against Marsch, it will also indirectly benefit most creditors with Claims against Briarwood.

After repaying the Lennar Loan, the amounts realized by the Plan Administrator for the benefit of the Marsch and Briarwood Estates will be distributed pro rata among creditors with Allowed Claims against the Marsch and Briarwood Estates, respectively, **subject to several exceptions pursuant to which Lennar and KBR will accept inferior treatment for the benefit of other creditors.**  First, Lennar will accept distributions as though its claims were significantly less than their actual amount—for purposes of distributions, Lennar's claims will be treated as though they equaled $20 million, i.e., approximately 2% of Lennar's asserted Claim.  KBR II will also accept distributions on its Claim against Marsch and Briarwood as thought those Claims were only $5 million, whereas KBR II asserts that this Claim is actually closer to $6 million.  In addition, Lennar will turn over to KBR any distributions it receives on account of its claims so that the dollar amount of the recoveries received by Lennar and KBR from the Marsch and Briarwood estates are equal.

As a result of Lennar's and KBR II's agreement to accept distributions as though their Claims against Marsch and Briarwood were only $20 million and $5 million, respectively, distributions to other creditors with Allowed Claims against Marsch and Briarwood will be significantly enhanced.  For example, although Lennar would be entitled to approximately 99% of any distributions available to creditors of Marsch and Briarwood if Lennar's Claims were Allowed in their asserted amounts, under the Plan collections of Cash by the Plan Administrator available to be distributed to unsecured creditors of the Marsch and Briarwood Estates will be shared approximately as follows:  (i) Lennar 35%, (ii) KBR 35%, and (iii) other unsecured

creditors 30%. The following is an estimate based on the Schedules filed by the Debtors. The exact percentage shares will depend on the amount of Claims in Classes A-3 and B-3 that are ultimately Allowed. But in any event, the Plan provides that Lennar will take a significantly lower share of such distributions than it asserts it is entitled to legally. This limitation on Lennar's and KBR II's Claims against the Marsch and Briarwood Estates is solely for purposes of the Plan. If the Plan is not confirmed, Lennar and KBR II will be free to (and intend to) assert Claims in higher amounts. Lennar and KBR II will also be free to assert that their Claims against Marsch are for higher amounts to the extent that they seek to recover non-dischargeable Claims from Marsch (as opposed to the Marsch Estate).

As described below, evidence suggests these Debtors have hidden valuable assets or transferred them to others in transactions that can be avoided as fraudulent conveyances. The Plan provides a means to attempt to recover these assets. While Lennar believes that pursuing such assets and claims offers creditors of Marsch and Briarwood the best available prospect of a recovery, there can be no assurance that any such proceeds will be realized except with respect to the MRP Claims, **where Lennar will guarantee that creditors with Allowed unsecured Claims against Marsch will share in at least $450,000**. **Using the estimates of Allowed Claims described above, this means that creditors with Allowed Unsecured Claims against Marsch will realize under the Plan a minimum recovery of approximately 1.5% of their Allowed Claims; the actual amount could be significantly higher.**

With respect to Colony I and Colony II, the Plan provides that KBR will finance certain administrative costs of these Estates and provide sufficient funding **to pay all Allowed Claims against such Debtors in full, other than Claims among the Debtors which will be released**. KBR I will retain its secured claims against Colony I and Colony II and KBR I and KBR II will receive 100% of the newly issued equity interests in Reorganized Colony I and Reorganized Colony II in satisfaction of their secured claims against Colony I and Colony II.

The Plan also provides for the release of any and all claims that the Debtors (or their affiliates), their Estates and the Trustees have against Lennar and KBR. As described below, Marsch and Briarwood have brought litigation against Lennar and KBR. This litigation has been

DISCLOSURE STATEMENT

1   hotly contested, including a lengthy trial and pretrial proceedings, in the course of which the

2   Debtors' claims have been rejected by the courts that have decided these matters.  For example, in

3   the main litigation case against Lennar, Briarwood alleged mismanagement, among other claims,

4   against Lennar related to the development of the real estate project known as The Bridges at

5   Rancho Santa Fe (the "Bridges Action").  After 11 months of trial, the Superior Court issued its

6   Statement of Decision rejecting Briarwood's contentions, rejecting Briarwood's request for

7   damages, and awarding Lennar over $12 million of damages against Briarwood and Marsch on

8   Lennar's cross-complaint.  The Superior Court concluded that: "Marsch was thoroughly

9   impeached with his own testimony, documents and the testimony of other witnesses" and that

10  "[d]uring trial, Marsch repeatedly gave false testimony on material issues."

11          Marsch and Briarwood have also exhibited a pattern of abuse of the judicial process.  For

12  example, when the loan extended by KBR I to Colony I and Colony II matured without payment,

13  the Debtors filed a lawsuit against KBR.  Apparently dissatisfied with the judge, the Debtors

14  dismissed the action and filed a nearly identical complaint the following day.  KBR filed a

15  counterclaim for repayment of its debt and a motion to compel arbitration, as required by the

16  parties' agreement.  The court ordered arbitration.  The Debtors then sought to enjoin KBR from

17  foreclosing on its collateral, but the court denied the request because the Debtors "had not shown

18  a likelihood of prevailing on the merits."  Apparently unsatisfied with the arbitrator, the Debtors

19  filed another nearly identical action against KBR, which was pending when the Debtors filed for

20  bankruptcy protection.

21          Courts in other cases have concluded that Marsch and others he retained have not been

22  truthful.  For example, in November 2008, the San Diego Superior Court dismissed with

23  prejudice a lawsuit that Briarwood brought against Lennar relating to property known as McCrink

24  Ranch (the "McCrink Action") based on sworn admissions of Marsch on behalf of Briarwood that

25  undermined the factual assumptions upon which the lawsuit had been based and litigated for

26  several years.  The Court rejected Marsch's attempt to minimize or explain away his admissions,

27  ruling that Marsch's explanation was "inherently incredible" and "necessarily inconsistent" with

28  his sworn admissions.

6

DISCLOSURE STATEMENT

Similarly, in May 2010, the Bankruptcy Court ordered the appointment of an examiner to investigate Lennar's allegations that Marsch was abusing his position on the governing body of HCC, the entity that owns and operates the Bridges.  Terrance J. Bruggeman was approved as examiner for Briarwood (the "Examiner").  On July 8, 2010, the Examiner issued a report in which he concluded that Marsch had abused his position on HCC's governing body, had breached his fiduciary duties to HCC and should be removed and replaced with an independent person.

In addition, on July 19, 2010, the Bankruptcy Court ordered that a Chapter 11 Trustee should be appointed for each of the Briarwood and Marsch Estates because, among other things, the Bankruptcy Court had "great concern [about Marsch's] honesty with the Court as a debtor-in-possession in his own case, and as managing member of Briarwood Capital, LLC."  As a result, the Bankruptcy Court held that it had "lost confidence in Marsch's capacity for candor and honesty, and concludes that a trustee should be appointed in both the Marsch and Briarwood Chapter 11 cases, both for cause under § 1104(a)(1), and in the best interests of creditors and the estate under § 1104(a)(2)."

A Florida state court (the "Florida Court") in which an action brought by Lennar (the "Florida Action") against Marsch, Briarwood, Barry Minkow and the Fraud Discovery Institute, Inc. ("FDI") is pending, held that Mr. Minkow, whom Marsch hired to help extort Lennar, lied under oath.  Marsch has admitted in sworn testimony that he turned to Mr. Minkow because Mr. Minkow operates outside the normal "justice-system toolbox."[4]  Lennar asserts that Messrs. Marsch and Minkow launched an elaborate scheme to defame and extort Lennar.  Lennar responded with the Florida Action.  As part of the Florida Action, Lennar brought a sanctions proceeding against Mr. Minkow and FDI for abuse of the judicial process, including destruction of documents and manufacturing other documents.  After a two-day evidentiary hearing held on August 26 and 27, 2010, the Florida Court concluded that sanctions against Mr. Minkow were in order and observed that Mr. Minkow "will lie, plain and simple."  The Florida Court added that

---

[4] Mr. Minkow achieved notoriety by launching a massive fraud related to the ZZZ Best scam of the 1980's.  Mr. Minkow was convicted and served 7 years of a 25-year prison sentence.

DISCLOSURE STATEMENT

LA3:1169526

1    Mr. Minkow "seems to have absolutely no sense of responsibility for telling the truth.  The truth

2    is whatever he decides is important to the moment."

3        Mr. Minkow also assisted Marsch in an effort to hide from creditors in these Chapter 11

4    Cases an asset that they valued at approximately $3 - 4 million.  In May 2009, Marsch transferred

5    equity in MRP—a company that owned a luxury ski home in Colorado—to Mr. Minkow and

6    Jeffrey Sachs.  In return for equity that Marsch had appraised at approximately $4 million a few

7    weeks earlier, Marsch received only $850,000 (or $950,000)[5] in cash, but with an understanding

8    that Messrs. Minkow and Sachs would return the profit to him when sold, less a reasonable

9    return.  This transaction with Mr. Minkow, and Marsch's dishonesty about it, was one of the

10   reasons the Bankruptcy Court ordered the appointment of trustees in the Marsch and Briarwood

11   Chapter 11 Cases.  It is also the source of the fraudulent conveyance claim that the Marsch Estate

12   has against Messrs. Minkow and Sachs (and their affiliates) which is included in the MRP Claims

13   that the Plan assures will realize at least $450,000 for distribution to creditors with Allowed

14   unsecured Claims against Marsch.

15       Lennar believes that it is time to bring to a halt the baseless litigation brought by Marsch

16   and the entities he controls against Lennar and KBR.  His litigation forays have damaged

17   creditors such as Lennar and KBR by forcing them to expend resources fighting Marsch's

18   scorched-earth litigation tactics, which he has financed largely through contingency fee

19   arrangements, unpaid debts to litigation creditors and assignments of the claims.  Moreover,

20   Lennar contends that continuing these efforts would have virtually no prospect for success, would

21   only lead to years of additional delay and increasing litigation expenditures by the Estates, and

22   will not benefit creditors.  In contrast, the Plan offers creditors a fair, balanced and equitable

23   alternative—financing the pursuit of assets that Marsch has likely hidden or transferred in

24   transactions that can be undone, with a guarantee that unsecured creditors with Allowed Claims

25   against Marsch will share in **a minimum** of $450,000.

26

27

28   [5] It is unclear whether the cash consideration was $850,000 or $950,000; Marsch and MRP have
     taken conflicting positions as to the amount of the consideration.

DISCLOSURE STATEMENT

1      **ACCORDINGLY, THE PLAN PROPONENTS URGE THAT YOU VOTE IN**

2 **FAVOR OF THE PLAN.**

3 **II.**     **DISCLAIMER**

4      THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS

5 INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.

6      **ON**     , **2010, THE BANKRUPTCY COURT ENTERED AN ORDER [***DOCKET***

7 *NO.*    **] APPROVING THE DISCLOSURE STATEMENT. APPROVAL OF THE**

8 **DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A**

9 **DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR**

10 **MERITS OF THE PLAN. CREDITORS ARE URGED TO REVIEW THIS**

11 **DISCLOSURE STATEMENT AND THE ATTACHED PLAN CAREFULLY.**

12      NO SOLICITATION OF VOTES FOR OR AGAINST THE PLAN MAY BE MADE

13 EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE

14 BANKRUPTCY CODE.

15      THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR

16 ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

17      LENNAR HAS MADE APPROPRIATE AND REASONABLE EFFORTS TO ENSURE

18 THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT IS ACCURATE,

19 RELYING LARGELY ON PUBLIC INFORMATION FILED WITH THE BANKRUPTCY

20 COURT AND OTHER COURTS. HOWEVER, THE PLAN PROPONENTS ARE NOT IN

21 CONTROL OF THE DEBTORS OR THE DEBTORS' ESTATES AND DO NOT HAVE

22 ACCESS TO ALL INFORMATION THAT MAY BE IN THE POSSESSION OF THE

23 DEBTORS OR THE CHAPTER 11 TRUSTEES. **AS NOTED HEREIN, THE DEBTORS**

24 **HAVE BEEN REMOVED FROM POSSESSION FROM THEIR ESTATES BASED, IN**

25 **PART, ON THE BANKRUPTCY COURT'S CONCERNS ABOUT THEIR INTEGRITY**

26 **AND THE RELIABILITY OF INFORMATION THEY HAVE SUPPLIED TO THE**

27 **BANKRUPTCY COURT. OTHER COURTS HAVE REACHED SIMILAR**

28 **CONCLUSIONS. AS A RESULT OF THOSE FACTS AND THE INHERENT**

DISCLOSURE STATEMENT

LA3:1169526

**UNCERTAINTY OF ATTEMPTING TO COLLECT ASSETS FROM THE DEBTORS AND THEIR TRANSFEREES, THERE CAN BE NO ASSURANCES AS TO WHAT, IF ANY, RECOVERIES WILL BE AVAIALBLE FOR CREDITORS OF THE MARSCH AND BRIARWOOD ESTATES OTHER THAN THE ASSURANCE THAT AT LEAST $450,000 WILL BE AVAILABLE FOR DISTRIBUTION TO CREDITORS WITH ALLOWED UNSECURED CLAIMS AGAINST MARSCH.  DESPITE THE INABILITY TO PROVIDE ASSURANCES OF THE AMOUNT OF RECOVERIES, THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST AVAILABLE ALTERNATIVE FOR CREDITORS.**

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CONCURRENTLY SERVED UPON YOU IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING OR BE DEEMED TO CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

LA3:1169526

1    CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

2    STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT

3    NEGOTIATIONS.   THIS   DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN

4    ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE

5    CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF

6    THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY

7    OF THE DEBTORS IN THESE CASES.

8    **III.    DESCRIPTION OF THE PLAN**

9         The following summary of certain principal provisions of the Plan is qualified in its

10   entirety by reference to the Plan, a copy of which is attached as Exhibit A to this Disclosure

11   Statement.   In the event of any discrepancy between this Disclosure Statement, including the

12   following summary description, and any provision of the Plan, the Plan or order confirming the

13   Plan will control.

14        **A.    SUMMARY**

15        The Plan is a joint Chapter 11 plan for Marsch, Briarwood, Colony I and Colony II in that

16   in a single integrated document it provides for the treatment of creditors against each of these

17   Debtors.  However, the Plan provides for separate treatment for creditors against each of these

18   Estates based upon the assets of the particular Estate—the Plan does not provide for substantive

19   consolidation (i.e., the assets of and claims against the Debtors are not merged).

20        **1.    Marsch and Briarwood.**

21        The Plan for the Briarwood and Marsch Estates provides that Lennar will loan these

22   estates an amount up to $750,000 (the "Lennar Loan") which will be used by a Plan

23   Administrator (who will be selected by the Plan Proponents) to pay Allowed Administrative and

24   Priority Claims against these Estates and to pursue assets that have either been hidden by Marsch

25   and Briarwood or transferred by these Debtors in transactions that can be avoided under the

26   Bankruptcy Code.  After repayment of the Lennar Loan, proceeds collected for the benefit of the

27   Marsch Estate will be distributed by the Plan Administrator to creditors with Allowed Unsecured

28   Claims against the Marsch Estate so that each creditor receives a Pro Rata Share of these

LA3:1169526                                                                          DISCLOSURE STATEMENT

recoveries.  The same is true for Briarwood—creditors with Allowed Unsecured Claims against the Briarwood Estate will receive a pro rata share of whatever assets the Plan Administrator receives for the benefit of the Briarwood Estate, after the Plan Administrator has repaid the Lennar Loan.

The Plan also provides that the Marsch Estate will receive a minimum of $450,000 on account of the MRP Claims (net of costs and fees incurred by the Plan Administrator in pursuing the MRP Claims) for distribution to creditors with Allowed unsecured Claims against Marsch (Claims in Classes A-3 and A-4).  This minimum amount is assured by the provisions of the Plan that provide that if the Plan Administrator has not received at least this sum by six (6) months after the Effective Date, Lennar will promptly pay any such shortfall to the Plan Administrator for distribution to creditors with Allowed Claims in Classes A-3 and A-4).

There are several exceptions to the provision for pro rata distributions among unsecured creditors of the Marsch Estate and creditors of the Briarwood Estate.  Each exception is designed to reduce the Pro Rata Share that Lennar receives and, therefore, benefit other unsecured creditors.  First, Lennar has agreed as part of the Plan that, although the amount of its Claims against Marsch and Briarwood total hundreds of millions of dollars of compensatory damage Claims, it will receive distributions as though its Claim were only $20 million.  This will significantly benefit all other creditors with Allowed Claims against Briarwood and Marsch.  Second, Lennar has also agreed with KBR that Lennar will turn over to KBR distributions it receives so that the distributions that Lennar and KBR receive from the Briarwood and Marsch Estates will be equal in dollar amount.  This agreement only affects Lennar and KBR.  No other unsecured creditors will be affected by this latter agreement; each will receive its Pro Rata Share of Assets to be distributed from the Estate against which the creditor has an Allowed Claim.  Moreover, KBR II has agreed as part of the Plan that, although the amount of its Claims against Marsch and Briarwood are close to $6 million, it will receive distributions as though its Claims against these Debtors were only $5 million.  This will provide an additional benefit to all other creditors (other than Lennar and KBR) with Allowed Claims against Briarwood and Marsch.

DISCLOSURE STATEMENT

LA3:1169526

The Lennar Loan is designed to provide the Plan Administrator with maximum flexibility. This loan has no maturity date or scheduled date for payment of principal or interest.  Rather, when and to the extent the Plan Administrator collects money, the Lennar Loan will be repaid with interest at 10%.  If the assets collected by the Plan Administrator for the benefit of the Marsch and Briarwood Estates turns out to be insufficient to repay the Lennar Loan, the unpaid portion of that loan will be forgiven.  Although the Lennar Loan and KBR Loan will be afforded superadministrative priority under Bankruptcy Code Section 364(c)(1), other Allowed Administrative and Priority Claims will be paid prior to repayment of these  loans.

The Plan Administrator is likely to recover sufficient assets, particularly for the benefit of the Marsch Estate, to make distributions to creditors.  As noted above, the Plan assures that at least $450,000 will be available for distribution to creditors with Allowed claims in Classes A-3 and A-4.  The amounts available for distribution could be substantially higher than $450,000 although there can be no assurances that this will be the result.  The Plan also provides that all Allowed Administrative Expense Claims and Priority Claims against Marsch and Briarwood will be paid in full (via funding provided by the Lennar Loan).  There can be no assurances that distributions will be available for creditors with Allowed unsecured Claims against Briarwood; however, according to the Debtors' Schedules most creditors with unsecured Claims against Briarwood also have corresponding Claims against Marsch.

**2.      Colony I and Colony II.**

The Plan with respect to Colony I and Colony II provides for the payment in full of all Allowed Unsecured Claims.

KBR will loan the Plan Administrator $150,000 (the "KBR Loan") on the same terms as the Lennar Loan.  The Plan Administrator will use this loan to pay the costs of administration and to make distributions to creditors with Allowed Priority and Unsecured Claims against Colony I and Colony II

On account of its Secured Claims against Colony I and Colony II of approximately $7 million, KBR I will retain its existing note and existing security documents that encumber the real and personal property owned by Colony I and Colony II and KBR will receive all the equity in

DISCLOSURE STATEMENT

Reorganized Colony I and Reorganized Colony II.  Colony I and Colony II, as reorganized, will be discharged of all Claims except for the note owed to KBR I.

3.      **Release of Claims Against the Debtors and Against Lennar and KBR.**

The Plan provides for releases of claims asserted by a Debtor (or an entity controlled by a Debtor) against another Debtor (or an entity controlled by another Debtor); provided that Colony I and Colony II will not release claims they have against entities controlled by Briarwood or Marsch that are not themselves a Debtor.

The Plan also provides for the release of all claims against Lennar and/or KBR held by any Debtor (and their respective affiliates and Estates), KRMW and the Trustees (in their capacities as chapter 11 trustees); however, the Plan does not provide for a release by Colony I and Colony II of any claims they may have against any entity controlled by a Debtor or any other non-Debtor entities.

B.      **CLASSES**

The Plan divides Claims into the following classes:

| CLASS | STATUS | VOTING RIGHTS |
|---|---|---|
| Class A-1:  Priority Claims Against Marsch | Impaired | Entitled to Vote |
| Class A-2:  Secured Claims Against Marsch | Not Impaired | Not Entitled to Vote |
| Class A-3: General Unsecured Claims Against Marsch | Impaired | Entitled to Vote |
| Class A-4: Lennar and KBR Unsecured Claims Against Marsch | Impaired | Entitled to Vote |
| Class A-5:  Intercompany Claims Against Marsch | Impaired | Not Entitled to Vote |
| Class B-1:  Priority Claims Against Briarwood | Impaired | Entitled to Vote |
| Class B-2:  Secured Claims Against Briarwood | Not Impaired | Not Entitled to Vote |
| Class B-3:  General Unsecured Claims Against Briarwood | Impaired | Entitled to Vote |
| Class B-4: Lennar and KBR Unsecured Claims Against Briarwood | Impaired | Entitled to Vote |
| Class B-5:  Intercompany Claims Against Briarwood | Impaired | Not Entitled to Vote |
| Class B-6:  Interests in Briarwood and Interest-Related Claims Against Briarwood | Impaired | Not Entitled to Vote |

14

LA3:1169526

| CLASS | STATUS | VOTING RIGHTS |
|---|---|---|
| Class C-1: Priority Claims Against Colony I | Impaired | Entitled to Vote |
| Class C-2: Secured Claims Against Colony I | Impaired | Entitled to Vote |
| Class C-3: General Unsecured Claims Against Colony I | Impaired | Entitled to Vote |
| Class C-4: Intercompany Claims Against Colony I | Impaired | Not Entitled to Vote |
| Class C-5: Interests in Colony I and Interest-Related Claims Against Colony I | Impaired | Not Entitled to Vote |
| Class D-1: Priority Claims Against Colony II | Impaired | Entitled to Vote |
| Class D-2: Secured Claims Against Colony II | Impaired | Entitled to Vote |
| Class D-3: General Unsecured Claims Against Colony II | Impaired | Entitled to Vote |
| Class D-4: Intercompany Claims Against Colony II | Impaired | Not Entitled to Vote |
| Class D-5: Interests in Colony II and Interest-Related Claims Against Colony II | Impaired | Not Entitled to Vote |

1.      **Treatment of Administrative Expense Claims, and Priority Claims.**

Administrative Expense Claims are claims for costs or expenses incurred in administering the Estates as specified in Bankruptcy Code sections 503(b) and 507(a)(1), including, without limitation: (a) claims under Bankruptcy Code sections 330(a), 331 or 503 for compensation for professional services rendered and reimbursement of expenses in the Chapter 11 Cases ("Fee Claims"); (b) any post-petition taxes subject to administrative treatment; and (c) fees and charges assessed against the Debtors or the Estates pursuant to Section 1930 of title 28 of the United States Code. Allowed Administrative Expense Claims (other than the Lennar and KBR Loans) will primarily be for the costs incurred by the Chapter 11 Trustees in administering the Estates since their appointment. The Chapter 11 Trustees have provided the Plan Proponents estimates that their Administrative Expenses as of October 1, 2010, are: (i) $_____for the Colony I and Colony II Trustees, (ii) $_____ for the Marsch Trustee, and (iii) $____ for the Briarwood Trustee. Most of these Administrative Expenses are Fee Claims for counsel to the Trustees, which will be Allowed only if the Bankruptcy Court approves them pursuant to a fee application.

All Allowed Administrative Expense Claims will be paid in full.

DISCLOSURE STATEMENT

LA3:1169526

1    In addition, the Lennar Loan and KBR Loan will be entitled to superadministrative

2    priority.  However, these loans will be repaid only when and to the extent the Plan Administrator

3    receives sufficient assets to pay them and after paying other Allowed Administrative Expenses

4    and Priority Claims.

5    Priority Tax Claims and certain unsecured claims of governmental units are entitled to

6    priority distribution from the Estates under Bankruptcy Code section 507(a)(8).  The Debtors'

7    Schedules indicate that Priority Tax Claims equal:

8    • Marsch:        $13,581.55 owed to the San Diego County Tax Collector.

9    • Briarwood:    $14,159.68 owed to the California Franchise Tax Board.

10    • Colony I:       $800.00 owed to the California Franchise Tax Board.[6]

11    • Colony II:      $800.00 owed to the California Franchise Tax Board.[7]

12    As described below, all Allowed Priority Tax Claims will be paid in full.

13    As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense

14    Claims and Priority Tax Claims will not be classified and will not be entitled to vote on the Plan.

15    **2.    Allowance of Administrative Expense Claims**

16    A Fee Claim will be Allowed only if the holder files a Fee Application no later than forty

17    five (45) days after the Effective Date and only if and to the extent such Fee Claim is approved by

18    the Bankruptcy Court.

19    Any holder of an Administrative Expense Claim (other than a Fee Claim) must file an

20    Administrative Expense Request requesting payment of such Administrative Expense Claim with

21    the Bankruptcy Court and serve such request on counsel for the Plan Proponents and the Plan

22    Administrator by no later than 30 days after the Bankruptcy Court after the Effective Date, unless

23    otherwise ordered by the Bankruptcy Court.  Any holder of an Administrative Expense Claim

24    (other than a Fee Claim) that does not timely file and serve an Administrative Expense Request in

25    accordance with the Plan will have its Administrative Expense Claim disallowed automatically

26    without the need for any objection or response from the Plan Administrator.  Unless the Plan

27    _____

[6] The California Franchise Tax Board filed a proof of claim asserting that this amount is $834.10.
[7] The California Franchise Tax Board filed a proof of claim asserting that this amount is $1,634.98.

28

16                                                          DISCLOSURE STATEMENT

Administrator or a Plan Proponent objects to an Administrative Expense Request within ninety (90) days after the Effective Date (or such later date as may be extended from time to time upon request of the Plan Proponents and as approved by the Bankruptcy Court), the Administrative Expense Claim will be deemed allowed in the amount set forth in the Administrative Expense Request.

### 3.    Treatment of Allowed Administrative Expense Claims

Each holder of an Allowed Administrative Expense Claim will receive full payment as soon as is practicable after (a) the Effective Date, or as soon as practicable thereafter, and (b) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim and (c) the date such Allowed Administrative Expense Claim is due for payment under any applicable agreement between the holder of the Allowed Administrative Expense Claim and the relevant Debtor or Trustee.

### 4.    Treatment of Claims Under the Lennar Loan.

No payment on the Lennar Loan will be made until any Allowed Fee Claims or other Allowed Administrative Expense Claims and Allowed Priority Claims against the Marsch and Briarwood Estates have been paid in full.  The Lennar Loan will be paid in full before any distributions are made to Claims or Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5 or B-6 under the Plan.

### 5.    Treatment of Claims Under the KBR Loan.

No payment on the KBR Loan will be made until any Allowed Fee Claims or other Allowed Administrative Expense Claims and Allowed Priority Claims against the Colony I and Colony II Estates and all Allowed Class C-1, C-3, D-1 and D-3 Claims have been paid in full. The KBR Loan will be paid in full before any distributions are made to Claims or Interests in Classes C-2, C-4, C-5, D-2, D-4 and D-5 under the Plan.

### 6.    Treatment of Priority Tax Claims.

Each holder of an Allowed Priority Tax Claim will receive payment under one of the following three alternatives (at the election of the Plan Administrator in consultation with the

DISCLOSURE STATEMENT

LA3:1169526

Plan Proponents): (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on the Effective Date, or as soon as practicable thereafter, (ii) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim will have agreed upon in writing or (iii) equal Cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed six years after the assessment of the tax on which such Allowed Priority Tax Claim is based, totaling the aggregate amount of such Allowed Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date but in no event greater than seven percent (7.0%) per annum.

### C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

#### 1.    Priority Claims Against Marsch (Class A-1).

Class A-1 consists of Priority Claims against Marsch. Priority Claims are Claims entitled to priority under Bankruptcy Code section 507(a), other than Administrative Expense Claims or Priority Tax Claims. Marsch's Schedules indicate that there are no such Claims. If those Schedules are incorrect and any such Claims are Allowed, they will receive, payment of the Allowed amount of such Claim, in relative order of priority pursuant to Bankruptcy Code § 507, in full, in Cash, without interest, as soon as is practicable after the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Claim.

If there are any Allowed Class A-1 Claims, Class A-1 is impaired and holders of Priority Claims are entitled to vote to accept or reject the Plan.

#### 2.    Secured Claims Against Marsch (Class A-2).

Class A-2 consists of Secured Claims against Marsch. Secured Claims are Claims that are secured by valid unavoidable security interests in or liens on property of the Debtors, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of the Claimholder's interest in the Estates' interest in the property of the Debtors that secures payment of the Claim. Each holder of an Allowed Secured Claim against Marsch will receive at the option of the Plan Administrator (in consultation with the Plan

18

DISCLOSURE STATEMENT

Proponents) either (i) Cash in an amount equal to such Claim, in full and complete satisfaction of such Claim, on the later of the Effective Date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable or (ii) the collateral securing its Claim in full and complete satisfaction of such Claim on the later of the Effective Date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

Class A-2 is unimpaired and holders of Secured Claims against Marsch are not entitled to vote to accept or reject the Plan.

Marsch's Schedules list the following secured claims:

- 1st Pacific Bank. Marsch's Schedules indicate that 1st Pacific Bank is owed $6,739,037.98 secured by litigation claims against Lennar. In May 2010, the FDIC seized 1st Pacific and sold its assets to CNB. The purported collateral for this debt was litigation claims against Lennar that the trial courts have ruled are invalid. Moreover, over one year prior to the time that Marsch and Briarwood purported to grant 1st Pacific liens on these claims asserted against Lennar, Marsch and Briarwood had assigned these purported claims to KRMW Real Estate Investment Group, LLC ("KRMW"). On October 5, 2010, 1st Pacific filed a proof of claim in the amount of $7,020,810.12 as an unsecured claim. This proof of claim supersedes the Schedules, and CNB's Claim will be treated in Classes A-3 and B-3.

- Gordon & Holmes. Marsch's Schedules indicate that Gordon & Holmes is owed $396,254.32 and an unknown amount on a contingency fee arrangement related to the litigation that Briarwood asserted against Lennar and that these claims are secured by an attorney's lien on the claims against Lennar. However, the courts trying these cases have rejected these claims against Lennar and all claims against Lennar will be released in the Plan. Thus, Gordon & Holmes will not be owed any contingency fees and its purported lien on claims against Lennar has no value. To the extent Gordon & Holmes

DISCLOSURE STATEMENT

has an Allowed Claim for non-contingency fees, such Claims will be treated as unsecured claims under Classes A-3 and B-3.

- <u>KBR</u>.  Marsch's Schedules indicate that KBR has secured claims in an undetermined amount secured by Marsch's and Briarwood's litigation claims against Lennar and Marsch's equity interest in Colony I.  The litigation claims asserted against Lennar have been rejected by the courts trying these cases and are being released in the Plan.  In addition, the equity interest in Colony I held by Marsch will be extinguished in the Plan and new equity interests in Reorganized Colony I (and Reorganized Colony II) will be issued to KBR on account of its secured claims against Colony I and Colony II.  Thus, KBR's Claims are treated in the Plan under Classes A-4, B-4, C-2 and D-2.

- <u>Pacific Western Bank</u>.  Marsch's Schedules list $20,241,055.84 owed to Pacific Western secured by various parcels of real property owed by Marsch and entities Marsch controls in Southern California.  In early 2010, German American Capital Corporation ("German American") acquired this secured debt previously owed by Pacific Western.  The Bankruptcy Court granted German American leave to foreclose on this collateral and, as a result, German American's secured Claim will be satisfied by exercising remedies against this collateral.  The Bankruptcy Court's order only allows German American to foreclose non-judicially.  Therefore, as provided by California Code of Civ. Pro. § 580(d), German American will not have an unsecured claim..

In sum, there are not likely to be any creditors with Allowed Claims in Class A-2.

### 3.    General Unsecured Claims Against Marsch (Class A-3).

Class A-3 consists of General Unsecured Claims against Marsch.  General Unsecured Claims are any Claims against the Debtors that are not Administrative Expense Claims, Lennar Loan Claims, KBR Loan Claims, Priority Tax Claims, Priority Claims, Secured Claims, Lennar and KBR Unsecured Claims, Intercompany Claims, Interests or Interest Related Claims.  General Unsecured Claims also include, without limitation, any Claim of a holder of a Secured Claim

20

DISCLOSURE STATEMENT

1    secured by an interest in property of the Estate to the extent the amount of such Claim exceeds the

2    value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code,

3    in the interest in property of the Estate securing such Claim.

4        Each holder of an Allowed General Unsecured Claim against Marsch will receive, along

5    with holders of Lennar and KBR Unsecured Claims Against Marsch, a Pro Rata Share of

6    Distributable Cash attributable to the Marsch Estate; provided, however, that for purposes of

7    determining Pro Rata Shares, the Claims in Class A-3 will be in their Allowed Amounts (with

8    reserves for Disputed Claims) and the Lennar Unsecured Claim will be treated as though it were

9    only $20 million and the KBR II Unsecured claim will be treated as if it were only $5 million.

10    Holders of General Unsecured Claims against Marsch are impaired and are entitled to vote to

11    accept or reject the Plan; their votes will be solicited, and they will receive ballots.

12        In addition, the Plan provides that creditors with Allowed Claims in Class A-3 and

13    creditors with Claims in Class A-4 will realize a minimum of $450,000 on account of the MRP

14    Claims.  If the MRP Claims have not been settled, released or otherwise resolved by the Effective

15    Date, and if the Plan Administrator has not recovered within six (6) months of the Effective Date

16    on account of the MRP Claims at least $450,000 (net of fees and costs of the Plan Administrator

17    incurred in pursuing the MRP Claims), then Lennar will promptly pay to the Plan Administrator

18    an amount of Cash equal to this shortfall.  If the Plan Administrator subsequently recovers

19    anything on the MRP Claims, then such proceeds will be promptly paid to Lennar to the extent

20    Lennar made this shortfall payment, plus interest at 10% per annum.  Any additional recoveries

21    on the MRP Claims, after reimbursement of the shortfall paid by Lennar (plus interest at 10% per

22    annum) will be available for distribution to creditors with Allowed Claims in Class A-3 and

23    creditors with Claims in Class A-4.

24        The major Allowed Claim in Class A-3 is expected to be:

25                o   $7,020,810.12 owed to CNB.

26        According to Marsch's Schedules, other Claims that will be classified in Class A-3 total

27    approximately $3.3 million.  Many of these Claims are for attorneys and consultants that Marsch

28

DISCLOSURE STATEMENT

LA3:1169526

1    engaged in his litigation with Lennar.  Many of these claims overlap with Class B-3 Claims

2    against Briarwood.

3         Other than the guarantee that the Plan Administrator will realize at least $450,000 on

4    account of the MRP Claims, it is not possible to predict the recoveries the Plan Administrator will

5    realize in pursuing assets owned by the Marsch Estate and Marsch's transferees.  For illustrative

6    purposes, if the Plan Administrator recovered $4 million for the benefit of the Marsch Estate, net

7    of expenses and after repayment of the Lennar Loan, this $4 million of Distributable Cash would

8    be allocated among Class A-3 and A-4 Creditors whose claims are estimated at $35 million[8]—

9    i.e., each creditor with an Allowed Class A-3 Claim would realize an 11.5% recovery.

10        **4.    Lennar and KBR Unsecured Claims Against Marsch (Class A-4)**

11        Class A-4 consists of Lennar and KBR Unsecured Claims against Marsch.  Lennar and

12   KBR Unsecured Claims are comprised of the Lennar Unsecured Claim and the KBR II

13   Unsecured Claim.  Each holder of a Lennar and KBR II Unsecured Claims will receive, along

14   with holders Allowed General Unsecured Claims against Marsch, a Pro Rata Share of

15   Distributable Cash attributable to the Marsch Estate; provided, however, that for purposes of

16   determining Pro Rata Shares, the Claims in Class A-3 will be in their Allowed Amounts (with

17   reserves for Disputed Claims) and the Lennar Unsecured Claim will be treated as though it were

18   only $20 million and the KBR II Unsecured claim will be treated as if it were only $5 million.

19   Holders of Lennar and KBR II Unsecured Claims against Marsch are impaired and are entitled to

20   vote to accept or reject the Plan; their votes will be solicited, and they will receive ballots.

21        Lennar has agreed to treat its Class A-4 Claim for purposes of the Plan as though it were

22   only $20 million.  KBR II has agreed to treat its Class A-4 Claim for purposes of the Plan as

23   though it were only $5 million.  This is a substantial discount from the Claims Lennar and KBR II

24   have asserted against Marsch, which redounds to the benefit of all other creditors with Allowed

25   Claims in Class A-3.  This greatly reduced amount is for purposes of the Plan only.  It will not be

26   binding on Lennar or KBR for any other purpose.  This treatment of Lennar and KBR II's Claims

27

28   _____

[8] Comprised of (i) Lennar's Claim at $20 million, (ii) KBR II's Claim at $5 million, (iii) $7 million owed to CNB, and (iv) $3.3 million owed to other Class A-3 creditors.

DISCLOSURE STATEMENT

LA3:1169526

1 in Class A-4 is without waiver of or prejudice to Lennar or KBR II's right to seek additional

2 damages in litigation against Marsch regarding the non-dischargeability of his obligations or

3 against non-Debtors for any purpose. Thus, Lennar and KBR II will have the right to seek to

4 establish that certain of their Claims against Marsch are non-dischargeable and assert that these

5 non-dischargeable Claims are in substantially higher amounts than $20 million and $5 million,

6 respectively; and if the Plan is not confirmed and consummated, Lennar and KBR II will have the

7 right to prove that their Claims against the Marsch Estate are substantially in excess of $20

8 million and $5 million, respectively.

9     Under the Plan, Lennar will turn over to KBR II a portion of the recoveries Lennar

10 receives on its Class A-4 and B-4 Claims such that the distributions Lennar and KBR II on

11 account of their Class A-4 and B-4 Claims are equal in terms of dollar amount.

12     In addition, the Plan provides that creditors with Allowed Claims in Class A-3 and

13 creditors with Claims in Class A-4 will realize a minimum of $450,000 on account of the MRP

14 Claims. If the MRP Claims have not been settled, released or otherwise resolved by the Effective

15 Date, and if the Plan Administrator has not recovered within six (6) months of the Effective Date

16 on account of the MRP Claims at least $450,000 (net of fees and costs of the Plan Administrator

17 incurred in pursuing the MRP Claims), then Lennar will promptly pay to the Plan Administrator

18 an amount of Cash equal to this shortfall. If the Plan Administrator subsequently recovers

19 anything on the MRP Claims, then such proceeds will be promptly paid to Lennar to the extent

20 Lennar made this shortfall payment, plus interest at 10% per annum. Any additional recoveries

21 on the MRP Claims, after reimbursement of the shortfall paid by Lennar (plus interest at 10% per

22 annumm) will be available for distribution to creditors with Allowed Claims in Class A-3 and

23 creditors with Claims in Class A-4.

24

25          **5.      Intercompany Claims Against Marsch (Class A-5).**

26     Class A-5 consists of Intercompany Claims against Marsch. Intercompany Claims are any

27 Claim held by a Debtor or an Affiliate of a Debtor against another Debtor or an Affiliate of a

28 Debtor affiliate, including, without limitation: (a) any account reflecting intercompany book

1    entries by a Debtor or an Affiliate of a Debtor with respect to another Debtor or an Affiliate of a

2    Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor or an Affiliate of

3    a Debtor against another Debtor or an Affiliate of a Debtor, and (c) any derivative Claim asserted

4    by or on behalf of one Debtor or an Affiliate of a Debtor affiliate against another Debtor or an

5    Affiliate of a Debtor.

6    Each holder of an Intercompany Claim against Marsch will not receive any property or

7    interest under the Plan on account of such Intercompany Claim.  Accordingly, holders of

8    Intercompany Claims against Marsch are deemed to have rejected the Plan and are not entitled to

9    vote to accept or reject the Plan; their votes will not be solicited, and they will not receive ballots.

10    There is one exception to this rule—Claims that Colony I and Colony II have against

11    Persons that are not Debtors but are Affiliates of a Debtor are not defined as Intercompany

12    Claims and will not be released.

13    **6.    Priority Claims Against Briarwood (Class B-1).**

14    Class B-1 consists of Priority Claims against Briarwood.  Briarwood's Schedules indicate

15    that there are no such Claims.  If Briarwood's Schedules are wrong and there are any such

16    Claims, each holder of an Allowed Priority Claim against Briarwood will receive, payment of the

17    Allowed amount of such Claim, in relative order of priority pursuant to Bankruptcy Code § 507,

18    in full, in Cash, without interest, as soon as is practicable after the later of (i) the Effective Date or

19    (ii) the date on which such Claim becomes an Allowed Claim.

20    If there are any Class B-1 Claims, Class B-1 is impaired and holders of Priority Claims

21    against Briarwood will be entitled to vote to accept or reject the Plan.

22    **7.    Secured Claims Against Briarwood (Class B-2).**

23    Class B-2 consists of Secured Claims against Briarwood.  Each holder of an Allowed

24    Secured Claim against Briarwood will receive one of the following treatments at the option of the

25    Plan Administrator (in consultation with the Plan Proponents), either (i) Cash in an amount equal

26    to such Claim, in full and complete satisfaction of such Claim, on the later of the Effective Date

27    and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable or (ii)

28    the collateral securing its Claim in full and complete satisfaction of such Claim as soon as is

1    practicable after the later of the Effective Date and the date such Claim becomes an Allowed

2    Claim.

3    Class B-2 is unimpaired and holders of Secured Claims against Briarwood are not entitled

4    to vote to accept or reject the Plan.

5    Briarwood's Schedules list the following secured claims:

6    • 1st Pacific Bank. Briarwood's Schedules indicate that 1st Pacific Bank is

7    owed $6,739,037.98 secured by litigation claims against Lennar. In May 2010,

8    the FDIC seized 1st Pacific and sold its assets to CNB. The purported

9    collateral for this debt was litigation claims against Lennar that the trial courts

10   have ruled are invalid. Moreover, over one year prior to the time that Marsch

11   and Briarwood purported to grant 1st Pacific liens on these claims, Marsch and

12   Briarwood had assigned these purported claims against Lennar to KRMW. On

13   October 5, 2010, 1st Pacific filed a proof of claim in the amount of

14   $7,020,810.12 as an unsecured claim. This proof of claim supersedes the

15   Schedules and CNB's Claim will be treated in Classes A-3 and B-3.

16   • Gordon & Holmes. Briarwood's Schedules assert that Gordon & Holmes is

17   owed $396,254.32 and an unknown amount on a contingency fee arrangement

18   related to the litigation that Briarwood asserted against Lennar and that these

19   claims are secured by an attorney's lien on the claims against Lennar.

20   However, the courts trying these cases have rejected these claims against

21   Lennar and all claims against Lennar will be released in the Plan. Thus,

22   Gordon & Holmes will not be owed any contingency fees and its purported

23   lien on claims against Lennar has no value. To the extent Gordon & Holmes

24   has an Allowed Claim for non-contingency fees, such Claims will be treated as

25   unsecured claims under Classes A-3 and B-3.

26   In sum, there are not likely to be any creditors with Allowed Claims in Class B-2.

27

28

LA3:1169526

**8.    General Unsecured Claims Against Briarwood (Class B-3).**

Class B-3 consists of General Unsecured Claims against Briarwood.  General Unsecured Claims are any Claims against the Debtors that are not Administrative Expense Claims, Lennar Loan Claims, KBR Loan Claims, Priority Tax Claims, Priority Claims, Secured Claims, Lennar and KBR Unsecured Claims, Intercompany Claims, Interests or Interest Related Claims.  General Unsecured Claims also include, without limitation, any claim of a holder of an Secured Claim secured by an interest in property of the Estate to the extent the amount of such claim exceeds the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, in the interest in property of the Estate securing such Claim

Each holder of an Allowed General Unsecured Claim against Briarwood will receive, along with holders of Lennar and KBR Unsecured Claims Against Briarwood, a Pro Rata Share of Distributable Cash attributable to the Briarwood Estate; provided, however, that for purposes of determining Pro Rata Shares, the Claims in Class B-3 will be in their Allowed Amounts (with reserves for Disputed Claims) and the Lennar Unsecured Claim will be treated as though it were only $20 million and the KBR II Unsecured claim will be treated as if it were only $5 million. Holders of General Unsecured Claims against Briarwood are impaired and are entitled to vote to accept or reject the Plan; their votes will be solicited, and they will receive ballots.

The major Allowed Claim in Class B-3 is likely to be:

  o   $7,020,810.12 owed to CNB.

According to Briarwood's Schedules, other Claims that will be classified in Class B-3 total approximately $4.2 million.  Many of these Claims are for attorneys and consultants that Marsch engaged in his litigation with Lennar.  Many of these claims overlap with Class A-3 Claims against Briarwood.

It is not possible to predict the recoveries the Plan Administrator will realize in pursuing Briarwood's assets and Briarwood's transferees.  For illustrative purposes, if the Plan Administrator recovered $4 million for the benefit of the Briarwood Estate and after repayment of the Lennar Loan, this $4 million would be allocated among Class B-3 and B-4 Creditors whose

DISCLOSURE STATEMENT

LA3:1169526

1  claims are estimated at $36 million million[9] – i.e., each creditor with an Allowed Class B-3 Claim

2  would realize an 11% recovery.

3  **9.    Lennar and KBR Unsecured Claims Against Briarwood (Class B-4).**

4  Class B-4 consists of Lennar and KBR Unsecured Claims against Briarwood.  Lennar and

5  KBR Unsecured Claims are comprised of the Lennar Unsecured Claim and the KBR II

6  Unsecured Claim.

7  Each holder of a Lennar and KBR Unsecured Claim against Briarwood will receive,

8  along with holders Allowed General Unsecured Claim against Briarwood, a Pro Rata Share of

9  Distributable Cash attributable to the Briarwood Estate; provided, however, that for purposes of

10  determining Pro Rata Shares, the Claims in Class B-3 will be in their Allowed Amounts (with

11  reserves for Disputed Claims) and the Lennar Unsecured Claim will be treated as though it were

12  only $20 million and the KBR II Unsecured claim will be treated as if it were only $5 million.

13  Holders of Lennar and KBR Unsecured Claims against Briarwood are impaired and are entitled to

14  vote to accept or reject the Plan; their votes will be solicited, and they will receive ballots.

15  Lennar has agreed to treat its Class B-4 Claim for purposes of the Plan as though it were

16  only $20 million.  KBR II has agreed to treat its Class B-4 Claim for purposes of the Plan as

17  though it were only $5 million.  This is a substantial discount from the Claims Lennar and KBR II

18  have asserted against Briarwood, which redounds to the benefit of all creditors with Allowed

19  Claims in Class B-3.  This greatly reduced amount is for purposes of the Plan only.  It will not be

20  binding on Lennar or KBR II for any other purpose.  This treatment of Lennar and KBR II's

21  Claims in Class B-4 is without waiver of or prejudice to Lennar or KBR II's right to seek

22  additional damages in litigation against Marsch regarding the non-dischargeability of his

23  obligations or against non-Debtors for any purpose.  Thus, Lennar and KBR II will have the right

24  to seek to establish that certain of their Claims against Marsch are non-dischargeable and assert

25  that these non-dischargeable Claims are in substantially higher amounts than $20 million and $5

26  million, respectively; and if the Plan is not confirmed and consummated, Lennar and KBR II will

27

28  [9] Comprised of (i) Lennar's Claim at $20 million, (ii) KBR II's Claim at $5 million, (iii) $7 million owed to CNB, and (iv) $4.2 million owed to other Class B-3 creditors.

LA3:1169526                                                                                    DISCLOSURE STATEMENT

1   have the right to prove that its Claims against the Estates are substantially in excess of $20

2   million and $5 million, respectively.

3          Under the Plan, Lennar will turn over to KBR II a portion of the recoveries Lennar

4   receives on its Class A-4 and B-4 Claims such that the distributions Lennar and KBR II on

5   account of their Class A-4 and B-4 Claims are equal in terms of dollar amount.

6          **10.    Intercompany Claims Against Briarwood (Class B-5).**

7          Class B-5 consists of Intercompany Claims against Briarwood.  Each holder of an

8   Intercompany Claim against Briarwood will not receive or retain any property or interest under

9   the Plan on account of such Intercompany Claim.  Accordingly, holders of Intercompany Claims

10  against Briarwood are deemed to have rejected the Plan and are not entitled to vote to accept or

11  reject the Plan; their votes will not be solicited, and they will not receive ballots.

12         There is one exception to this rule—Claims that Colony I and Colony II have against

13  entities that are not Debtors but are affiliated with a Debtor are not defined as Intercompany

14  Claims and will not be released.

15         **11.    Interests in and Interest-Related Claims Against Briarwood (Class**

16                 **B-6).**

17         Class B-6 consists of Interests in and Interest-Related Claims against Briarwood.  Interests

18  are limited liability company or similar equity interest in a debtor and any legal, equitable,

19  contractual and other rights of any person with respect to any such interest in a debtor.  Interest-

20  Related Claims are Claims against the Debtors arising from the purchase or sale of an Interest in

21  the Debtors, or any Claim against the Debtors by an entity that asserts equitable or contractual

22  rights of reimbursement, contribution or indemnification arising from such Claim.

23         Holders of any Interest in or Interest-Related Claim against Briarwood will not receive or

24  retain anything on account of such Interest or Claim, and the Interests in Briarwood will be

25  cancelled pursuant to the Plan as of the Effective Date.  Accordingly, holders of Interests in and

26  Interest-Related Claims against Briarwood are deemed to have rejected the Plan and are not

27  entitled to vote to accept or reject the Plan; their votes will not be solicited, and they will not

28  receive ballots.

LA3:1169526

1    The Marsch Estate owns 100% of the Interests in Briarwood, but subject to a lien in favor

2    of KBR II to secure a claim of approximately $5 million (including fees and interest) owed by

3    Marsch to KBR II.  There are not likely to be any Interest-Related Claims against Briarwood.

4              **12.    Priority Claims Against Colony I (Class C-1).**

5    Class C-1 consists of Priority Claims against Colony I.  Colony I's Schedules indicate that

6    there are no Priority Claims against Colony I and no proofs of claim asserting such a Claim were

7    filed by the September 15, 2010 claims bar date set for Colony I.

8              Nonetheless, purely for purposes of completeness, the Plan provides that if there are any

9    such Claims, each holder of an Allowed Priority Claim against Colony I will receive, payment of

10    the full Allowed amount of such Claim, in relative order of priority pursuant to Bankruptcy Code

11    § 507, in full, in Cash, without interest, on the later of (i) the Effective Date or (ii) the date on

12    which such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

13              If there are any Class C-1 Claims, Class C-1 is impaired and holders of Priority Claims

14    against Colony I are entitled to vote to accept or reject the Plan.

15              **13.    Secured Claims Against Colony I (Class C-2).**

16              Class C-2 consists of Secured Claims against Colony I.  Colony I's Schedules indicate

17    that the only Secured Claim against Colony I is the secured loan made by KBR I, which is

18    secured by the property near Cabo San Lucas, Mexico owned by Colony I.  KBR I's secured

19    Class C-2 Claim is Allowed in the Plan at approximately $7 million.  In addition, KBR II has a

20    secured claim against Colony I's equity interests in Colony II to secure approximately $5 million

21    (growing at 20% per annum) owed to KBR II.

22              On account of their Secured Claims against Colony I and Colony II, KBR I will retain its

23    existing note and existing security documents that encumber the real and personal property owned

24    by Colony I and KBR I and KBR II will receive Interests in Reorganized Colony I and

25    Reorganized Colony II which, together with the Interests in Reorganized Colony II that KBR II

26    receives on account of its Secured Claim against Colony II, constitute 100% of the Interests in

27    Reorganized Colony I and Reorganized Colony II.  KBR I and KBR II will hold these Interests in

28

29

1    Reorganized Colony I and Reorganized Colony II as tenants in common and in such proportions
2    as they agree between themselves.

3        The Bankruptcy Court set September 15, 2010 as the date for filing proofs of claim
4    against Colony I.  Through that date, only one creditor besides KBR filed a secured claim against
5    Colony I.   The San Diego Tax Collector filed a proof of claim asserting a secured claim of
6    $84,628.82.  The attachments to this proof of claim indicate that the taxes are actually owed by
7    Colony Properties, LLC ("Colony Properties").  Colony Properties is a different entity than
8    Colony I.  Colony Properties is not a Debtor and is owned by NHG, Inc. ("NHG") (which in turn
9    is owned by the Marsch Estate).  The real property in question is subject to liens in favor of
10   German American.  As indicated above, German American has been granted relief from the
11   automatic stay to foreclose on this property and presumably in connection with doing so will
12   bring the property taxes current.  KBR intends to object to the Secured Claims filed by the San
13   Diego Tax Collector based on the facts set forth above.

14       If the San Diego Tax Collector, or any Person other than KBR I and KBR II, is,
15   nonetheless, determined to have an Allowed Secured Claim against Colony I in Class C-2, the
16   Plan provides that if there are any Allowed Class C-2 Claims other than the Allowed KBR
17   Claims, each holder of such an Allowed Class C-2 Claim will receive on the Effective Date, or as
18   soon as practicable thereafter, at the option of KBR, either (i) Cash in an amount of such Claim,
19   or (ii) the collateral securing such Claim.

20       Class C-2 is impaired and holders of Secured Claims against Colony I are entitled to vote
21   to accept or reject the Plan

22       **14.    General Unsecured Claims Against Colony I (Class C-3).**

23       Class C-3 consists of General Unsecured Claims against Colony I.  Each holder of an
24   Allowed General Unsecured Claim against Colony I will receive payment of the full Allowed
25   amount of such Claims, without interest, as soon as is practicable after the later of (i) the
26   Effective Date or (ii) the date on which such Claim becomes an Allowed Claim.  General
27   Unsecured Claims against Colony I are impaired and holders of these Claims are entitled to vote
28   to accept or reject the Plan.

DISCLOSURE STATEMENT

LA3:1169526

The Schedules filed by Colony I list unsecured claims (other than Intercompany Claims) totaling $27,671.48.

The Plan Proponents reserve the right to include these Claims scheduled against Colony I on a list of Disputed Claims to be filed prior to the Confirmation Hearing.

In addition to these scheduled claims, the California Franchise Tax Board filed a proof of claim against Colony I asserting a general unsecured claim of $1,148.51.  This is the only proof of claim in this Class filed prior to the claims bar date.

The Plan provides that any of these Claims that are Allowed will be paid in full in Cash (without interest).

**15.    Intercompany Claims Against Colony I (Class C-4)**

Class C-4 consists of Intercompany Claims against Colony I.  Each holder of an Intercompany Claim against Colony I will not be entitled to, and will not receive or retain, any property or interest under the Plan account of such Claim.  Accordingly, holders of Intercompany Claims against Colony I are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan; their votes will not be solicited, and they will not receive ballots.

**16.    Interests in and Interest-Related Claims Against Colony I (Class C-5).**

Class C-5 consists of Interests and Interest-Related Claims against Colony I.  Each holder of an Interest in or Interest-Related Claim against Colony I will not receive anything on account of such Interest or Claim, and the Interests in Colony I will be cancelled pursuant to the Plan as of the Effective Date.  Accordingly, holders of Interests and Interest-Related Claims against Colony I are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan; their votes will not be solicited, and they will not receive ballots.

The Marsch Estate holds all the Interests in Colony I, subject to a lien in favor of KBRI and KBR II to secure approximately $12.7 million.

**17.    Priority Claims Against Colony II (Class D-1).**

Class D-1 consists of Priority Claims Against Colony II.  Colony II's Schedules indicate that there are no such Claims and no proof of claim asserting a Class D-1 Claim was filed prior to the claims bar date. Nonetheless, for the sake of completeness, the Plan provides that any holder

LA3:1169526                                                                    DISCLOSURE STATEMENT

1   of an Allowed Priority Claim against Colony II will receive, payment of the full Allowed amount

2   of such Claim, in relative order of priority pursuant to Bankruptcy Code § 507, in full, in Cash,

3   without interest, on the later of (i) the Effective Date or (ii) the date on which such Claim

4   becomes an Allowed Claim, or as soon thereafter as is practicable

5        If there are any Class D-1 Claims, Class D-1 is impaired and holders of these Claims are

6   entitled to vote to accept or reject the Plan.

7        **18.    Secured Claims Against Colony II (Class D-2).**

8        Class D-2 consists of Secured Claims against Colony II.  Colony II's Schedules indicate

9   that its only secured debt is owed to KBR I.  No other creditor filed a proof of claim asserting a

10  secured claim against Colony II by the September 15, 2010 Claims bar date.

11       The Plan provides that KBR I will have an Allowed Class D-2 Claim in the amount of

12  [approximately $7 million].  On account of its Secured Claims against Colony I and Colony II,

13  KBR I will retain its existing note and existing security documents that encumber the real and

14  personal property owned by Colony II and KBR I will receive 100% of the Interests in

15  Reorganized Colony II.  KBR I and KBR II will hold the Interests in Reorganized Colony I and

16  Reorganized Colony II as tenants in common and in such proportions as they agree between

17  themselves.

18       If there are any Allowed Class D-2 Claims other than the Allowed KBR Claims, each

19  holder of such an Allowed Class D-2 Claim will receive on the Effective Date, or as soon as

20  practicable thereafter, at the option of KBR, either (i) Cash in an amount of such Claim to be paid

21  on the Initial Distribution Date, or collateral securing such Claim.

22       Class D-2 is impaired and holders of Secured Claims against Colony II are entitled to vote

23  to accept or reject the Plan.

24       **19.    General Unsecured Claims Against Colony II (Class D-3).**

25       Class D-3 consists of General Unsecured Claims against Colony II.  Each holder of an

26  Allowed General Unsecured Claim against Colony II will receive the full Allowed amount of

27  such Claims, without interest, as soon as is practicable after the later of (i) the Effective Date or

28  (ii) the date on which such Claim becomes an Allowed Claim, or as soon thereafter as is

32

1   practicable.  Accordingly, General Unsecured Claims against Colony II are impaired and holders

2   or such Claims are entitled to vote to accept or reject the Plan.

3        Colony II's Schedules indicate that total unsecured Claims equal $25,651.52.  The Plan

4   Proponents reserve the right to include these Claims scheduled against Colony II on a list of

5   Disputed Claims to be filed prior to the Confirmation Hearing.

6        Only one creditor filed a proof of claim against Colony II prior to the September 15, 2010

7   claims bar date—the California Franchise Tax Board filed a proof of claim for $136.00.

8        To the extent that Class D-3 Claims are Allowed, they will be paid in full in Cash (without

9   interest).

10       **20.    Intercompany Claims Against Colony II (Class D-4)**

11       Class D-4 consists of Intercompany Claims against Colony II.  Each holder of an

12  Intercompany Claim against Colony II will not be entitled to, and will not receive or retain, any

13  property or interest under the Plan account of such Claim.  Accordingly, holders of Intercompany

14  Claims against Colony II are deemed to have rejected the Plan and are not entitled to vote to

15  accept or reject the Plan; their votes will not be solicited, and they will not receive ballots.

16       **21.    Interests and Interest-Related Claims Against Colony II (Class D-5).**

17       Class D-5 consists of Interests in and Interest-Related Claims against Colony II.  Each

18  holder of an Interest in or Interest-Related Claim against Colony II will not receive anything on

19  account of such Interest or Claim, and the Interests in Colony II will be cancelled pursuant to the

20  Plan as of the Effective Date.  Accordingly, holders of Interests in and Interest-Related Claims

21  against Colony II are deemed to have rejected the Plan and are not entitled to vote to accept or

22  reject the Plan; their votes will not be solicited, and they will not receive ballots.

23       Colony I holds all of the Interests in Colony II, subject to liens in favor of KBR I and

24  KBR II to secure approximately $12.7 million.  There are not likely to be any Interest-Related

25  Claims in Class D-5.

26

27

28

LA3:1169526

DISCLOSURE STATEMENT

### D.    IMPLEMENTATION OF THE PLAN

#### 1.    Reorganization of Colony I and II.

Colony I and Colony II will be reorganized in accordance with the Plan.  On the Effective Date, all right, title and interest in and to the Assets of Colony I and Colony II (other than any Released Claims) will vest fully in Reorganized Colony I and Reorganized Colony II, free and clear of all liens, claims, encumbrances, interests and other liabilities, Claims against or Interests in Colony I and Colony II other than the liens held by KBR I.  On the Effective Date, the existing equity Interests in Colony I and Colony II will be cancelled and KBR I and KBR II will be issued all the equity Interests in Reorganized Colony I and Reorganized Colony II.

#### 2.    The Marsch and Briarwood Estates.

The Plan Administrator will be responsible for carrying out the Plan with respect to the Marsch and Briarwood Estates.  Confirmation will not revest property of the Marsch or Briarwood Estates in the Marsch or Briarwood Debtors.  Subject to the provisions of the Plan and the Confirmation Order, the Marsch and Briarwood Estates will remain in existence after the Effective Date until the entry of a final decree closing the Marsch Chapter 11 Case and the Briarwood Chapter 11 Case, and all property of the Marsch and Briarwood Estates will remain in such Estates.  The Plan Administrator will thereafter have responsibility for the management, control and operation of thereof, and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except as otherwise provided by the Plan.  Among other things, the Plan Administrator will investigate and bring actions, as appropriate, to collect on assets held by the Marsch and Briarwood Estates or transferred by these Debtors in transactions that can be avoided.  After paying Allowed Administrative Costs, Allowed Priority Claims and the Lennar Loan, the Plan Administrator will make distributions to unsecured creditors with Allowed Claims against Marsch and Briarwood from any such assets realized by the Plan Administrator.

The Plan Proponents will select the Plan Administrator and will provide notice of their selection in the Plan Supplement to be filed prior to the Confirmation Hearing.

DISCLOSURE STATEMENT

LA3:1169526

### 3.    Cancellation of Interests; Issuance of New Interests

The Plan provides that on the Effective Date, the Interests in Briarwood, Colony I and Colony II will be cancelled and new membership interests in Reorganized Colony I and Reorganized Colony II will be issued to KBR I and KBR II, as tenants in common, free and clear of all liens, claims and interests.

### 4.    Assignment of Interest in HCC

The Plan provides that on the Effective Date, any interest in (or claim to an interest in) HCC and Lennar Bridges, LLC (or their subsidiaries) by Briarwood, Marsch or KRMW will be assigned to Lennar free and clear of all liens, claims and interests, and neither KRMW, Marsch nor Briarwood (nor their respective Estates) will have any right to participate as a member of the HCC Executive Committee or other governing body for HCC.

### 5.    Discharge of Trustees

The Plan provides the Effective Date, the Trustees shall be discharged from their roles as chapter 11 trustees in the Chapter 11 Cases and will have no further powers, responsibilities or functions in the Chapter 11 Cases.

### 6.    Preservation of All Rights of Action.

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, all claims, causes or Causes of Action that the Debtors or the Estates may have against any Person will be preserved, including without limitation any and all Causes of Action the Debtors, the Estates or other appropriate party in interest may assert under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, and all such claims, causes or Causes of Action may be brought by the Plan Administrator or the Reorganized Colony Debtors in the name of the relevant Debtor or Estate.  Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, the Plan Administrator (in consultation with the Plan Administrators) will determine whether to bring, settle, release, compromise or enforce such claims, causes or Causes of Action on behalf of Marsch, Briarwood and their Estates.  The Plan Administrator will be free to investigate all such assets and transfers

1   and, other than claims released in the Plan, will be free to pursue them.  While the Plan

2   Proponents do not have the ability to predict what claims and transfers the Plan Administrator

3   will pursue, it is likely that the Plan Administrator will pursue claims against Mr. Minkow,

4   www.degreefraud.com, Mr. Sachs, Mountain Resorts Properties, LLC, Mr. Marshall, Patricia

5   Marsch and other transferees of Marsch and Briarwood.

6        **E.**        **CLAIMS AND DISTRIBUTIONS**

7               **1.**       **Time and Manner of Distributions.**

8                    (a)     Distributions With Respect to Administrative Claims.

9         Payment of Allowed Administrative Claims and Priority Claims will be made on or as

10  promptly as practicable after the Effective Date provided that, distributions with respect to or as a

11  result of Administrative  Claims and Priority Claims that become Allowed after the Effective

12  Date will be made as soon as practicable after such Claim becomes an Allowed Claim.

13                   (b)     Distributions with Respect to General Unsecured Claims.

14        Payments of General Unsecured Claims against Colony I and Colony II will be paid by

15  the Reorganized Colony Debtors as soon as practicable on the latter of (i) the Effective Date of

16  the Plan, or (ii) the Claim becoming Allowed.

17        Payments to General Unsecured Claims against Marsch and Briarwood will be paid from

18  collections received by the Plan Administrator.  Receiving such recoveries will probably require

19  the Plan Administrator to engage in investigations, negotiations and litigation, so that the timing

20  of such distributions (or whether any will prove possible) is presently uncertain.  The Plan

21  provides that the Plan Administrator will make such distributions periodically as Cash is available

22  and no more frequently than quarterly.  It is likely that the first such distribution to creditors with

23  Allowed General Unsecured Claims against Marsch will occur no later than approximately six (6)

24  months after the Effective Date, given the provisions of the Plan that guarantee that the Plan

25  Administrator will receive at least $450,000 (net of fees and costs) on account of the MRP

26  Claims.

27              **2.**       **Resolution of Claims Disputes.**

28                   (a)     Reservation of Rights to Object to Claims.

DISCLOSURE STATEMENT

LA3:1169526

1    Unless a Claim is specifically Allowed pursuant to or under the Plan, or otherwise

2    Allowed prior to or after the Effective Date, the Plan Administrator and each of the Plan

3    Proponents will have the right to object to any and all Claims.  From and after the Effective Date,

4    the Plan Administrator and the Plan Proponents will have the sole authority to dispute, object to,

5    compromise or otherwise resolve Claims.

6    The Plan Proponents had no role in the Debtors' preparation of their Schedules and may

7    not agree that some of the Claims listed in those Schedules should, in fact, be Allowed.  The Plan

8    provides that the Plan Proponent will file with the Plan Supplement a list of any scheduled Claims

9    that the Plan Proponents believe should not be Allowed.  All Claims on that list will be deemed

10    Disputed and will only be Allowed if so ordered by the Bankruptcy Court. If a Claim that was

11    previously scheduled as Allowed is listed by the Plan Proponents as Disputed, the creditor will

12    have 60 days after notice to file a responsive pleading; if the claimant fails to do so, the Claim

13    will be disallowed.

14    Unless otherwise extended by the Bankruptcy Court or set forth in the Plan, any

15    objections to Claims will be filed within six (6) months after the Effective Date (unless such day

16    is not a Business Day, in which case such deadline will be the next Business Day thereafter).

17    (b)    No Distributions Pending Allowance.

18    No payments or distributions will be made with respect to all or any portion of a Disputed

19    Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or

20    have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

21    (c)    Claim Estimation.

22    The Plan Proponents or the Plan Administrator may request estimation or limitation of any

23    Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy

24    Code; provided, however, that the Bankruptcy Court will determine (i) whether such Disputed

25    Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the

26    timing and procedures for such estimation proceedings, if any.

27

28

37

DISCLOSURE STATEMENT

1

### 3. Bar Dates.

2      Lennar has filed a motion to establish the deadline for filing proofs of claim in the

3  Briarwood and Marsch Chapter 11 Cases; the deadline for filing proofs of claim in the Briarwood

4  and Marsch Chapter 11 Cases will be set forth in an order of the Bankruptcy Court.  The deadline

5  for filing proofs of claim in the Colony I and Colony II Chapter 11 Cases was September 15,

6  2010.

7

8      ### F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9      Under section 365 of the Bankruptcy Code, a debtor may assume or reject executory

10 contracts and unexpired leases.  The Plan provides that, except as otherwise provided in the Plan,

11 each executory contract and unexpired lease as to which any of the Debtors is a party, including,

12 without limitation, any guaranties by any of the Debtors with respect to real estate leases of

13 subsidiaries of and businesses of any of such Debtors, will be deemed automatically rejected in

14 accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy

15 Code on the Effective Date, unless such executory contract or unexpired lease (i) will have been

16 previously assumed by the Debtors or the Estates by order of the Bankruptcy Court, (ii) is the

17 subject of a motion to assume pending on or before the Effective Date or (iii) is otherwise

18 assumed pursuant to the terms of the Plan.  Entry of the Confirmation Order by the Bankruptcy

19 Court will constitute approval of the rejections contemplated by the Plan pursuant to sections 365

20 and 1123 of the Bankruptcy Code as of the Effective Date.

21     The Plan provides that on the Effective Date, (i) Colony I shall assume the lease

22 agreement between Colony I and KBR I for the lease of the real property located in San Jose Del

23 Cabo, Mexico commonly known as Unit 496 Villas Del Mar ("Unit 496") and (ii) Colony II shall

24 assume the lease agreement between Colony II and KBR I for the lease of the real property

25 located in San Jose Del Cabo, Mexico commonly known as Unit 21 Villas Del Mar ("Unit 21").

26 The Plan also makes clear that on the Effective Date, any unexpired lease of real property,

27 including, without limitation, any leases of Unit 496 and Unit 21, between First Place Equity,

28

DISCLOSURE STATEMENT

1    LLC and Colony I or Colony II will be deemed automatically rejected in accordance with the

2    terms of the Plan.

3        Claims created by the rejection of any executory contract or unexpired lease (including

4    claims under section 365(d)(3) of the Bankruptcy Code) must be served on the Plan

5    Administrators and the Plan Proponents and filed with the Bankruptcy Court by the earlier of

6    thirty (30) days after the Confirmation Date or such earlier date previously set by order of the

7    Bankruptcy Court.  Any Claims not filed within such time will be forever barred from assertion

8    against the Debtors and the Estates.  Unless otherwise ordered by the Bankruptcy Court, all such

9    Claims arising from the rejection of executory contracts will be treated as General Unsecured

10   Claims under the Plan.

11       To the extent that any of the Debtors' insurance policies are considered to be executory

12   contracts, then notwithstanding anything contained in the Plan to the contrary, the Plan will

13   constitute a motion to assume such insurance policies. Subject to the occurrence of the Effective

14   Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to

15   section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such

16   assumption is in the best interest of the Estates and all parties in interest in the Chapter 11 Cases.

17   Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by

18   the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the

19   Debtors existing as of the Confirmation Date with respect to each such insurance policy.  To the

20   extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the

21   Plan Administrator reserves the right to seek rejection of such insurance policy or other available

22   relief.

23       **G.    RELEASES AND EXCULPATION**

24           **1.    Releases of Claims Against Lennar and KBR**

25       The Plan provides that on the Effective Date each of the Debtors, the Estates, the Trustees

26   (in their capacities as such), as well as KRMW and the KBR Parties, on behalf of themselves and,

27   as applicable, each of their former and current direct and indirect owners, parents, subsidiaries,

28   successors, predecessors and affiliates, and each of their respective officers, directors,

                                            39

shareholders, partners, representatives, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns, will fully, finally, and forever release and discharge the Lennar Parties and each of their former and current direct and indirect owners, parents, subsidiaries, successors and predecessors and affiliates, and each of their respective former and current officers, employees, directors, shareholders, partners, representatives, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns from any and all liabilities, claims, demands, obligations, causes of action, indemnifications, penalties, costs, expenses, attorneys' fees, damages, or demands of any kind or nature, whether known or unknown, suspected or unsuspected, which may have existed, do exist, or thereafter may exist, based on any reason of acts, matters, events or omissions occurring or existing on or prior to the Effective Date, including, but not limited to, claims that were asserted or could have been asserted in the Bridges Action, the McCrink Action, the HCC Action, the DLA Piper Cases and/or the KBR Cases.  The Plan further provides for a waiver of Section 1542 of the California Civil Code, which provides as follows (and is further explained in the Plan):

"**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR**."

The Plan also provides that on the Effective Date each of the Debtors, the Estates, the Trustees (in their capacities as such) and the Lennar Parties, on behalf of themselves and, as applicable, each of their former and current direct and indirect owners, parents, subsidiaries, successors, predecessors and affiliates, and each of their respective officers, directors, shareholders, partners, representatives, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns, will fully, finally, and forever release and discharge the KRMW and the KBR Parties and each of their former and current direct and indirect owners, parents, subsidiaries, successors and predecessors and affiliates, and each of their

LA3:1169526

respective former and current officers, employees, directors, shareholders, partners, representatives, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns from any and all liabilities, claims, demands, obligations, causes of action, indemnifications, penalties, costs, expenses, attorneys' fees, damages, or demands of any kind or nature, whether known or unknown, suspected or unsuspected, which may have existed, do exist, or thereafter may exist, based on any reason of acts, matters, events or omissions occurring or existing on or Prior to the Effective Date.  The Plan further provides for a waiver of Section 1542 of the California Civil Code, which provides as follows (and is further explained in the Plan):

"**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR**."

### 2.    Release of Inter-Company Claims

The Plan also provides for the release of Claims among the Debtors and entities they control, subject to one exception—Colony I and Colony II will retain any Claims they have against entities affiliated with the other Debtors (but will release Claims against the other Debtors) or any other non-Debtor entities.

### 3.    Exculpation and Limitation of Liability.

The Plan provides that the Plan Proponents in their capacity as such, and any such parties' respective present or former members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers or agents and any of such parties' successors and assigns, will not have or incur, and are thereby released from, any claim, obligation, Causes of Action, or liability to one another or to any Claimholder or Interestholder, or any of their respective agents, employees, representatives, financial advisors, attorneys or

41

LA3:1169526

1    affiliates, or any of their successors or assigns, for any act or omission in connection with,

2    relating to or arising out of the Debtors' Chapter 11 Cases, negotiation and filing of the Plan, the

3    Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the

4    administration of the Plan or the property to be distributed under the Plan, except for their willful

5    misconduct or gross negligence and except with respect to obligations arising under

6    confidentiality agreements, joint interest agreements and protective orders entered during the

7    Chapter 11 Cases, and in all respects will be entitled to reasonably rely upon the advice of

8    counsel with respect to their duties and responsibilities under this Plan.

9              **4.        Voluntary Creditor Releases of Plan Proponents**.

10              The Plan provides that unless they opt not to do so by so indicating on their ballots,

11   creditors will forever release and discharge the Plan Proponents and their Affiliates from any and

12   all Claims, obligations, suits, arbitrations, judgments, damages, rights, Causes of Action or

13   liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities

14   laws, or otherwise, whether known or unknown, whether foreseen or unforeseen, existing or

15   hereafter arising, based in whole or in part upon any act or omission, transaction, or other

16   occurrence taking place on or before the Effective Date in any way relating to the Debtors, the

17   Chapter 11 Cases, or the Plan.  The Confirmation Order will enjoin the prosecution by any

18   Person, whether directly, derivatively or otherwise, of any Claim, debt, right, cause of action or

19   liability which was or could have been asserted against the Plan Proponents.  Notwithstanding the

20   foregoing, the obligations under the Plan are not released.

21              Creditors can elect not to give such a release by either (i) voting to reject the Plan; (ii)

22   voting to accept the Plan but opting out of the foregoing release by checking a box on their ballot,

23   or (iii) abstained from voting on the Plan but opting out of the foregoing release by returning a

24   ballot with the box checked that indicates that the creditor does not want to give this release.

25              The Plan provides that creditors who give this release will waive Section 1542 of the

26   California Civil Code, which provides as follows (and is further explained in the Plan):

27

28

DISCLOSURE STATEMENT

LA3:1169526

"**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR**."

## H.    DISCHARGES AND INJUNCTIONS

### 1.    Injunctions Against Interference with the Plan.

The Plan provides that, except as otherwise expressly provided in the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Estates, the Reorganized Colony Debtors, the Plan Administrator or the Estates, any property of the Estates, or the Plan Administrator, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Reorganized Colony Debtors, the Plan Administrator or the Estates, the Plan Administrator or the Estates, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance or any kind against the Reorganized Colony Debtors, the Plan Administrator or the Estates, or any property of the  Plan Administrator or the Estates, with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest.  The Plan provides that the Debtors and their affiliates, including Nicolas Marsch III specifically, will be permanently enjoined from interfering with the Plan.

43

LA3:1169526

1

## 2.      Colony I and Colony II Discharge

The Plan provides that except as expressly provided therein, the confirmation of the Plan will, if not vacated, have the effect described in Bankruptcy Code 1141, discharging any and all Claims against and Interests in Colony I and Colony II, and, without in any way limiting the foregoing, shall (i) bind all holders of Claims and Interests against Colony I and Colony II, whether or not they accept the Plan, and (ii) discharge Colony I and Colony II effective immediately from any Claim and any "debt" (as that term is defined in section 101(12) of the Bankruptcy Code) incurred before the Confirmation Date, and liability of Colony I and Colony II in respect thereof is extinguished completely including, without limitation, any liability of a kind specified in section 502(g) of the Bankruptcy Code. In addition, except as otherwise provided in the Plan, confirmation of the Plan pursuant to the Confirmation Order acts as a discharge effective as of the Confirmation Date, as to each Claimant or Interest holder receiving or entitled to receive any distribution under the Plan in respect of any direct or indirect right or Claim or Interest such Claimant or Interest holder had or may have had against or in Colony I and Colony II.  On and after the Confirmation Date, as to every discharged Claim and Interest against Colony I and II, every holder of such Claim or Interest against Colony I or Colony II shall be precluded from asserting against the Colony or Colony II or their assets or properties, any further Claim or Interest based on any document, instrument or act, omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

## 3.      No Briarwood Discharge

The Plan provides that nothing in the Plan will effect a discharge of any Claims against Briarwood in contravention of section 1141(d)(3)(4) of the Bankruptcy Code

## 4.      Right to Oppose a Marsch Discharge; Preservation of Right to Assert that Certain Claims are Not Dischargeable.

The Plan provides that parties will be free to assert that Marsch is not entitled to a discharge pursuant to Bankruptcy Code Section 1141(d)(3) so long as such party files a complaint asserting that Marsch would not be entitled to a discharge under Bankruptcy Code Section 727(a) which complaint is filed no later than the first day set for the Confirmation Hearing, as provided

1  in Federal Rule of Bankruptcy Procedure 4004(a).  The Notice of the Confirmation Hearing will

2  advise parties of this deadline.

3      The Plan also provides that parties are free to assert that a Claim against Marsch is not

4  dischargeable pursuant to Bankruptcy Code Section 523, so long as they filed a complaint under

5  Bankruptcy Code Section 523 by the applicable deadline, and that any such creditor who asserts

6  that a Claim against Marsch is not dischargeable under Bankruptcy Code Section 523 will be free

7  to liquidate that Claim.

8      If Marsch wants to seek a discharge, he will need to file a noticed motion under

9  Bankruptcy Code Section 1141(d)(5).  If he does so, the Plan provides that any party will have the

10  right to oppose that discharge.

11

12  **IV.    VOTING INSTRUCTIONS AND PROCEDURES**

13  ***Notice to Holders of Claims and Interests***

14      Approval by the Bankruptcy Court of this Disclosure Statement means that the

15  Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in

16  sufficient and adequate detail to enable holders of Claims to make an informed judgment whether

17  to accept or reject the Plan.

18      THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT

19  DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR

20  COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN

21  ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

22      IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF

23  CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE

24  BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST,

25  AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO

26  VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR

27  RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, ALL

28  HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE

LA3:1169526

ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.  No such information will be relied upon in making a determination to vote to accept or reject the Plan.

***Voting Rights***

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the Plan and (b) entitled to receive a distribution under such Plan are entitled to vote on the plan.  In these Chapter 11 Cases, under the Plan, only holders of Claims in Classes A-1, A-3, A-4, B-1, B-3, B-4, C-1, C-2, C-3, D-1, D-2 and D-3 are entitled to vote on the Plan.  Claims and Interests in other Classes are either (i) unimpaired and their holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their holders are deemed to have rejected the Plan.

Only holders of Allowed Claims in the voting Classes are entitled to vote on the Plan.  A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement.  However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are holders as of the Record Date, which Record Date is **[_____ ___, 2010]**.

DISCLOSURE STATEMENT

LA3:1169526

*Solicitation Materials*

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Plan Proponents will send to holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail, overnight courier or hand delivery:**

Lynn Talab
O'Melveny & Myers, LLP
ATTN:  MARSCH, BRIARWOOD, COLONY I AND COLONY II
400 South Hope Street
Los Angeles, CA 90071

**If by telephone,**

Lynn Talab
(213) 430-6000

*Voting Procedures, Ballots and Voting Deadline*

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

Each ballot has been coded to reflect the Debtor obligated on the Claim and the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

DISCLOSURE STATEMENT

1    Ballots include a box that may be used by creditors to indicate that they do not consent to

2   the release of any Claims related to the Debtors that they individually might have against the Plan

3   Proponents.  Creditors can elect not to give this release even if they vote in favor of the Plan or

4   abstain from voting on the Plan.

5    IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE

6   PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE

7   VOTING INSTRUCTIONS ON THE BALLOT AND **RECEIVED** NO LATER THAN

8   _____,**2010**, AT 5:00 P.M. PACIFIC TIME (THE "VOTING DEADLINE") BY THE

9   FOLLOWING:

10    **If by regular mail, overnight courier or hand delivery:**

11    Lynn Talab
      O'Melveny & Myers, LLP
12    ATTN:  MARSCH, BRIARWOOD, COLONY I AND COLONY II
      400 South Hope Street
13    Los Angeles, CA 90071

14

15    **FAXED BALLOTS WILL NOT BE ACCEPTED.**

16    BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.

17   BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER

18   ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID.  DO NOT RETURN ANY

19   DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

20    **THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO**

21   **VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND**

22   **OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE**

23   **VOTING DEADLINE.**

24

25

26

27

28

DISCLOSURE STATEMENT

LA3:1169526

1

2    **V.    THE DEBTORS, THEIR ASSETS AND LIABILITIES AND THEIR HISTORY OF**

3    **LITIGATION**

4          Marsch is a real estate developer who historically has operated through a series of

5    companies.  His affiliated group of companies is displayed in the following chart:[10]



20         Marsch and his affiliated companies have a history of bitter litigation with the parties with

21   whom they deal.  Over the years, Marsch and his companies have been involved in numerous

22   lawsuits, including cases with parties other than the Plan Proponents.  The following section of

23   this Disclosure Statement sets forth a general description of the Debtors' business, the Debtors'

24   assets and the litigation in which they are presently embroiled.

25

26

27

---

28   [10] The chart represents the companies known at this time to be affiliated with Marsch.  There may
be other companies affiliated with Marsch in addition to those identified above.

LA3:1169526

1    **A.    The Bridges.**

2         The Schedules of Assets and Liabilities filed by the Debtors in these cases indicate that

3    the most significant assets the Debtors claim to have are an alleged interest in a real estate project

4    located in North San Diego County known as The Bridges at Rancho Santa Fe (the "Bridges")

5    and litigation claims related to the Bridges.  The central case in these protracted proceedings is

6    the Bridges Action against Lennar, which was tried for nearly a year in San Diego Superior

7    Court.  At the conclusion of that trial, the Superior Court ruled that the Debtors do not have valid

8    claims against Lennar and the Debtors effectively have no economic interest in the Bridges

9    project.  Most of the debts owed by the Debtors arise out of the Bridges project and the litigation

10   related to it (other than secured debt incurred by the Debtors to purchase other real property).

11   Accordingly, a brief background of the Bridges, the Debtors' involvement in this project and the

12   related litigation is useful to understanding these Chapter 11 Cases.

13        The description set forth in Sections V.A.1 - V.A.3 below (including the headings) is

14   taken directly from the Superior Court's September 30, 2010 Statement of Decision in the

15   Bridges Action.

16        **1.    The Williams Litigation and Acquisition of the Horizon Property**

17        "In the mid-1980's, Nicolas Marsch, III formed a partnership called 'Horizon Properties'

18   with another real estate developer named Ronald Williams to develop and market approximately

19   540 acres of real estate in Rancho Santa Fe, California (the 'Horizon Property' or, as it was later

20   called, the 'Bridges property').  Marsch and Mr. Williams were jointly involved in several other

21   projects as well, including a venture involving commercial real estate in La Jolla, California (the

22   'La Jolla Venture').  After a couple of years, the relationship between Marsch and Mr. Williams

23   deteriorated into substantial and protracted litigation.  More than 10 years of litigation between

24   the two former partners followed, as both Mr. Williams and Marsch sought to gain control of the

25   Horizon property.  In 1992, after a lengthy arbitration, a receiver was appointed for the Horizon

26   Properties partnership and its primary asset, the Horizon property.

27        "In need of a capital partner to fund his ongoing litigation with Mr. Williams, Marsch was

28   introduced to Jon Jaffe of Lennar in 1995. In February 1996, Marsch entered into an agreement

50

DISCLOSURE STATEMENT

1   with Lennar San Jose called the 'Original Formation Agreement' (Ex. 7639).  Under the Original

2   Formation Agreement, Lennar San Jose was to pay certain of Marsch's attorneys' fees and related

3   litigation expenses and, in exchange, acquired certain rights to recoveries by Marsch against Mr.

4   Williams. In early 1996, Lennar San Jose and Marsch sought to prevent Mr. Williams from

5   acquiring control of the Horizon Property from the Horizon Properties receiver.  In May 1996,

6   those efforts failed when the receiver sold the Horizon Property at auction to Mr. Williams.

7       "In April 1997, Marsch obtained a $56 million judgment against Mr. Williams and two

8   related companies on claims arising out of the La Jolla Venture (the 'La Jolla Judgment').  When

9   Mr. Williams and his entities declared bankruptcy, the Horizon Property became part of the

10  bankruptcy estate.  In June 1997, the parties entered into the 'HCC Formation Agreement' (Ex.

11  151), which anticipated the formation of a company (then called Horizon Investors, LLC) to

12  pursue the acquisition and development of the Horizon Property. The contemplated company,

13  which was eventually called HCC Investors, LLC ('HCC'), was formed in August 1997 when the

14  parties entered into another agreement called the 'HCC Operating Agreement' (Ex. 6).

15      "The efforts to acquire the Horizon property from Mr. Williams came to a head at a

16  hearing in the United States Bankruptcy Court for the Southern District of California on

17  December 4, 1997.  As a result of negotiations during breaks in the hearing, Mr. Williams agreed

18  to sell the Horizon property to HCC, but only if certain conditions were met. Under the agreement

19  with Mr. Williams, which was described to the bankruptcy judge and agreed to by all parties on

20  the record, Mr. Williams' bankruptcy estate would be paid $52 million and receive a contingent

21  participating interest in HCC's profits above certain specified amounts. As a further condition of

22  the sale, the parties agreed that Marsch would divest himself of his entire Membership Interest

23  and Economic Interest in HCC and any right to control HCC under terms that became known as

24  the 'Marsch Restrictions.'  These conditions of sale were incorporated into a Stipulation and

25  Order issued by the Bankruptcy Court on January 28, 1998, and signed by Marsch, Mr. Williams,

26  and Lennar San Jose. (Ex. 341, the 'Stipulation and Order').  Lennar San Jose, Mr. Williams, and

27  Marsch then entered into an Agreement Assigning Membership Interest (Ex. 266, the '1998

28  Assignment') to carry out this court-ordered divestment.  Among other provisions of the 1998

51

Assignment, Marsch was entitled to receive certain monetary payments, access to certain financial information, and a potential right to acquire a membership interest in HCC should certain conditions occur.

"HCC acquired the Horizon property with bankruptcy court approval in February 1998. On January 15, 2004, as a result of an agreement among HCC, Marsch, and Mr. Williams' estate, the Marsch Restrictions were terminated. In March 2004, Marsch was assigned a membership interest in HCC pursuant to the 'Agreement Assigning Membership Interest' (Ex. 268, the 'Marsch Reassignment').

## 2. Formation of Lennar Bridges and Acquisition of the Santa Fe Creek Property

"In 1998, a parcel of real property known as Santa Fe Creek located adjacent to the Horizon property became available for purchase. At the time, however, HCC was unable to purchase the Santa Fe Creek property because of certain provisions in the agreements between HCC and Williams, among other reasons. With the knowledge and consent of Marsch, in November 1998, Lennar San Jose and Lennar Southland I, Inc. formed a company called Lennar Bridges, LLC ('Lennar Bridges') to acquire and develop the Santa Fe Creek property and purchased the property on November 19, 1998.

"As described in more detail [in the Statement of Decision], at various times between 1999 and 2006, Marsch and Lennar discussed the possibility that Marsch might acquire an interest in Lennar Bridges under certain conditions. At trial, Briarwood and Marsch claimed, among other things, that Briarwood either was or should be equitably deemed a member of Lennar Bridges. Lennar disputed that contention, claiming that neither Briarwood nor Marsch is now or ever has been a member of Lennar Bridges.

## 3. Development of the Property

"Since the Horizon and Santa Fe Creek properties were acquired in the late 1990s, HCC and Lennar Bridges have developed those properties into an exclusive residential community, nationally renowned championship golf course, and private country club (collectively, the 'Bridges project'). The Bridges project now consists of over two hundred semi-custom or custom

1  homes.  A subgroup of semi-custom homes built by HCC and Lennar Bridges using Greystone

2  Homes, Inc., a Lennar affiliate, as the general contractor have won significant awards within the

3  homebuilding industry."

4              **4.      The Transfer to KRMW**

5        In October 2008, Marsch and Briarwood entered into an agreement with KBR II to form

6  KRMW.  On October 9, 2008, these parties executed the Operating Agreement for KRMW and

7  on November 5, 2008, this transaction closed.  Thus, on November 5, 2008:

8    •   KBR I contributed $3 million to KRMW and received 65% of the equity units in KRMW.

9         This equity was entitled to a preferred return prior to any distributions to Briarwood on the

10        35% of the equity Briarwood received for its contributions.

11   •   Briarwood and Marsch contributed to KRMW all their claims against Lennar and

12        Briarwood's interest in HCC (other than Briarwood's or Marsch's purported right to

13        receive certain fees from HCC) and any interest in Lennar Bridges they claimed to hold (it

14        was disputed in the Bridges Action that Briarwood held any interest in Lennar Bridges

15        and the court concluded that "[n]either Marsch nor Briarwood is now or ever has been a

16        member of Lennar Bridges.").  In return, Briarwood received a 35% equity interest in

17        KRMW with distributions on this equity junior to the preferred equity received by KBR

18        II.

19        As a result, KRMW, rather than Briarwood, presently holds the 50% equity interest in

20  HCC not owned by Lennar.

21        Marsch was originally appointed the manager of KRMW, but on February 23, 2010, KBR

22  II voted its 65% equity in KRMW to remove Marsch from this position and appointed KBR

23  Group as the manager of KRMW.  In addition, on February 24, 2010, KBR II exercised a proxy

24  given to it by Marsch to remove him from control of Briarwood.

25        As a result of the foregoing actions, KBR asserts that it is in control of any litigation

26  claims against Lennar and the 50% interest in HCC that is not owned by Lennar.  KBR also

27  asserts that it is entitled to receive the economic benefit, if any, of any such claims against Lennar

28

DISCLOSURE STATEMENT

and the 50% interest in HCC until it has received its preferred interest, which presently equals approximately $5 million (growing at 20% per annum).

KBR filed two adversary proceedings in the Bankruptcy Court to determine that it had properly taken control of Briarwood, KRMW, Colony I and Colony II and that KRMW owns any claims against Lennar and the 50% interest in HCC not owned by Lennar.  Prior to the appointment of the Trustees in the Chapter 11 Cases, the Debtors in Possession opposed a motion of KBR for a preliminary injunction filed in the first KBR adversary proceeding.  At a hearing held on May 5, 2010, the Bankruptcy Court declined to grant KBR a preliminary injunction.  The Bankruptcy Court concluded that KBR was likely to prevail on the merits, but that KBR had not established a likelihood of irreparable injury and, thus, was not entitled to a preliminary injunction.  At this hearing, the Bankruptcy Court also granted KBR's motion to appoint a trustee for Colony I and Colony II and appointed an Examiner for Briarwood.  On July 12, 2010, KBR filed its second adversary proceeding and on August 2, 2010 filed a summary judgment motion seeking a determination that, among other things, KBR Group is the manager of KRMW.  KBR filed this summary judgment motion shortly after the Trustees were appointed for the Marsch and Briarwood Estates.  These Trustees asked the Bankruptcy Court to give them time to analyze this matter and the Bankruptcy Court did so.  The Trustees have not yet taken a position as to whether KBR is correct that KBR Group is in control of KRMW and that KRMW owns any claims against Lennar and the 50% interest in HCC.  See Section VI.F below.

### 5.    Impact of the Superior Court's Statement of Decision in the Bridges Action on the Debtors' Asserted Interest in the Bridges.

Since December 2006, Briarwood, Marsch and Lennar have been embroiled in the litigation described herein as the Bridges Action.  In the Bridges Action, Briarwood asserted various claims against Lennar related to the Bridges project (including mismanagement, breach of fiduciary duty and an accounting).  Lennar filed a cross-complaint against Briarwood and Marsch.  After 11 months of trial, the San Diego Superior Court issued its Statement of Decision.  The litigation is described in greater detail in Section V.E.1(a) below.  A number of aspects of this

ruling are important to an understanding of the Estates' assets related to the Bridges. In brief, the effect of the Statement of Decision is that Briarwood and Marsch have no valid claims against Lennar related to the Bridges project and are not entitled to any damages. Thus, whether those claims are presently owned by KRMW or one of the Estates, they are not valid. A more detailed description of the impact of the Statement of Decision on the litigation claims against Lennar is discussed in Section V.E.1(a) below. In addition, the Statement of Decision effectively holds that the Estates have no economic interest in the Bridges. The Superior Court ruled, among other things, that:

- Lennar's accounting for the Bridges is accurate and its preferred interest in HCC totals $274,444,136 as of December 31, 2008 (and has continued to grow thereafter). Under the terms of the operative agreements, profits (if any) from the Bridges are distributed first to Lennar and only after it receives return of all its capital plus the preferred return will any amounts be due to KRMW or the Briarwood Estate, depending on which of them holds the other 50% interest in HCC. Since the future value of the Bridges is nowhere close to $274 million (indeed, it is projected to be a small fraction of that amount), Lennar owns all the present and future economic value of the Bridges project and the other 50% interest in HCC has no economic value, whether it is owned by KRMW or Briarwood.

- Briarwood and Marsch have no valid claims to fees or other distributions from HCC under the operative agreements. The court rejected their claims that they were owed developer, override and other fees on multiple grounds, including: (1) HCC has no obligation to pay the fees because "Marsch has taken actions, including the deception addressed herein, that render him unable to provide" the required services for developer fees; (2) Marsch and Briarwood repudiated the bases for receipt of certain of these fees and therefore are not entitled to them; and (3) they were offset by the amounts that Briarwood and Marsch owe Lennar.

- Marsch and Briarwood are jointly obligated to Lennar in the amount of $12,046,192 for matters related to the Bridges.

DISCLOSURE STATEMENT

1

**B.      Real Property Located in Southern California.**

2      When the Chapter 11 Cases were filed, Marsch owned, either directly or indirectly, five

3   parcels of real property.  The parcels that Marsch did not own directly were owned by Colony

4   Properties.  NHG owns Colony Properties and the Marsch Estate owns NHG.  Thus, all of these

5   properties were either owned or controlled by the Marsch Estate. The 5 parcels were:

6      •   A beachfront luxury home in La Jolla Shores Beach, California that Marsch used as his

7          residence. He owned this property in his own name.

8      •   A beachfront townhouse in Del Mar, California.  This property was used as a rental unit

9          and was owned by Colony Properties.

10      •   A luxury home in the Bridges development.  This property was used by Marsch as an

11          office and was owned by Colony Properties.

12      •   Two vacant lots in the Bridges project owned by Colony Properties.

13      These properties, however, are encumbered by secured debt totaling approximately $24.9

14   million.  Of that debt, (i) approximately $22.27 is owed to German American[11] and is secured by

15   all the properties, (ii) approximately $2.2 million is owed to JPMorgan Chase Bank ("JPMC")[12]

16   secured by a first lien on the luxury home located at the Bridges, and (iii) approximately

17   $500,000 is owed in back property taxes.

18      On July 26, 2010, German American filed a motion for relief from the automatic stay to

19   let it foreclose on these five properties.  In that motion, German American asserted, based on

20   appraisals that it had obtained, that the value of the properties totaled $23.5 million—i.e. about

21   $1.4 million less than the total of the secured debt.  The Briarwood Trustee determined not to

22   oppose this motion since none of the properties are owned, directly or indirectly, by Briarwood.

23   The Marsch Trustee initially opposed this motion but later withdrew that objection.  Marsch,

24   through personal counsel, opposed that motion asserting that the properties were worth more than

25   the secured debt.  Ultimately, Marsch settled his objection by stipulating to the property values

26   

27   [11] The original lenders on this debt were First National Bank and Pacific Western Bank.  German
     American acquired this debt in February 2010.
28   [12] Washington Mutual was the original lender.  JPMC acquired this debt after Washington Mutual
     was taken over by the FDIC and its assets were sold to JPMC.

DISCLOSURE STATEMENT

LA3:1169526

1   asserted by German American and agreeing to an order that allows German American to

2   foreclose but allows Marsch and his wife to remain in the La Jolla beachfront luxury house

3   through February 2011 so long as they pay for insurance on this property with at least $10 million

4   of coverage.  The Bankruptcy Court entered the order granting German American relief from the

5   automatic stay on October 22, 2010.

6          On August 25, 2010, JPMC also filed a motion for relief from the automatic stay to allow

7   it to foreclose its first priority lien on the luxury home at the Bridges.  This motion was

8   unopposed and the Bankruptcy Court granted it on September 29, 2010.

9          Although it is possible that the foreclosure sale of these properties might yield some value

10  for the estates, that is unlikely.

11         On the other hand, it is unlikely that German American or JPMC will have claims against

12  the Estates after these foreclosures.  The order allowing German American to foreclose requires

13  that it foreclose non-judicially.  Under California law, a secured creditor that conducts a non-

14  judicial foreclosure is not entitled to a deficiency judgment.  Presumably, JPMC will also

15  foreclose non-judicially, since a non-judicial foreclosure is substantially faster and less expensive

16  than a judicial foreclosure.  Even if JPMW were to proceed judicially, the appraisals indicate that

17  JPMC is oversecured, which means that JPMC would not be entitled to a deficiency judgment in

18  a judicial foreclosure.

19         **C.     Colorado Property Owned by MRP.**

20         The Marsch Estate may be able to recover certain assets related to MRP.  The Plan

21  anticipates that the Plan Administrator will investigate and pursue these claims for the benefit of

22  creditors.  The transactions are both complex and sufficiently suspect that they led to the

23  appointment of Chapter 11 Trustees in the Marsch and Briarwood Chapter 11 cases.

24         In December 2006, Marsch purchased a 10,000 sq. ft. luxury ski villa (the "Ski Villa") in

25  the Bachelor Gulch area of the Beaver Creek Ski Resort in Colorado.  The purchase price was

26  $7,350,000.  His initial intent was apparently to market the Ski Villa to residents of the Bridges

27  and members in the Bridges country club as part of a plan to offer them luxury rental properties in

28  various resorts.  Soon after he purchased this property, however, Briarwood became embroiled in

57

DISCLOSURE STATEMENT

1    the Bridges Action with Lennar.  Thus, on September 27, 2007, Marsch formed MRP and

2    transferred the Ski Villa to it.  He also had MRP purchase an airport garage at the Eagle Creek

3    Airport for $75,000.

4          The Ski Villa owned by MRP was appraised as of April 9, 2009 at $10 million.  This

5    property was encumbered by a loan owed by MRP to Alpine Bank totaling, at the time, about

6    $5.9 million.  As a result, the equity in MRP owned by Marsch was worth about $4 million.

7    Nonetheless, Marsch sold his equity in MRP to Barry Minkow[13] and Jeffrey Sachs for $850,000

8    in cash and satisfaction of $500,000 that Marsch and Briarwood owed Mr. Minkow for their work

9    in improperly attacking Lennar.  Mr. Minkow and his company FDI had been working with

10   Marsch and Briarwood since early 2007 in a campaign that Lennar asserts was intended to

11   defame and extort Lennar.  As a result, Lennar commenced suit in the Florida Action. (See

12   Section V.E.3(a) below).

13         When Marsch filed his personal bankruptcy in California, he failed to disclose the MRP

14   equity transaction despite the fact that he was specifically required to do so.  Question 10 in the

15   standard Statement of Financial Affairs ("SOFA") required to be filed under penalty of perjury

16   requires a debtor to identify all property he transferred in the prior two years outside the ordinary

17   course of business.  Yet, the SOFA in his personal bankruptcy that was signed by Marsch under

18   penalty of perjury on March 17, 2010 fails to list this transfer.  At the Briarwood 341(a) meeting

19   held on March 23, 2010.  Marsch testified, under oath, that he did not know the relationship

20   between Briarwood and MRP, did not know who owns the equity in MRP, did not know the

21   nature of MRP's business, and did not know anything about the $2,000 payment from Briarwood

22   to MRP.

23         As the Bankruptcy Court later held, this testimony of Marsch was false.  At the time he

24   testified in California, Marsch was in fact acting as the manager of MRP, had been negotiating

25   with MRP's secured lender for several months, maintained all of MRP's books, records and bank

26   accounts and was preparing MRP to file for bankruptcy protection in Colorado three weeks later.

27

28   _____
     [13] Mr. Minkow took title through his company www.degreefraud.com.

DISCLOSURE STATEMENT

LA3:1169526

1    These facts came to light when MRP filed a chapter 11 petition in Colorado on April 5,

2  2010 (Case No. 10-177079 SBB).  Neither Marsch nor anyone else affiliated with MRP provided

3  notice of this bankruptcy filing to creditors in these Chapter 11 Cases in California or to the

4  Bankruptcy Court with jurisdiction over these Chapter 11 Cases.  Instead, after testimony by

5  Marsch in Colorado and the filing of pleadings in the MRP bankruptcy case that contradicted

6  Marsch's sworn statements in California, the attorney for the U.S. Trustee in Colorado contacted

7  her counterpart in San Diego.  As a result, creditors in these cases and the Bankruptcy Court

8  learned about statements and claims that Marsch had made in Colorado that belied his prior

9  testimony and pleadings in California.

10    The SOFA filed in the MRP bankruptcy case on April 20, 2010 disclosed that the equity

11  in MRP was held by Messrs. Minkow and Sachs.  The SOFA for MRP also disclosed that Marsch

12  transferred this equity in MRP to Messrs. Minkow and Sachs on May 8, 2009.  At the § 341(a)

13  meeting of creditors for MRP held on May 17, 2010, Marsch testified that in May 2009 he

14  received $950,000 for selling the equity in MRP to Messrs. Minkow and Sachs.  He also testified

15  that at the time of this transfer the equity in MRP was worth over $4 million, based on an

16  appraisal done at the time of the transfer.  At the § 341(a) meeting for of creditors MRP, Marsch

17  claimed that the present value of the Ski Villa remained approximately $10 - $11 million.  He

18  based the figure on recent comparable high-end sales in this community and what he described as

19  the best metric, price per square foot.  Marsch provided substantial details regarding this large

20  Adirondack style single-family, 10,000 sp. ft., 5- suite, "ski-in, ski-out" vacation home and the

21  market in this high-end community.  As the Bankruptcy Court in these Chapter 11 Cases stated,

22  "He testified he thinks the property is still worth $10 - 11 million, and he explained why."

23  [Docket No. 199 at 8].

24    When the attorney for the Office of the United States Trustee who conducted the

25  examination inquired as to why Marsch—who supposedly had no present ownership or

26  management role with MRP according to the MRP Schedules and SOFA—was appearing on

27  behalf of MRP at the 341(a) meeting of creditors, Marsch admitted that he did not have an

28  "employment arrangement per se" with MRP but said he had an undefined "arrangement to

1   represent the debtor at this proceeding."  Marsch testified that he was knowledgeable about the

2   history of MRP and its day-to-day operations so that he could properly represent it at the 341(a)

3   meeting.  Over the balance of the MRP 341(a) meeting, he demonstrated that he, in fact, knew a

4   lot about MRP and its properties, testifying as to the details of MRP's real property, its current

5   rental arrangements and sale prospects.

6        At the time of his testimony in Colorado (and in California), Marsch maintained all of

7   MRP's books and records and administered its bank accounts.  As recently as January 4, 2010,

8   Marsch signed a judgment on behalf of MRP as its Managing Member.  It also was later

9   discovered that he had been actively negotiating with MRP's secured lender since late 2009 when

10  it started foreclosure proceedings.  In addition, upon MRP filing bankruptcy in Colorado, Messrs.

11  Minkow and Sachs signed a consent granting Marsch (and Glenn Marshall—see Section V.D

12  below) authority to take all actions in the MRP bankruptcy case on behalf of MRP.  For the first

13  several months of MRP's bankruptcy, Marsch signed all of MRP's operating reports.

14       It is highly suspect that Marsch sold equity in MRP worth about $4.5 million to Messrs.

15  Minkow and Sachs for only $950,000 (or $850,000).  Recognizing that Mr. Minkow and Mr.

16  Sachs stood to realize a "pretty dog gone good return"—about $5 million on a $950,000

17  investment—the lawyer for the U.S. Trustee in Colorado probed further.  At that point, a

18  previously-undisclosed facet of this transaction was exposed.  Marsch testified that if this luxury

19  ski-in-ski-out property sells, Messrs. Minkow and Sachs "would return a good portion of it [the

20  profit, to Marsch]."  But Marsch added that "[w]e don't have any, you know, written agreements

21  to that effect."

22       A lawyer for MRP creditor Starwood Capital Group (the successor to Alpine Bank)

23  followed up on this revelation.  In response, Marsch explained that his agreement to sell $5

24  million in interests for just $950,000 was part of a series of transactions with Messrs. Minkow

25  and Sachs:

26               And I don't want to sound like I'm kind of waffling around or
             something like that.  This transaction was one of a number of
27           transactions that I had with these gentlemen and so there's a much
             bigger thing that we're doing right now and I would expect that if

28

we sell the property, they would return anything past a reasonable
agreed return.

In its order directing the appointment of Trustees for the Marsch and Briarwood Estates, the Bankruptcy Court summarized this testimony by stating that Marsch "testified that if Sachs and Minkow sold the property for a good return, he anticipated they would give him some part of the equity because that is how they do business together."

This "arrangement" pursuant to which Marsch is entitled to receive "anything past a reasonable agreed return" is a highly-valuable asset that should have been disclosed on the Schedules in his personal bankruptcy. The Schedules filed in Marsch's personal bankruptcy also fail to disclose a $75,000 advance owed to him by MRP which was listed on Schedule F to the MRP Schedules filed on April 20, 2010 and about which Marsch testified at the MRP 341(a) meeting of creditors on May 17, 2010. After he testified in Colorado, Marsch also recalled another loan that he had made to MRP, this one totaling $161,228. On July 5, 2010 MRP amended its Schedules to list this debt.

There has also been conflicting testimony regarding ownership of the furnishings at the Ski Villa. MRP's initial bankruptcy schedules asserted that it owned $442,607.27 of furnishings—plus some unspecified art and antiques. At the MRP 341(a) meeting held on May 17, 2010, Marsch testified that these luxury items were owned by his wife, Patricia, and that these furnishings were not included in the "transfer" of the equity in MRP. Based on Marsch's direction, on May 27, 2010, MRP filed an amended set of schedules that removed all of these furnishings from the assets MRP owns. However, MRP recently amended its schedules to again assert that these furnishings are owned by MRP.

MRP has recently taken positions in its Chapter 11 Case that change the story once again and threaten to adversely affect the Marsch Estate, as well as the Estates for Colony I and Colony II.

On August 2, 2010, MRP filed a plan and disclosure statement that asserts that the cash portion of the consideration paid by Mr. Sachs and Mr. Minkow's company for the equity in MRP was $850,000, rather than the $950,000 testified to by Marsch and as set forth in the

1    amended SOFA filed in the Marsch case on July 16, 2010.  MRP also argued that the $75,000

2    debt owed to the Marsch Estate is not valid since when Marsch sold the equity in MRP he did not

3    receive any additional consideration for the airport garage and this asset was not excluded from

4    this transfer.  The plan of reorganization that MRP filed on August 2, 2010 purported to

5    extinguish the debt owed to all insiders, including (i) $161,228 owed to the Marsch Estate (*i.e.*,

6    the debt owed to the Marsch Estate excluding the $75,000 mentioned above which MRP now

7    asserts is invalid), (ii) $340,202 owed to Colony Properties (the entity owned by NHG, which in

8    turn is owned by the Marsch Estate), (iii) $8,053 owed to Colony I, (iv) $10,875 owed to Colony

9    II , and (v) $235,816 owed to LADCO, Ltd. ("LADCO") (the amended Schedules in the Marsch

10   Chapter 11 Case indicate that LADCO has a claim against the Marsch Estate for $244,160.59

11   based on a December 15, 2008 guarantee by Marsch of LADCO's claims against some other

12   debtor, presumably MRP).  These creditors would receive nothing under the MRP plan

13   notwithstanding the fact that the MRP disclosure statement asserts that the value of MRP's

14   properties is substantially more than sufficient to pay them in full.  Thus, the MRP plan

15   envisioned that debt owed to the Marsch Estate and to a company owned by the Marsch Estate

16   totaling approximately $570,000 and debt which the Marsch Estate guaranteed totaling

17   approximately $240,000 would be eliminated.

18        Lennar, the Marsch Trustee, LADCO and the U.S. Trustee objected to MRP's disclosure

19   statement.  MRP offered to withdraw its plan and disclosure statement, but the Colorado

20   Bankruptcy Court proceeded with the hearing.  A the hearing held on September 22, 2010, the

21   Colorado Bankruptcy Court disapproved MRP's disclosure statement stating that it preferred to

22   disapprove the disclosure statement on the record rather than allowing MRP to withdraw it.  The

23   Colorado Bankruptcy Court also concluded that Marsch could not be trusted and should not have

24   anything to do with this debtor.  The Court expressed reservations about leaving Messrs. Minkow

25   and Sachs in control of this debtor, but deferred a decision until a status conference set for

26   October 29, 2010.

27        On November 1, 2010, the Marsch Trustee filed a motion (i) to settle the fraudulent

28   conveyance claims against www.degreefraud.com, Minkow and Sachs for $375,000 and (ii) to

DISCLOSURE STATEMENT

LA3:1169526

settle the debt claims against MRP held by the Marsch Estate and entities controlled by the Marsch Estate (which total $576,430) for $75,000—i.e., $425,000 in total.  Lennar believes that this proposed settlement is inappropriate and that the MRP Claims have value worth much more than $425,000.  Thus, Lennar intends to object to this proposed settlement.  The Plan provides that if the MRP Claims are not resolved prior to the Effective Date (e.g., the proposed settlement is not approved), then Lennar will ensure that creditors with Allowed unsecured Claims against Marsch will realize at least $450,000 on account of the MRP Claims.  Lennar will backstop this minimum recovery.

Lennar intends to encourage the Plan Administrator to seek an even greater recovery on the MRP Claims and the Lennar Loan provides funding for the Plan Administrator to do so. While there can be no assurances that the Plan Administrator will achieve recoveries greater than this $450,000 minimum, the Plan provides funding of up to $750,000 for the Plan Administrator to investigate and possibly pursue such matters as:

- **Equity in MRP's assets that might be available to pay approximately $576,000 owed to the Marsch bankruptcy estate and $240,000 owed to LADCO on debt guaranteed by Marsch**.  As noted above, the MRP disclosure statement asserted that there was sufficient equity in the properties owned by MRP to pay all MRP creditors in full, including this debt owed to the Marsch bankruptcy estate and to LADCO.  This was based on an appraisal of the Ski Villa prepared by Forsythe Appraisals, LLC as of June 10, 2010 which values this property at $9,494,000.  Counsel for MRP has stated that Mr. Sachs has been exploring possible financing and one of his prospective lenders obtained an appraisal of this property prepared by the Appraisal Office, LLC as of August 11, 2010 which totals $7.5 million.  At this lower value, there would enough to pay the secured debt and have a small amount of equity left over to pay unsecured creditors.  None of these appraisals include the Eagle Airport facility (purchase price of $75,000) or the furnishings at the Ski Villa.

- **The Furnishings Located at the Ski Villa**.  The Ski Villa is well appointed—the MRP bankruptcy pleadings include a schedule of luxury furnishings located on this property

that cost $442,607.27. In addition, the pleadings indicate that the property houses art and antiques with additional value. MRP has taken three alternative positions regarding who owns these furnishings, art and antiques. Initially, MRP claimed that it owned them. After Marsch testified that they were owned by Patricia Marsch, MRP took the position that they are owned by her. More recently, MRP has again asserted that these furnishings, antiques and art are owned by MRP based on the fact that LADCO sold the furnishings to MRP. In fact, these items are likely owned by the Marsch Estate. While it is possible that LADCO sold these furnishings to MRP, the May 5, 2009 Purchase and Sale Agreement in which Marsch sold the equity in MRP to Messrs. Sachs and Minkow provides that these furnishings, art and antiques were not part of this sale. Section 5 of this agreement provides that these items, which were detailed on Attachment C, were not owned by MRP and would be owned by the seller—Marsch. Thus, it is probable that the items in question were distributed by MRP to Marsch prior to the time that he sold the equity in MRP and are now property of the Marsch Estate.

- **Fraudulent Conveyance Action Against Messrs. Minkow and Sachs**. The Plan anticipates that the Plan Administrator will pursue a fraudulent conveyance action against Messrs. Sachs and Minkow (and Mr. Minkow's company www.degreefraud.com) to recover approximately $3 - 4 million. Bankruptcy Code § 548 allows a representative of the estate to avoid a transfer made within the prior two years if the debtor received less than reasonably equivalent value and at the time the debtor was either (i) insolvent, (ii) was engaged in a business or transaction for which any property remaining left the debtor with unreasonably small capital, or (iii) the debtor intended to incur or believed that the debtor would incur debts beyond the debtor's ability to pay as these debts matured. Bankruptcy Code § 544 also allows an estate representative to avoid a transaction of this sort if it may be avoided by a creditor under applicable state law; the laws of most states, including California, include a version of the Uniform Fraudulent Transfer Act that sets forth a test similar to Bankruptcy Code § 548. In filings with the Bankruptcy Court, Marsch has effectively admitted that he received less than reasonably equivalent value

64    DISCLOSURE STATEMENT

1    when he sold the equity in MRP.  For example, in a declaration he signed on August 30,

2    2010, he referred to this as a "discount."  However, in connection with a motion to

3    reconsider the Bankruptcy Court's appointment of a Chapter 11 Trustee, counsel for

4    Marsch argued that the transaction may not be avoided as a fraudulent transfer because at

5    the time Marsch was supposedly not insolvent.  Lennar disagrees with this assertion for at

6    least three reasons.  First, Marsch was insolvent at the time in the sense that his assets

7    where worth far less than his liabilities.  The only meaningful assets that he has (or admits

8    to having) are claims against Lennar that the Superior Court has ruled are without value,

9    and, in any event, are subject to offsets far in excess of any conceivable value of those

10    claims, while his liquidated debts include over $12 million owed to Lennar, approximately

11    $5 million owed to KBR II and over $7 million owed to CNB—and Lennar has additional

12    claims of hundreds of millions of dollars against him.  Second, Marsch's remaining

13    working capital was insufficient, which is one of the alternative bases for avoiding a

14    transfer for less than reasonably equivalent value.  Marsch admitted in his August 30,

15    2010 declaration that he accepted a deep discount on this sale because of his "desperate"

16    need for cash as he was ramping up for his unsuccessful litigation with Lennar in the

17    Bridges Action.  He also admitted that this sale to Messrs. Minkow and Sachs was driven

18    by his "pressing need for liquidity."  Third, this transaction may also be avoided as a

19    transfer made with an actual intent to hinder, delay or defraud creditors.  The

20    undocumented arrangement with Messrs. Minkow and Sachs that they would return to

21    him the profit from MRP at an unspecified time is strong evidence that Marsch conspired

22    to park this asset away from his creditors.  And the fact that Marsch later gave false and

23    misleading testimony about the transfer and failed to disclose it in his personal bankruptcy

24    case is further evidence that the transfer was fraudulent under the actual fraud prong of

25    Bankruptcy Code § 548 and the California Uniform Fraudulent Transfer Act.  If the

26    transfer can be avoided as a fraudulent transfer, Bankruptcy Code § 550 provides that an

27    estate representative can recover either the property or the value of the property as of the

28    date of transfer.  When property declines in value after a transfer, this alternative allows

65

DISCLOSURE STATEMENT

the estate to recover the value as of the date of the transfer, here May 8, 2009.  5 Collier on Bankruptcy ¶ 550.02[3][a] at 550-9 (16th ed. 2010).  Thus, if the equity in MRP was worth $3 - 4 million when Marsch sold it, but worth less now, the Plan Administrator should be able to elect to seek $3 - 4 million from Messrs. Sachs and Minkow rather than the return of the property.  The disclosure statement filed in the MRP bankruptcy case attached a set of personal financials for Mr. Sachs that indicate that he has approximately $17 million of assets, including substantial marketable securities.  It is likely that Messrs. Sachs and Minkow will contest an action by the Plan Administrator to collect $ 3- 4 million.  While there can be no assurances that the Plan Administrator will be able to collect more than the $450,000 guaranteed in the Plan on account of this claim, the Plan provides funding and authority for the Plan Administrator to pursue it for the benefit of creditors. .

**D.      Other Assets that Marsch and Briarwood May Have Hidden or Transferred in Transactions that Might be Avoided for the Benefit of Creditors.**

The Plan provides that the Plan Administrator will investigate other possible assets that Marsch and Briarwood may have hidden or transferred but which can be recovered for the benefit of creditors.  There can be no assurances that this effort will recover anything for creditors, but the Plan anticipates that the Plan Administrator will pursue the following, among other possible avenues for recovery:

- **Briarwood and Marsch Received Over $50 Million of Cash That Has Not Been Accounted For**.  During the years before they filed bankruptcy, Marsch and Briarwood received over $50 million of cash from HCC, KBR and 1st Pacific.  The Plan Administrator will be able to conduct forensic accounting of what Briarwood and Marsch did with this money.  Lennar can provide to the Plan Administrator details of over $36 million of cash that HCC paid to Briarwood and Marsch since 1997.  In addition, HCC paid many of Marsch's other business costs (e.g., attorneys' fees) totaling more than $35 million, so that the benefits that Marsch and Briarwood received from HCC totaled approximately $71 million and increased Mr. Marsch's ability to use the more than  $35

LA3:1169526

1  million in cash that he received from HCC for other purposes.  In addition, KBR advanced

2  Marsch over $7 million and 1st Pacific loaned him over $7 million.  It is unlikely that

3  Marsch likely used very much of the money provided to him by HCC, KBR and 1st Pacific

4  to acquire his properties in Southern California or Colorado since those acquisitions were

5  financed with substantial debt—over $22 million owed to German American, over $2

6  million owed to JPMC and approximately $6 million owed to Starwood.  As a result, the

7  Plan proposes that the Plan Administrator investigate where this money went.

8  •  **Marsch Has Engaged in Numerous Suspect Transactions with Barry Minkow and**

9  **Jeffrey Sachs**.  The Plan Administrator will also be able to investigate other dealings with

10  Messrs. Minkow and Sachs.  At the MRP § 341(a) meeting, Marsch testified that the

11  transfer of equity in MRP to Messrs. Minkow and Sachs was "one of a number of

12  transactions that I had with these gentlemen and so there's a much bigger thing that we're

13  doing right now and I would expect that if we sell the property [owned by MRP], they

14  would return anything past a reasonable agreed return."  The pleadings and testimony to

15  date give a hint of some of these other transactions.  Marsch testified that he turned to

16  Mr. Minkow for help because Mr. Minkow operates outside the normal "justice-system

17  toolbox."  At the § 341(a) meeting in his personal bankruptcy held on March 23, 2010,

18  Marsch indicated that his Schedules and SOFA were incorrect in that they failed to

19  disclose that Mr. Minkow's company, FDI, is a substantial creditor of one or more of the

20  Debtors.  On March 23, 2010, Marsch promised to correct this error in his Schedules.

21  Almost two months later, Marsch "corrected" his Schedules by listing FDI (controlled by

22  Mr. Minkow) as a creditor owed an "unknown" amount on a loan made to Marsch on

23  November 30, 2008.  The SOFA Marsch filed in his personal chapter 11 case also lists a

24  payment of $35,000 to Grace Trucking made on January 22, 2010—one month before

25  Marsch filed for bankruptcy.  According to records from the California and Georgia

26  Secretaries of State, Grace Trucking was created on June 17, 2009—just one month after

27  Marsch "sold" more than $4 million in MRP equity to Mr. Minkow and Mr. Sachs for

28  somewhere around $1 million.  The documents list 9770 Carroll Center Rd., Suite F, San

LA3:1169526

1    Diego, California as the address for Grace Trucking.  This is the same address as the San

2    Diego Community Bible Church, where Mr. Minkow is a Senior Pastor.  In addition,

3    according to state records, Lisa Minkow—Mr. Minkow's wife—is the church's CEO,

4    CFO and Secretary.

5    •   **Marsch Engaged in Questionable Transactions Involving Glenn Marshall**.  The Plan

6        Administrator will also be able to investigate Marsch's and Briarwood's dealings with

7        Glenn Marshall, a former loan officer at 1st Pacific who was responsible for that bank's

8        relationship with Marsch during the time that 1st Pacific loaned $7 million to SJ Land,

9        LLC ("SJ Land").  SJ Land is owned by NHG, which in turn was owned by Marsch (and

10       now is property of the Marsch Estate).  SJ Land owned an option to develop land in San

11       Jacinto, California.  That option proved worthless and SJ Land filed its own bankruptcy

12       case in October 2008.  Marsch and Briarwood guaranteed this debt; they each listed 1st

13       Pacific in their Schedules as a creditor owed approximately $7 million.  In late 2008,

14       Glenn Marshall introduced Barry Minkow to Marsch, which led to the defamation and

15       extortion campaign against Lennar.  In November 2009, 1st Pacific extended the maturity

16       on this debt in return for a second lien on Marsch's and Briarwood's purported claims

17       against Lennar.  Not only were these claims invalid, as ruled by the Superior Court in the

18       Bridges Action, but over one year earlier, Briarwood and Marsch had transferred any such

19       claims to KRMW and KBR II had already perfected a lien on these claims.  On November

20       13, 2009, 1st Pacific filed a UCC-1 financing statement in California and Delaware against

21       Briarwood even though Briarwood had assigned any such claims to KRMW over one year

22       earlier, KBR II had a prior lien on any such claims, and the claims against Lennar were

23       invalid.  In May 2010, 1st Pacific was taken over by the FDIC.  The FDIC sold 1st

24       Pacific's assets (including the debt owed by Marsch and Briarwood) to CNB.  Mr.

25       Marshall is no longer with 1st Pacific and has never been employed by CNB.  But he

26       continues to have an ongoing relationship with Marsch and his affiliated companies.  For

27       example, the SOFA that Marsch filed in the Marsch Chapter 11 Case indicates that

28       Marsch made payments totaling $10,000 to Mr. Marshall on February 17, 2010 and

LA3:1169526

February 25, 2010.  This second payment was made on the day that Marsch filed his bankruptcy petition, so it is likely an unauthorized post-petition payment.  The other payment was made within 8 days of his bankruptcy and can likely be recovered as a voidable preference.  At the 341(a) meeting of creditors of Marsch, Marsch testified that these payments were made for alleged consulting services that he could not explain.  And when MRP filed for bankruptcy in Colorado, Messrs. Minkow and Sachs signed a consent authorizing Mr. Marshall to act on behalf of MRP in its bankruptcy case and MRP initially maintained a debtor-in-possession bank account in the name of the Marshall Family Trust with Mr. Marshall's address listed on the account.

- **Transfers to Patricia Marsch.**  The Plan Administrator will also be able to investigate whatever property is claimed by Patricia Marsch as her separate property.  It is not uncommon for debtors such as Marsch to transfer property into the name of their spouse in an effort to shelter assets from creditors; such assets can often be recovered as fraudulent transfers.  Particularly in light of the fact that Marsch has not explained what happened to over $50 million of cash received by Briarwood and himself personally, the Plan Administrator is likely to investigate what property is asserted to be Patricia Marsch's separate property.  Even though this investigation has not yet been initiated, there are at least three other facts that raise questions.  First, as noted above, Marsch asserted that over $440,000 of furnishings, plus additional art and antiques, located at the Colorado Ski Villa are his wife's separate property.  However, he has never provided any documentation to support that claim and it is inconsistent with the May 8, 2009 Purchase and Sale Agreement which indicates that this is property of the Marsch Estate.  Second, German American recently settled its relief from stay action by agreeing to allow Mr. and Mrs. Marsch to remain in their beachfront luxury home located in La Jolla (appraised by German American at $10.3 million) through February 1, 2011 conditioned on them paying premiums on insurance with at least $10 million of coverage.  Marsch has no ability to pay these premiums since virtually all his assets are property of the Marsch Estate and the Marsch Estate has no liquid assets.  All of Marsch's earnings and any property he receives

69

currently (even gifts) are also property of the Marsch Estate.  Bankruptcy Code § 1115. So it is probable that Mrs. Marsch is the source of these payments.  Third, Marsch has continued to live a rich life style since filing for bankruptcy.  When he filed for bankruptcy, he indicated that his <u>monthly</u> living expenses totaled approximately $60,000, including $3,000 to maintain his residence at La Jolla, $2,050 for food, $1,000 for clothing, $1,000 for recreation, and $2,000 for travel.  He has never requested authorization from the Bankruptcy Court for money to pay any of his expenses and it has not done so.  So how has he been maintaining the life of a wealthy real estate developer living in a lavish house on the beach at La Jolla?  Mrs. Marsch is an obvious possibility. The Plan Administrator will be able to investigate the source of the money off of which Marsch has been living, for under the law it was required to be used for the repayment of his creditors, at least until and unless the Bankruptcy Court authorized him a living allowance.

**E.    Litigation with Lennar**

When Marsch filed voluntary bankruptcy petitions for himself and Briarwood, he asserted that by far their most substantial assets were litigation claims against Lennar.  He valued these claims at $200 million and described the Bridges Action as the most significant component of that claim.  However, the court that tried the Bridges Action has concluded that the claims Briarwood asserted against Lennar are invalid and, rather, that Marsch and Briarwood owe Lennar substantial sums.  Following is a brief description of the litigation among these parties.

**1.    Claims Asserted Against Lennar.**

(a)    The Bridges Action - *Briarwood Capital, LLC v. HCC Investors LLC, et al.*, Case No. GIC-877446

When it filed bankruptcy, Briarwood characterized this litigation as "by far the largest and most significant asset of the Debtor's estate."[14]  Briarwood filed the Bridges Action against Lennar in December 2006 in San Diego Superior Court, claiming, among other things, that Lennar mismanaged the Bridges project owned by HCC and seeking substantial damages and an

---

[14] Stipulation for Relief from the Stay, Docket No. 8 in the Briarwood bankruptcy case.

1    accounting.  The trial of Phase I of the Bridges Action lasted nearly one year: opening statements

2    began on June 23, 2009, evidence closed on May 20, 2010 and closing arguments concluded on

3    May 27, 2010.  This trial was underway when Briarwood filed for bankruptcy protection; the

4    parties stipulated that the automatic stay be lifted to allow the trial to proceed to judgment,

5    including Lennar's cross-complaint against Briarwood and Marsch.  The Superior Court heard

6    testimony from 21 percipient and expert witnesses and admitted 1,264 exhibits.

7         On July 16, 2010, the Superior Court issued its tentative decision, which it then revised

8    and issued as its final Statement of Decision re Phase I on September 30, 2010.  Among other

9    things in its detailed 52-page decision, the court ruled against Briarwood on its claims against

10   Lennar, rejected Briarwood's claims for damages, rejected Briarwood's claim that Lennar's

11   accounting for the Bridges was incorrect, affirmed the accuracy of those accountings, and ruled

12   that Marsch and Briarwood are jointly and severally liable to Lennar for damages of $12,046,192

13   plus attorneys' fees and costs to be awarded to the prevailing party.  The court also found that

14   "During trial, Marsch repeatedly gave false testimony on material issues."  The court concluded

15   that the "story" Marsch told "did not withstand close scrutiny and cross examination.  Ultimately,

16   Marsch was thoroughly impeached with his own testimony, documents and the testimony of other

17   witnesses."  The court also entered more than 20 specific findings regarding aspects of Marsch's

18   testimony that were "not credible." The court also found that Marsch recanted sworn testimony

19   he had previously submitted to the California Bankruptcy Court in November 1997.

20        This Statement of Decision ends Phase I of the Bridges Action in the trial court.  Phase II

21   was reserved for alter ego claims.  Briarwood initially asserted that in Phase II it would seek to

22   establish alter ego liability against various Lennar entities, including Lennar Corporation.

23   However, since the Superior Court held that Briarwood had no valid claims or damages against

24   Lennar, the Statement of Decision concluded that there will be no Phase II with respect to

25   Briarwood's asserted alter ego claims.  However, Lennar has the right to proceed to a Phase II

26   trial with respect to its claims that Marsch, Briarwood and Colony Properties are alter egos of

27   each other.

28

DISCLOSURE STATEMENT

LA3:1169526

1      Prior to the commencement of the trial, the Court ordered that, after the Phase II alter ego

2  trial, there could be two additional phases:  Phase III for issues to be tried to a jury, if any such

3  issues remained after the conclusion of Phase I; and Phase IV for punitive damages.  Briarwood

4  asserts that it is entitled to proceed to a jury trial on some issues in Phase III.  Lennar strongly

5  disputes that contention and filed a motion on October 20, 2010 seeking a determination that

6  nothing remains to be tried in Phase III or Phase IV and that judgment be entered.  The Court has

7  set a hearing date of November 18, 2010 on that motion.

8      It is possible that Briarwood might appeal the Superior Court's Statement of Decision.

9  Lennar will oppose any effort to reverse the Superior Court's decision and believes the decision

10  will not be reversed because, among other reasons, the decision followed a lengthy trial during

11  which Briarwood was given ample opportunity to present evidence and after which the court

12  concluded that the Marsch's testimony was "not credible" and that he "repeatedly gave false

13  testimony on material issues."  The appellate process would likely take more than a year and, in

14  the unlikely event that the appellate court were to modify any aspect of the trial court's detailed

15  ruling, the Marsch and Briarwood Estates would be confronted with years more of costly

16  litigation before there would be any resolution.  In short, pursuit of an appeal based upon "false

17  testimony" by Marsch could take years. Further pursuit of the Bridges Action could also subject

18  the Marsch and Briarwood Estates to claims of malicious prosecution and abuse of process,

19  among other remedies.

20      Moreover, as noted above, the claims asserted by Briarwood in the Bridges Action were

21  transferred to KRMW in November 2008.  KBR II owns 65% of the equity in KRMW and is

22  entitled, as a result, to at least the first $5 million (growing at 20% per annum) on any recovery on

23  the claims asserted by Briarwood in the Bridges Action.  KBR has concluded that this action

24  should be resolved pursuant to the terms of the Plan rather than engaging in further meritless

25  litigation.

26      (b)      The McCrink Action - *Briarwood Capital, LLC v. Lennar Land Partners*

27  *II, et al.*, Case No. GIC 875457.

28

DISCLOSURE STATEMENT

1    Briarwood filed the McCrink Action in November 2006 in San Diego Superior Court,

2    alleging that it was entitled to 50% of a real estate development project called "McCrink Ranch"

3    that Lennar and a joint venture partner acquired for approximately $130 million.  The lawsuit

4    alleged that Lennar had entered into an oral agreement with Marsch that Briarwood would be an

5    equal partner, even though it contributed no money and took no risk in the venture.  For nearly

6    two years of the litigation, Marsch and Briarwood – in pleadings, sworn declarations and

7    deposition testimony under oath – asserted that the agreement was oral, that the agreement was

8    never reflected in any writing and that the agreement was unrelated to the parties' written

9    agreements relating to the Bridges.  Lennar disputes the existence of any such agreement.  Then,

10   on the eve of the trial that was set to commence in late 2008, Marsch changed his testimony in a

11   deposition and instead claimed that the agreement was not oral but, rather, was based upon the

12   written agreements relating to the Bridges.  Lennar filed a motion for judgment on the pleadings

13   on the grounds that Marsch's testimony negated the premise upon which the case had been based.

14   The San Diego Superior Court granted the motion and dismissed the case with prejudice based on

15   the admissions made by Marsch under oath—admissions that undermined key allegations in

16   Briarwood's complaint.  The court found Marsch's attempt to explain away these admissions to

17   be "inherently incredible."  The court awarded Lennar more than $300,000 in litigation costs as

18   the prevailing party.

19   Briarwood appealed the dismissal of the McCrink Action.  Lennar has filed its appeal

20   brief in which it argues that the trial court's decision is supported on the facts and the law.  The

21   appellate argument is scheduled for November 9, 2010.  Even if the appellate court were to

22   reverse the dismissal, Lennar asserts that it is likely to prevail for numerous reasons.  For

23   example, and without limitation, Briarwood's case depends heavily on the testimony of Marsch—

24   a witness who has been found not to be credible by the judges in at least four separate matters.[15]

25   Moreover, when Marsch changed his testimony during the deposition that prompted the court to

26   dismiss the case, the new theory of his case is that Lennar breached an obligation to joint venture

27

28   [15] The courts in the McCrink Action, the Bridges Action, the Bankruptcy Court in these
     bankruptcy cases and the Bankruptcy Court in the MRP bankruptcy case.

DISCLOSURE STATEMENT

LA3:1169526

1    the project with HCC (not Briarwood or Marsch).  Thus, Briarwood now purports to be pursuing

2    the claim as a derivative claim on behalf of HCC so that any recovery would be for the benefit of

3    HCC—not Briarwood or Marsch.  Indeed, before appealing, Briarwood submitted a proposed

4    amended complaint in which it alleged that Lennar usurped HCC's corporate opportunity—not an

5    independent right of Briarwood or Marsch.  Since the San Diego Superior Court has ruled in the

6    Statement of Decision that Lennar is entitled to the first $274 million of profit from HCC, any

7    recovery by HCC in the McCrink Action would redound to the benefit of Lennar.  And any

8    recovery by Briarwood (however unlikely that may be) will be subject to offsets for the hundreds

9    of millions of dollars of claims that Lennar has against Briarwood in the Bridges Action, the DLA

10   Cases and the Florida Action.  In addition, any further proceedings would take years to conclude.

11       Moreover, as noted above, the claims asserted by Briarwood in the McCrink Action were

12   transferred to KRMW in November 2008.  KBR II owns 65% of the equity in KRMW and is

13   entitled, as a result, to at least the first $5 million (growing at 20% per annum) on any recovery on

14   the claims asserted by Briarwood in the McCrink Action.  KBR has concluded that this action

15   should be resolved pursuant to the terms of the Plan rather than engaging in further meritless

16   litigation.

17       (c)    The HCC Action - *Briarwood Capital, LLC v. HCC Investors LLC*, Case

18   No. 37-2009-00097749-CU-BC-CTL (complaint filed on September 3, 2009 in the San Diego

19   Superior Court).

20       Briarwood filed this action in an effort to obtain certain fees that it asserted were owed to

21   it by HCC pursuant to the HCC Operating Agreement for periods beginning on January 1, 2009.

22   These are the identical types of fees that Briarwood claimed were due to it in the Bridges Action

23   for the period prior to January 1, 2009 – override fees, developer fees and transfer fees.  Thus,

24   this action was stayed pending the resolution of the Bridges Action; on November 5, 2010, the

25   court continued the stay for six months.  In the Statement of Decision in the Bridges Action,

26   Judge Nevitt ruled that no such fees are owed to Briarwood under the HCC Operating Agreement

27   for the reasons set forth in Section V.E.1(a).  Lennar asserts that this ruling against Briarwood is

28   dispositive of the issues in this second case and that Briarwood's claims in this second case are

DISCLOSURE STATEMENT

1    barred for the same reasons that they were barred in the Bridges Action.  In addition, these claims

2    are subject to Lennar's offsets and KBR II asserts a lien on any such fees if they were, in fact,

3    owed by HCC to Briarwood.

4                    **2.        Resolution of the Claims Asserted Against Lennar.**

5            The Plan provides for the release of all claims against Lennar that have been or might be

6    asserted by any of the Debtors and their affiliates, the Estates or by KRMW.  As set forth above,

7    these claims have been rejected by trial courts.  Further pursuit of these claims would be an

8    inappropriate and wasteful expenditure of Estate assets because, among other reasons, it is based

9    on the testimony of Marsch who has been adjudicated to have given dishonest testimony, would

10   tie the Marsch and Briarwood Estates up in litigation for years, could expose the Marsch and

11   Briarwood Estates to malicious prosecution, abuse of process and attorney's fees and costs

12   claims, and would mean that the rights of creditors could not be determined for years to come as

13   the claims and offsets are litigated to conclusion.  As is set forth in Section V.E.3 below, Lennar

14   has asserted significant compensatory damage claims against Briarwood totaling hundreds of

15   millions of dollars.  Any recovery by Briarwood in the foregoing lawsuits would be offset against

16   the far more significant claims that Lennar has against Briarwood and Marsch.  Moreover, as

17   discussed above in connection with the McCrink Action, any recovery in that case is not for the

18   benefit of Briarwood, but, rather, is being pursued for HCC.  Since the Superior Court has

19   effectively ruled that Lennar is entitled to all the profits from HCC, any recovery would be for the

20   benefit of Lennar and not the Estates.  Even further compounding the lack of merit to pursuing

21   these claims is that KBR would be the major beneficiary and KBR does not believe that it is

22   appropriate to expend yet further time or effort in pursuing the frivolous litigation claims that

23   Marsch has asserted against Lennar (and KBR).  The litigants such as Lennar and KBR who have

24   been subjected to Marsch's lawsuits have suffered enough and creditors would be ill-served by

25   further wasteful and time-consuming lawsuits.  Moreover, if the Estates were to pursue litigation

26   against Lennar (or KBR), additional years would be consumed and neither Lennar nor KBR

27   would provide the funding set forth in the Plan which can be used to pursue assets that Marsch

28   and his affiliates have likely hidden or transferred in transactions that can be avoided.

DISCLOSURE STATEMENT

3.      **Claims Asserted By Lennar Against the Debtors.**

(a)      The Florida Action - *Lennar Corporation, et. al. v. Briarwood Capital, LLC, et al.*, Case No. 08-55740 CA40.

In July, 2008, Marsch and Briarwood sent a letter to Lennar's Board of Directors threatening to expose alleged wrongdoing by Lennar unless it agreed to pay tens of millions of dollars.  The allegations of wrongdoing were false and Lennar refused to pay the demand for extortion.   Instead, in September 2008, Lennar filed the Florida Action against Briarwood and Marsch in Florida state court seeking damages resulting from their defamatory and extortionate actions against Lennar.  Lennar also alleged that Marsch and Briarwood improperly interfered with Lennar's relationship with its joint venture partner in the McCrink Ranch project, resulting in Lennar having to buy the partner out.  Soon after the initial lawsuit was filed in Florida, Marsch enlisted the help of Mr. Minkow and his company, FDI, because in Marsch's words they operate outside the normal "justice-system tool box."  Lennar amended the complaint in January 2009 to add Mr. Minkow and FDI as defendants.  The operative complaint in the Florida Action alleges, among other items, that:

- In July 2008, Marsch and Briarwood published a highly defamatory and extortionate letter threatening to "expose" supposed crimes of Lennar management to the Securities and Exchange Commission if Lennar did not pay them money—those alleged acts were false.

- Upset at being sued and other setbacks, Marsch and Briarwood turned to Mr. Minkow—an admitted perpetrator of financial frauds who served 7 years of a 25-year prison sentence—and his company FDI.  Marsch, Briarwood, Mr. Minkow, and FDI agreed to and did use fraud, identity theft, and manipulation of the public securities markets to harm Lennar's business and reputation in an effort to force Lennar to pay millions of dollars.

- Before the New York Stock Exchange opened on January 9, 2009, the defendants issued a widespread press release stating they had "launched" the "Top 10 Red Flags for Fraud at Lennar Corporation."  The press release directed members of the business community and public throughout the U.S. to a new website called "www.lenn-ron.com" in an effort to associate Lennar with Enron Corporation, a company accused of illegal accounting.  The defendants falsely stated that Lennar, like "Bernie Madoff," "treat[ed] their joint ventures exactly like a Ponzi scheme"; failed to account to its business partners; violated securities laws by not disclosing the $5 million loan to its Chief Operation Officer; gave its COO illegal "kickbacks"; and overstated its income and "conceal[ed]" debt for the purpose of hiding a "true financial condition border[ing] on insolvent."

76                              DISCLOSURE STATEMENT

LA3:1169526

1

2
- As a direct and immediate consequence of the defendants' public dissemination of the January 9, 2009 press release and the content of the

3    "lenn-ron" website, Lennar Corporation's stock plunged more than 20%, falling from $11.42 at the previous day's close to a low of $8.23. Lennar

4    suffered hundreds of millions of dollars lost in the two days following the initial attack. Lennar lost further market capitalization as a result of

5    ongoing attacks. In addition to reputational harm, the artificial decrease in Lennar's stock price negatively impacted Lennar's credit rating, ability to

6    borrow capital, subsequent equity offerings, and day-to-day, long-term, and strategic operations, among other things.

7
- Based on this conduct, Lennar's complaint asserted five causes of action—

8    (1) Florida's Civil RICO Law (Civil Remedies Against Criminal Practices Act) § 772.101, et. seq., Florida Statutes; (2) intentionally interfered with

9    contractual and economic relations; (3) engaged in defamation per se; (4) violations of Florida Deceptive and Unfair Trade Practices Act, § 501.204,

10    Florida Statutes; and (5) civil conspiracy.

11    In this case, Lennar is seeking compensatory damages of hundreds of millions of dollars

12    plus punitive damages, attorneys' fees and costs. The damages include, but are not limited to:

13    (1) more than $ 480 million in lost market capitalization in just the few days following the initial

14    attack; (2) more than $50 million in excess interest payments that Lennar has had to incur for debt

15    that it had to obtain above market; (3) more than $50 million in damages that Lennar has suffered

16    as a result of having to buy its joint venture partner out of the McCrink project following the

17    defendants' wrongful interference with the venture; (4) fees and costs; and (5) punitive damages.

18    On February 28, 2010, Briarwood filed an adversary proceeding against Lennar (Adv.

19    Pro. No. 10-90118) in which it sought to enjoin Lennar from moving forward in the Florida

20    Action not only against it but also against non-debtors Mr. Minkow and FDI. The Bankruptcy

21    Court issued a preliminary injunction preventing the litigation from proceeding without further

22    order, but allowed it to proceed with two then pending motions for sanctions that Lennar had filed

23    against (a) Mr. Minkow and FDI; and (b) a non-party named Tracy Coenen for discovery abuses.

24    On February 24, 2010, Briarwood filed a notice of removal to federal court from the

25    Florida state court. The sole bases for removal were the bankruptcy petitions filed by Marsch and

26    Briarwood. The Florida Action was then transferred to the Bankruptcy Court for the Southern

27    District of Florida. In response, Lennar filed a motion to remand the Florida Action to the Florida

28    state court or, in the alternative, to abstain in favor of the Florida state court. Briarwood opposed

DISCLOSURE STATEMENT

1    Lennar's motion and filed a motion to transfer the Florida Action to the Southern District of

2    California.  On April 30, 2010, the Bankruptcy Court for the Southern District of Florida granted

3    Lennar's motion and remanded the case to Florida state court.

4        On March 10, 2010, Lennar filed a motion in this Court for relief from the stay, or in the

5    alternative, abstention to allow the Florida Action proceed with respect to all defendants.  On

6    May 3, 2010, the Bankruptcy Court ruled that it would abstain in favor of the Florida state court

7    so that the case will be tried there and maintained the stay in effect (with the exception of the

8    sanctions motions) to see how a number of matters developed, including Judge Nevitt's ruling in

9    Phase I of the Bridges Action.  The stay order was confirmed on September 28, 2010 until the

10    Trustees have a chance to be heard on the issue.

11        The sanctions motion against Mr. Minkow and FDI proceeded.  Lennar sought sanctions

12    against Mr. Minkow and FDI for abuse of the judicial process, including perjury, willful

13    spoliation of evidence, concealment of documents, manufacturing of documents and repeated

14    contumacious violations of court orders.  After a two-day evidentiary hearing held on August 26

15    and 27, 2010, the Florida court concluded that sanctions against Mr. Minkow are in order and

16    observed that he "<u>seems to have absolutely no sense of responsibility for telling the truth.  The

17    truth is whatever he decides is important to the moment</u>" and that Mr. Minkow "<u>will lie, plain and

18    simple</u>."  The sanctions motion against the non-party was resolved by stipulation pursuant to

19    which the non-party agreed to pay Lennar $20,000.

20        The Plan will resolve this matter as against the Estates by agreeing that Lennar will

21    discount this significant claim of hundreds of millions of dollars in compensatory damages alone

22    as against the Estates for purposes of determining Lennar's share of the unsecured creditor

23    distribution.  As set forth elsewhere, Lennar has agreed to accept distributions premised on the

24    assumption that its claim for this lawsuit as well as the DLA Piper Cases, the McCrink Action

25    and the Bridges Action were only $20 million.  This is a significant discount and provides

26    meaningful benefits for other unsecured creditors since Lennar's share of any net recoveries the

27    Plan Administrator obtains will be drastically limited.  This resolution provides further tangible

28    benefits to the Marsch and Briarwood Estates, namely avoiding hundreds of thousands of dollars,

78

1   if not substantially more, in fees and costs defending these matters.  Lennar will be free to

2   proceed with this action against Mr. Minkow and FDI and also to attempt to establish that its

3   claims against Marsch are not dischargeable and to liquidate the claims against Marsch.  This

4   greatly reduced amount of Lennar's Claim is for purposes of the Plan only.  It will not be binding

5   on Lennar for any other purpose.  Thus, Lennar will have the right (and intends) to seek to

6   establish that certain of its Claims against Marsch are non-dischargeable, to assert that these non-

7   dischargeable Claims are in substantially higher amounts than $20 million and to liquidate its

8   non-dischargeable Claims against Marsch.  Lennar will have the right to seek damages against

9   non-Debtors for any purpose.  If the Plan is not confirmed and consummated, Lennar will have

10   the right (and will intend) to prove that its Claims against the Briarwood and Marsch Estates are

11   substantially in excess of $20 million.

12             (b)      The DLA Piper Cases - *Lennar Homes of California, Inc. v. DLA Piper US*

13   *LLP, et al.*, San Diego Superior Court Case No. 37-2008-00076811-CU-PN-CTL (the "DLA-1"

14   case), and Lennar Homes of California, Inc., et al. v. DLA Piper US LLP, et al., San Diego

15   Superior Court Case No. 37-2008-00092842-CU-PN-CTL (the "DLA-2" case) (collectively, the

16   "DLA Piper Cases").

17         In 2008, Lennar filed two suits against DLA Piper US LLP (collectively with Brian

18   Foster, "DLA Piper"), Brian Foster (a partner at DLA Piper) and Marsch.  Lennar asserts that the

19   defendants engaged in misconduct, including negligence, breaches of fiduciary duty and aiding

20   and abetting such breaches related to the acquisition of McCrink Ranch, in the case of DLA-1,

21   and the Bridges, in the case of DLA-2.  After Marsch filed for bankruptcy, on May 7, 2010,

22   Lennar filed a motion seeking relief from the stay to allow it to proceed against all the defendants

23   or, at a minimum, against DLA Piper and Mr. Foster.  On May 28, 2010, the Bankruptcy Court

24   ruled that Lennar was permitted to proceed against DLA Piper and Mr. Foster and to take

25   discovery against Marsch as though he were a non-party to the action.  The Bankruptcy Court

26   denied Lennar's motion to proceed against Marsch as a defendant without prejudice to lifting the

27   stay at a later date.

28         In connection with McCrink Ranch, Lennar alleges in these cases, among other things,

LA3:1169526

1   that defendants withheld material information from Lennar which, had it known the truth, would

2   have caused it not to acquire the property for approximately $130 million and more to develop the

3   property.  In connection with the Bridges, Lennar alleges, among other things, that defendants

4   wrongfully: (1) convinced Lennar and HCC to pay Marsch/Briarwood millions of dollars to

5   which they were not entitled, including override fees, payments relating to investors to whom

6   Marsch was obligated in connection with the Williams litigation described above in Section

7   V.A.1, and judgments against Marsch in the aforementioned Williams litigation; (2) convinced

8   Lennar to enter into one-way tolling agreements based upon deceit and non-disclosure of material

9   facts; (3) induced Lennar to acquire the McCrink Ranch property without disclosure that Marsch

10  intended to assert baseless claims to the property and interfere with Lennar's contractual

11  relationship with its joint venture partner; (4) induced Lennar to execute a member admission

12  agreement regarding Lennar Bridges without disclosing that Marsch intended to refuse to accept

13  its terms, including a preferred return; (5) asserted false claims that the accountings for HCC were

14  unreliable; and (6) conspired to prepare litigation against Lennar.  This case is not yet set for trial

15  and discovery is not complete, so the full extent of Lennar's damages are not yet known.  At a

16  minimum, Lennar is claiming compensatory damages of hundreds of millions of dollars, plus

17  punitive damages, fees and costs.

18      In the Statement of Decision in the Bridges Action, the Superior Court made a number of

19  findings regarding misconduct by Marsch and DLA Piper that are at issue in the DLA Piper

20  Cases, including findings that:  Marsch and DLA worked behind Lennar's back to the detriment

21  of Lennar and for Marsch's benefit during the time that DLA Piper was serving as Lennar's

22  attorneys; and Marsch and DLA made misrepresentations to Lennar in order to induce Lennar to

23  enter into agreements to its detriment, which the court ordered rescinded due to this misconduct.

24  Lennar intends to proceed aggressively with this litigation.

25      The Plan will avoid the Estates having to incur costs to defend this litigation.  Instead, the

26  Plan will resolve this matter by agreeing that Lennar will discount its significant claim as against

27  the Estates for purposes of determining Lennar's share of the unsecured creditor distribution at

28  $20 million.  This is a significant discount and provides meaningful benefits for other unsecured

1    creditors since Lennar's share of any net recoveries the Plan Administrator obtains will be

2    drastically limited.  This greatly reduced amount of Lennar's Claim is for purposes of the Plan

3    only.  It will not be binding on Lennar for any other purpose.  Thus, Lennar will have the right

4    (and intends) to seek to establish that certain of its Claims against Marsch are non-dischargeable,

5    to assert that these non-dischargeable Claims are in substantially higher amounts than $20 million

6    and to liquidate its non-dischargeable Claims against Marsch.  Lennar will have the right to seek

7    damages against non-Debtors for any purpose.  If the Plan is not confirmed and consummated,

8    Lennar will have the right (and will intend) to prove that its Claims against the Briarwood and

9    Marsch Estates are substantially in excess of $20 million.

10    **F.    Transactions and Litigation with KBR.**

11    In mid-2008, Marsch approached KBR and induced it to advance over $7 million, which

12    with interest and preferred returns has grown to over $12 million, to fund the McCrink Action and

13    the Bridges Action against Lennar.  Marsch shortly thereafter defaulted on his obligations to

14    KBR.  When KBR sought to enforce its contractual rights, Marsch and his affiliates filed a series

15    of lawsuits against KBR.

16    The various transactions and litigations involving KBR and the Debtors are briefly

17    described below.

18    **1.    Transactions Between KBR and the Debtors.**

19    (a)    The Colony I and II Loan.

20    Colony I and Colony II own two casitas in or around the Palmilla Resort near Cabo San

21    Lucas, Mexico (the "Palmilla Properties").  Colony I owns one casita. Colony II owns the other.

22    Colony I also owns all of the membership interests in Colony II.  At the time that Marsch

23    approached KBR, Colony I and Colony II rented these casitas as resort properties—i.e., short-

24    term stays.

25    On June 24, 2008, Colony I, Colony II, Marsch, and KBR I entered into a written loan

26    agreement (the "Colony Loan Agreement").  The loan provided by KBR I was designed to

27    refinance existing indebtedness and to provide working capital.  Pursuant to the terms of the

28    Colony Loan Agreement, Colony I and Colony II jointly borrowed from KBR I the original

DISCLOSURE STATEMENT

1   principal sum of $4,900,000, of which $4,400,000 was initially disbursed and the balance was

2   held as reserves for specific payments.  Colony I and Colony II made, executed, and delivered to

3   KBR I a Promissory Note in the original principal amount of $5,880,000 to evidence the loan (the

4   "Colony Loan Promissory Note").  The Colony Loan Agreement expressly stated that the

5   Promissory Note was to be in the face amount of the loan plus the maximum Premium Amount,

6   which is defined in the Colony Loan Agreement.

7          The obligations owed to KBR I under the Colony Loan Agreement are secured by certain

8   property interests including, without limitation, the following:

9          (a)     A first priority mortgage lien encumbering Unit 496 and Unit 21, and all

10  improvements and personal property on such real property, recorded in the Cabo San Lucas

11  Country Recorder's Office on June 15, 2009, as Instrument No. 572312, and insured by

12  LandAmerica Title Insurance Company of Mexico, S.A., Policy No. M08-KBR-SJC-319, issued

13  on August 16, 2008;

14         (b)     An Assignment of Leases and Rents on Unit 496 and Unit 21;

15         (c)     A first priority security interest in all of Colony I's interest in Colony II and all

16  other assets of Colony I;

17         (d)     A first priority security interest in all of Marsch's membership interests in Colony

18  I; and

19         (e)     A security interest in all assets of Colony II.

20         On May 1, 2009, less than 9 months after this loan was made, counsel for Colony I

21  notified counsel for KBR I that it would not be making a payment due on May 1, 2009.  This was

22  the first of the payment defaults under the Colony Loan Agreement.  In fact, KBR I has received

23  no payments under the Colony Loan Agreement since April of 2009 and the loan matured on June

24  24, 2009.

25         The Colony Loan Agreement provides for a 10-day grace period for late interest

26  payments.  Thus, since May 10, 2009, KBR I has been entitled to exercise its rights and remedies

27  under the Colony Loan Agreement.  KBR I started that process in mid-May 2009.  On May 15,

28  2009, KBR I accelerated the loan and declared all loan funds to be due and payable.  KBR I then

proceeded to exercise other remedies, including removing Marsch from control of Colony I and Colony II. The relevant agreements gave KBR I a proxy to vote the member interests in Colony I and Colony II; on February 23, 2010, KBR I exercised this right and removed Marsch as the manager of Colony I and Colony II and appointed KBR Group as the manager of Colony I and Colony II.

Notwithstanding the fact that KBR had removed him from control of Colony I, two days later—February 25, 2010—Marsch purported to file a voluntary Chapter 11 petition on behalf of Colony I. Then on February 28, 2010, Marsch caused Briarwood Capital, Inc. to file an involuntary Chapter 11 petition against Colony II. Colony II did not contest the involuntary bankruptcy petition so on April 1, 2010, an order for relief was entered in the Colony II involuntary bankruptcy.

Since May 10, 2009, interest and other charges have continued to accrue under the Colony Loan Agreement. As a result, approximately $7 million was owed by Colony I and Colony II to KBR I under the Colony Loan Agreement as of February 25, 2010 when Colony I filed a voluntary bankruptcy petition.

After Colony I and Colony II filed for bankruptcy protection, KBR learned that Marsch had caused Colony I and Colony II to lease the Palmilla Properties on a long-term basis to First Place Equity, LLC ("First Place"), an entity which Marsch also controls. These leases were entered into in the summer of 2009, without KBR's knowledge or consent. These undisclosed leases effectively extracted the value of the Palmilla Properties out of Colony I and Colony II.

At the 341(a) meeting, Marsch was unable to give an accounting of what happened to the $4.4 million of cash that KBR I had advanced to these Debtors. However, the Schedules filed by Colony I and Colony II in their Chapter 11 Cases listed substantial outflows from Colony I and Colony II to other entities controlled by Marsch, including over $2 million of loans made by Colony I and II to other Marsch affiliates, including NHG, Briarwood and Marsch personally. At the 341(a) meeting, Marsch was unable to provide any guidance regarding these loans other than to say that he believed they were not documented.

DISCLOSURE STATEMENT

1    These developments, and the resulting high level of acrimony, led the Bankruptcy Court

2  on May 5, 2010 to order the appointment of a Chapter 11 Trustee for Colony I and Colony II.

3        (b)    The KRMW Investment.

4    The second transaction between KBR and the Debtors involved creating a new limited

5  liability company, KRMW.   On October 9, 2008, Marsch, Briarwood, and KBR II entered into

6  an Operating Agreement for KRMW (the "KRMW Operating Agreement").  On October 9, 2008,

7  the Articles of Organization for KRMW were filed with the California Secretary of State.

8    Briarwood is the Common Member in KRMW and holds a thirty-five percent (35%)

9  membership interest in KRMW, while KBR II is the Preferred Member and holds a sixty-five

10  percent (65%) membership interest in KRMW.

11    In return for these equity interests in KRMW, both KBR II and Briarwood/Marsch made

12  the following contributions to this venture:

13        • KBR II contributed to KRMW $3,000,000 in cash.

14        • Briarwood and Marsch contributed to KRMW:

15            o  Their direct and indirect claims against Lennar relating to HCC and Lennar

16                Bridges, LLC and the Bridges development, including claims asserted in the

17                Bridges Action and their claims against Lennar relating to The Lakes

18                development in Rancho Santa Fe, including claims asserted in the McCrink

19                Action (collectively the "Lennar Litigation");

20            o  All of their direct and indirect ownership interests in both HCC and Lennar

21                Bridges, to the fullest extent permitted by these companies' governing

22                documents (except for certain identified Retained Benefits -- the right to

23                receive certain fees from HCC under Section 6.05 of the HCC Operating

24                Agreement, which Briarwood kept); and

25            o  Their assumption of the obligation to pay all Lennar litigation costs.  (KRMW

26                Operating Agreement Section 2.1.1)

27    The KRMW Operating Agreement provides that any distributions to be made by KRMW

28  are to go first to KBR II on its Preferred Member Interest until it receives its Capital Contribution

84

DISCLOSURE STATEMENT

and a Preferred Return.  KRMW Operating Agreement Sections 7.1.1 and 7.1.2.  The Preferred

Return is 20% per annum.  KRMW Operating Agreement Section 13.17.26.  Presently, on

account of its Preferred Units, KBR II is entitled to receive approximately $5 million (growing at

20% per annum) from KRMW, before any money would be available to distribute to Briarwood

or anyone else.  This means that the value of the claims against Lennar and/or the interests in

HCC held by KRMW would have to exceed approximately $5 million before anyone other than

KBR II would be entitled to any proceeds.  That amount will grow over time as the 20% preferred

return continues to accumulate.

In addition, the KRMW Operating Agreement gives KBR II a Preferred Member Put

Right ("Put Right") to require KRMW, Briarwood, and Marsch to purchase, on thirty days'

notice, all of KBR II's Preferred Units in KRMW (excluding the Retained Equity and Retained

Litigation Interest) for cash in a amount set forth in a formula which includes adjustments for

Preferred Returns minus certain Option Fees.  KRMW Operating Agreement at Section 4.4(2).

KBR II was authorized to exercise its Put Right on or after the earlier of (i) the second

anniversary of the Effective Date of the KRMW Operating Agreement; or (ii) the date Marsch

failed to timely exercise the right to extend the Repurchase Right and/or timely pay the $120,000

option fee or failed to timely pay any Option Fee after the 18th month anniversary of the Effective

Date; or (iii) the Litigation Determination Date.  KRMW Operating Agreement Section § 3.1.2.4.

One such event would be sufficient to trigger KBR II's Put Right.  KBR asserts that multiple

triggering events have, in fact, occurred.

The time to exercise the right to extend the Repurchase Right and timely pay the $120,000

option fee was at any time up to the first anniversary of the Effective Date.  KRMW Operating

Agreement § 3.1.2.1.1  KBR II and Marsch disagree on whether the Effective Date for the

KRMW Operating Agreement is the date the agreement was dated, October 9, 2008, or the date

on which KBR II funded its investment in KRMW, November 5, 2008.  But under either

formulation, the 12-month anniversary of the Effective Date has passed.  Since Marsch never

exercised the option to extend the Repurchase Right and never paid the option fee, KBR II asserts

that it had the right to exercise its Put Right.

DISCLOSURE STATEMENT

1    KBR II's right to exercise its Put Right was also triggered on two separate occasions by

2    occurrences of the Litigation Determination Date, as defined in the KRMW Operating

3    Agreement.  Section 4.4 of the KRMW Operating Agreement defines a "Litigation Determination

4    Date" as  including:  (1) if the Lennar Litigation is not fully adjudicated within 12 months of the

5    Effective Date; or (2) if either action comprising the Lennar Litigation is dismissed or results in

6    no award to Marsch and/or KRMW for any one action.

7    There can be no question that the Lennar Litigation was not fully adjudicated within 12

8    months past the Effective Date; this trigger occurred long ago.  Moreover, one of the cases

9    comprising the Lennar Litigation—the McCrink Action—was dismissed.  These facts provided

10   KBR II two additional bases for exercising its Put Right.

11   This Put Right is secured by a security interest and lien on the following:

12   (a)    Any and all claims arising out of, related to, or that may be derived from HCC and

13   the Lennar Litigation;

14   (b)    The Retained Benefits—i.e., Briarwood's rights to certain fees under Section 6.05

15   of the HCC Operating Agreement;

16   (c)    Marsch's membership interest in Briarwood and Colony I;

17   (d)    Colony I's membership interest in Colony II; and

18   (e)    Any and all proceeds of or from the foregoing.  KRMW Operating Agreement at

19   Section 3.1.2.4.

20   After the Superior Court dismissed the McCrink Action, KBR II sent a letter to Marsch

21   noting that the McCrink Action had been dismissed and reserving its right to exercise the Put

22   Right..  On March 25, 2009, KBR II exercised the Put Right.  At that time, the Put Purchase Price

23   was $4,734,000; the first installment of that amount was due on or before sixty days after Marsch

24   and Briarwood received the written notice.  On April 22, 2009, Marsch and Briarwood denied

25   that the McCrink Action had been dismissed and refused to purchase KBR II's Preferred Units.

26   On May 20, 2009, KBR II notified Marsch and Briarwood that Colony I and Colony II's default

27   under the Colony Loan Agreement also constituted an Event of Default and that on that basis as

28

DISCLOSURE STATEMENT

1    well, KBR II elected to accelerate the due date of the Put Purchase Price as permitted by the

2    Security Agreements.

3    　　　Irrespective of Marsch's and Briarwood's allegations that the Put Right was not triggered

4    in the spring of 2009, KBR asserts that it was triggered no later than November 5, 2009—the 12

5    month anniversary of the date that KBR II funded its contributions to KRMW.  As of the date

6    Marsch and Briarwood filed for bankruptcy protection, the accrued amount of the Put Right was

7    approximately $5 million (growing at 20% per annum).  As noted above, this claim is secured by

8    any claims that could be asserted by HCC, all claims that Briarwood or Marsch have against

9    Lennar, any right Briarwood has to fees from HCC, and the membership interests in Briarwood,

10   Colony I and Colony II.

11   　　　Neither Marsch nor Briarwood has purchased KBR II's Preferred Units in KRMW as

12   required.  Thus, KBR II asserts that it has both: (i) ownership of the Preferred Units in KRMW

13   with a preference of approximately $5 million (growing at 20% per annum), and (ii) a claim

14   against Marsch and Briarwood under the Put Right for approximately $5 million (growing at 20%

15   per annum), which claim is secured by any claims that could be assert by HCC, all claims that

16   Briarwood or Marsch have against Lennar, any right Briarwood has to fees from HCC, and the

17   member interests in Briarwood, Colony I and Colony II.  Until and unless Marsch or Briarwood

18   pay for the Put Right, KBR II asserts that it has both the Preferred Units in KRMW and a secured

19   claim against Marsch and Briarwood.

20   　　　　　　　(c)　　　Non-Bankruptcy Litigation

21   　　　Prior to filing for bankruptcy protection, Marsch and his affiliates filed the following

22   lawsuits against KBR.

23   　　　*Briarwood Capital, LLC, et. al, v. KBR Group, LLC, et al*. Case No. 37-2009-00090247-

24   CU-BC-CTL (the "First KBR Action").  On May 21, 2009, Marsch and his affiliates filed a pre-

25   emptive lawsuit against KBR and certain individuals affiliated with KBR to attempt to prevent

26   KBR from exercising remedies under the agreements described above.  The First KBR Action

27   was assigned to Hon. David B. Oberholtzer of the Superior Court for San Diego County.

28

DISCLOSURE STATEMENT

LA3:1169526

1    *Briarwood Capital, LLC, et. al., v. KBR Group, LLC, et. al.*, Case No. 37-2009-00090462-

2    CU-BC-CTL (the "Second KBR Action").  Apparently dissatisfied with their judicial assignment

3    in the First KBR Action, on May 22, 2009, Marsch and his affiliates filed a second, identical case

4    against KBR. The Second KBR Action was assigned to Hon. Jay M. Bloom of the Superior Court

5    for San Diego County.  The plaintiffs then dismissed the First KBR Action. The relevant

6    agreements provide for arbitration, so KBR petitioned to compel arbitration and to stay the action

7    before Judge Bloom.  On August 14, 2009, Judge Bloom granted this petition to stay the action

8    and compelled arbitration of the entire dispute against all the KBR Parties based on the

9    mandatory arbitration provisions in the Colony Loan Agreement and the KRMW Operating

10   Agreement.  This matter was then assigned to the Hon. Kevin W. Midlam (Retired) at JAMS for

11   arbitration.

12   *Briarwood Capital, LLC, et. al., v. KBR Group, LLC, et. al.*, Case No. 37-2009-00100835-

13   CU-BC-CTL (the "Third KBR Action").  Marsch and his affiliates never challenged Judge

14   Bloom's order in the Second KBR Action.  Instead, on October 26, 2009 they attempted to

15   circumvent that order by commencing a third action in San Diego Superior Court.  In the Third

16   KBR Action, the same plaintiffs raised the same allegations against the same KBR parties for the

17   third time, notwithstanding the fact that Judge Bloom already ordered all such claims to binding

18   arbitration.  In addition, in the third KBR Action, Briarwood and Marsch sued Lennar (and

19   certain of Lennar's officers) for engaging in settlement discussions with KBR.

20   The Third KBR Action was removed to the United States District Court for the Southern

21   District of California.  After the case was removed, Briarwood dismissed the federal claim

22   (RICO) and the individual Lennar defendants in order to try to negate federal jurisdiction, and

23   then moved to remand.  The case was remanded to state court.  Once in state court, Lennar filed a

24   demurrer to stay the claims against Lennar on the grounds that they were already the subject of

25   the Bridges Action.  Briarwood dismissed the entire case without prejudice on or about the day its

26   opposition to this motion was due.

27   The bankruptcy Schedules that Marsch caused to be filed in the Briarwood case list these

28   litigation claims against KBR as assets and assert that they have a value of $90 million.  KBR and

DISCLOSURE STATEMENT

1    Lennar assert that the claims are baseless.  Many of the litigation claims asserted by Marsch and

2    his affiliates allegedly arise from a settlement meeting that took place between representatives of

3    Lennar and representatives of KBR.  The meeting was appropriate.  As the 65% member in the

4    entity that owns any claims against Lennar, it was proper for KBR to meet with Lennar.  This

5    meeting was also fully disclosed to Marsch.  It provides no basis for a legitimate cause of action,

6    much less damages.

7         **G.    Relations with 1st Pacific Bank and its Successor CNB.**

8         In August 2006, 1st Pacific made a $4 million loan to SJ Land.  This loan was secured by

9    an option that SJ Land had to acquire property in San Jacinto, California.  In August 2007, 1st

10   Pacific increased the loan to $7 million.  This loan was secured by the option, but that option

11   turned out to be worthless and SJ Land filed for bankruptcy in October 2008.

12        SJ Land was controlled by Marsch.  Marsch and Briarwood guaranteed that debt.  Thus,

13   the Schedules that Marsch filed in his Chapter 11 Case and that he caused Briarwood to file in its

14   Chapter 11 Case list an undisputed obligation to 1st Pacific totaling $6,739,037.98. The Schedules

15   also claim that this obligation is secured by litigation claims against Lennar that the Schedules

16   assert have a value of $200 million.

17        On May 20, 2009, the FDIC seized 1st Pacific and, as receiver, sold 1st Pacific's assets

18   (including the debt owed by Marsch and Briarwood) to CNB.  Thus, CNB is the successor to 1st

19   Pacific.  On October 5, 2010, CNB filed proofs of claim in both the Marsch and Briarwood

20   Chapter 11 Cases asserting that it is owed $7,020,810.12.  CNB filed these proofs of claim as

21   unsecured debt.  It is appropriate that CNB does not assert any collateral (much less $200 million

22   of collateral) given that the Superior Court has ruled that Briarwood and Marsch do not have any

23   legitimate claims against Lennar.  Even if there were any such claims, Briarwood and Marsch

24   transferred them to KRMW over one year earlier, and therefore, were not able to grant 1st Pacific

25   a lien on any such claims.

26        After the collapse of SJ Land, in late 2008, Glenn Marshall—a former loan officer at 1st

27   Pacific—introduced Barry Minkow to Marsch, which led to the defamation and extortion

28   campaign against Lennar described above. Mr. Marshall is no longer with 1st Pacific and has

DISCLOSURE STATEMENT

1    never been employed by CNB.  But he continues to an ongoing relationship with Marsch and his

2    affiliated companies.  For example, the SOFA that Marsch filed in his personal Chapter 11 Case

3    indicates that Marsch made payments totaling $10,000 to Mr. Marshall on February 17, 2010 and

4    February 25, 2010.  This second payment was made on the very day that Marsch filed his

5    bankruptcy petition, so it is likely an unauthorized post-petition payment.  The other payment was

6    made within 8 days of his bankruptcy and can likely be recovered as a voidable preference.  At

7    his 341(a) meeting, Marsch testified that these payments were made for alleged consulting

8    services that he could not explain.  And when MRP filed for bankruptcy in Colorado, Messrs.

9    Minkow and Sachs signed a consent authorizing Mr. Marshall to act on behalf of MRP in its

10   bankruptcy case and MRP initially maintained a debtor-in-possession bank account in the name

11   of the Marshall Family Trust with Mr. Marshall's address listed on the account.

12   **VI.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES**

13          The following section of this Disclosure Statement describes certain of the major events

14   that have occurred to date in the four Chapter 11 Cases covered by this Disclosure Statement.

15   The following description is not exhaustive, for these bankruptcy cases have been active and

16   contentious.

17          **A.    The Bankruptcy Petitions.**

18          Briarwood filed its voluntary Chapter 11 petition on February 23, 2010.  Its stated purpose

19   was to prevent KBR II from exercising remedies since Briarwood had failed to succeed in the

20   non-bankruptcy litigation it had filed against KBR.  In addition, Briarwood sought to prevent

21   Lennar from proceeding with the Florida Action, which the court had set for trial in August 2010.

22          On February 25, 2010, Marsch and Colony I also filed voluntary Chapter 11 petitions.

23   Marsch had given KBR proxies to vote the membership interests in Briarwood and Colony I in

24   2008. KBR exercised them on February 24, 2010, when Marsch was not protected by the

25   automatic stay.

26          On February 28, 2010, Briarwood filed an involuntary Chapter 11 petition against Colony

27   II.  Colony II did not contest the involuntary bankruptcy petition, so on April 1, 2010, an order for

28   relief was entered in the Colony II involuntary bankruptcy case.

1    **B.    Stipulation for Relief From the Stay to Let the Bridges Action Proceed to**

2    **Judgment.**

3    When Briarwood and Marsch filed for bankruptcy protection, the Bridges Action was

4    midway through trial.  Briarwood and Lennar stipulated that the Bridges Action could proceed to

5    judgment, including with respect to Lennar's cross-complaint against Briarwood, Marsch and a

6    non-Debtor affiliate of Marsch.  The Bankruptcy Court approved that stipulation on February 26,

7    2010.  When Marsch filed for bankruptcy, the parties entered into a similar stipulation, which the

8    Bankruptcy Court approved on March 1, 2010.

9    As a result, the trial in the Bridges Action continued without interruption.  As described

10    above, on September 30, 2010, the Superior Court issued its Statement of Decision re Phase I in

11    which it rejected the Debtors' claims against Lennar and held that Briarwood and Marsch owe

12    Lennar over $12 million.  The Superior Court also concluded that Marsch had repeatedly lied on

13    material facts throughout that trial.

14    **C.    The Florida Action.**

15    As described above, unlike the Bridges Action (and other litigation in which they were

16    plaintiffs), Marsch and Briarwood sought to stop the Florida Action after they filed for

17    bankruptcy protection.  On February 28, 2010, Briarwood filed an adversary proceeding in the

18    Bankruptcy Court against Lennar (Ad. Pro. No. 10-90118) in which it sought to enjoin Lennar

19    from moving forward in the Florida Action against Mr. Minkow and FDI and also sought to

20    prevent Lennar from seeking to remand the Florida Action to Florida state court.

21    On February 24, 2010, Briarwood filed a notice of removal in which it sought to remove

22    the Florida Action from the Florida state court before which this litigation had been pending.  The

23    Florida Action was transferred to the Bankruptcy Court for the Southern District of Florida.

24    Lennar filed a motion with that court either to remand the Florida Action to the Florida state court

25    or, in the alternative, to abstain in favor of the Florida state court.  In response, Briarwood filed a

26    motion to transfer venue of the Florida Action to the Southern District of California.  On April 30,

27    2010, the Bankruptcy Court for the Southern District of Florida issued its order remanding the

28    case to Florida state court and ruling that it would abstain in favor of that court.

DISCLOSURE STATEMENT

LA3:1169526

1     On March 29, 2010, the Bankruptcy Court issued a preliminary injunction preventing the

2     litigation from proceeding without further order, but declined to enjoin Lennar from proceeding

3     with a sanctions action that Lennar had filed against Mr. Minkow, FDI and a non-party for

4     discovery abuses.  The Bankruptcy Court also declined to prevent Lennar from seeking to remand

5     the Florida Action back to Florida state court.

6     On March 10, 2010, Lennar filed with the California Bankruptcy Court a motion for relief

7     from the automatic stay, or in the alternative, abstention to let the Florida Action proceed with

8     respect to all defendants.  On May 3, 2010, the California Bankruptcy Court ruled that it would

9     abstain in favor of the Florida state court so that the case would be tried there and maintained the

10    stay in effect (with the exception of the sanctions motions), to see how a number of matters

11    developed, including Judge Nevitt's ruling in Phase I of the Bridges Action.  The stay order was

12    confirmed on September 28, 2010 until the Trustees have an opportunity to be heard on the issue.

13    The sanctions motions against Mr. Minkow and FDI proceeded.  Lennar sought sanctions

14    against Mr. Minkow and FDI for gross abuses of the judicial process, including destruction of

15    documents and manufacturing other documents.  After a two-day evidentiary hearing held on

16    August 26 and August 27, 2010, the Florida court concluded that sanctions against Mr. Minkow

17    are definitely in order and observed that he "<u>seems to have absolutely no sense of responsibility</u>

18    <u>for telling the truth.  The truth is whatever he decides is important to the moment</u>" and that Mr.

19    Minkow "<u>will lie, plain and simple.</u>"

20    Todd Macaluso was initially one of Briarwood's and Marsch's trial counsel in the Florida

21    Action.  Mr. Macaluso, who is based in California, however, had his license to practice law

22    suspended.  Briarwood and Marsch were also represented in this action by Dimond Kaplan &

23    Rothstein, P.A. (the "Dimond Firm"), a Florida firm.  On April 28, 2010, Briarwood and Marsch

24    filed applications with the Bankruptcy Court to retain the Dimond Firm as special litigation

25    counsel.  Lennar objected on the grounds, among others, that the application failed to disclose the

26    relationship between Messrs. Dimond and Mr. Macaluso or that Mr. Macaluso had guaranteed the

27    fees to be incurred by the Dimond Firm.  The Bankruptcy Court deferred ruling on the retention

28    application while Marsch was in control of the Debtors.  At a hearing held on September 21,

92

1    2010, the Briarwood and Marsch Trustees indicated that they were withdrawing the application to

2    retain the Dimond Firm (without prejudice to renewing it) both because of the issues raised in

3    Lennar's objection and the fact that they did not believe that it would be prudent for the Estates to

4    incur fees on this matter at the present time, particularly since the Estates had no resources to pay

5    them.

6                  **D.       Briarwood's Adversary Proceeding Against HCC Regarding Fees.**

7           On April 5, 2010, Briarwood filed in the Bankruptcy Court an adversary proceeding

8    against HCC (Ad. Pro. No. 10-90184-PB).  In this complaint, Briarwood asserted that HCC had

9    failed to pay HCC certain fees allegedly owed under Section 6.05 of the HCC Operating

10   Agreement.  Briarwood also filed an application for a preliminary injunction forcing HCC to pay

11   it these fees.

12          The issues that Briarwood raised in this adversary proceeding were already being litigated

13   in the Bridges Action.  Thus, on April 22, 2010, Lennar filed an opposition to Briarwood's

14   application for a preliminary injunction and also filed a motion to abstain in favor of the court

15   trying the Bridges Action.  Lennar argued that Briarwood was not entitled to any such fees and

16   that Judge Nevitt had already taken substantial evidence on these exact issues.

17          The Bankruptcy Court heard this matter on May 3, 2010 and took it under submission, but

18   has yet to rule.  Lennar requested an extension to answer or to move to dismiss the complaint

19   since the motion for preliminary injunction was pending.  Briarwood refused, so Lennar filed a

20   motion to dismiss on May 5, 2010.  Briarwood requested an extension of time to respond to that

21   motion and Lennar agreed.

22          Judge Nevitt's September 30, 2010 Statement of Decision in the Bridges Action resolves

23   the issues raised in this adversary proceeding.  He ruled that HCC owes no such fees to

24   Briarwood because: (i) no override fees are owed to Briarwood since the agreements provide that

25   no such fees are to be paid until Lennar has achieved a 25% internal rate of return and Lennar has

26   not achieved that rate of return (nor will it achieve it in the future), (ii) Marsch and Briarwood

27   repudiated any entitlement to these fees, and (iii) in any event, HCC would be entitled to offset

28   the over $12 million owed to it by Briarwood and Marsch against any such fees.

                                                                                       DISCLOSURE STATEMENT

1    Lennar believes that Judge Nevitt's ruling resolves this adversary proceeding.  Moreover,

2    any fees owed to Briarwood would have been subject to a lien in favor of KBR II to secure its Put

3    Right, which presently is approximately $5 million (growing at 20% per annum).  KBR II filed a

4    pleading in which it underscored that any funds that Briarwood would collect in this adversary

5    proceeding would be KBR's cash collateral and KBR did not consent to Briarwood using any

6    such cash collateral.

7    The Plan will resolve this dispute, to the extent there is anything left to decide, by KRMW

8    and Briarwood transferring to Lennar all their interests in HCC and the Estates releasing all

9    claims against Lennar.

10    **E.    The Chapter 11 Trustee Motions, the Appointment of an Examiner for**

11    **Briarwood and the Appointment of Chapter 11 Trustees for Each of the**

12    **Debtors.**

13    **1.    The Appointment of a Chapter 11 Trustee for Colony I and Colony II**

14    **and the Appointment of an Examiner for Briarwood.**

15    On March 25, 2010, KBR filed motions in each of the four Chapter 11 Cases seeking the

16    appointment of Chapter 11 Trustees for Colony I, Colony II, Briarwood and Marsch.  KBR

17    detailed Marsch's suspect dealings involving Colony I and Colony II, including the lease of their

18    properties to First Place Equity.  KBR also asserted that it had exercised the proxies that Marsch

19    had granted to KBR to elect managers of Briarwood, Colony I and Colony II and had done so

20    prior to Marsch's bankruptcy.  KBR contended that, as a result, actions taken by Marsch on

21    behalf of these entities were improper and that this issue would place a cloud on the bankruptcy

22    cases that could best be resolved by appointing Chapter 11 Trustees.  KBR also detailed the

23    misrepresentations that Marsch had made to KBR about the claims against Lennar and asserted

24    that "Marsch is pursuing a scorched-earth, winner-take-all litigation strategy.  However, Marsch

25    is not gambling with his own money…. Marsch's creditors have already suffered the effects of

26    his poor judgment and his ill-conceived litigation strategy.  Marsch has amply demonstrated that

27    he cannot be relied upon to act prudently and in the best interests of creditors."  KBR argued that

28

DISCLOSURE STATEMENT

1  the appointment of trustees was justified either for cause, or because it was in the best interests of

2  the estates given the extreme acrimony between Marsch and his creditors.

3      Lennar joined in these motions.  Lennar supplemented KBR's arguments by presenting

4  evidence that Marsch had rendered HCC dysfunctional by abusing his position on HCC's

5  governing board.  The HCC Operating Agreement is structured so that Briarwood and Lennar

6  each are able to appoint 2 representatives to this governing board and that 3 votes are required to

7  approve any significant action.  During the relevant time, Marsch was Briarwood's sole

8  representative on the HCC governing body and effectively had a veto.  Lennar asserted that he

9  had used this position to disable HCC from dealing with pressing operational issues involving this

10 development and The Bridges Club at Rancho Santa Fe (the "Bridges Club").  As a result, the

11 members were becoming adversarial to HCC and the value of HCC was being severely damaged.

12     The Debtors in Possession opposed these Motions.

13     The Bankruptcy Court heard this matter on May 5, 2010.  At the conclusion of that

14 hearing, the Court announced that it would (i) order the appointment of  a Chapter 11 Trustee for

15 the Colony I and Colony II cases on the grounds that creditor distrust of the Debtors and

16 acrimony among the parties was sufficiently high that this was in the best interests of creditors

17 and the estates, (ii) order the appointment of an Examiner for Briarwood to investigate Lennar's

18 allegations that Marsch had abused his position on the HCC governing board, and (iii) continue

19 the motions to appoint Chapter 11 Trustees for the Briarwood and Marsch Estates until a status

20 conference to be held on July 12, 2010.

21     On May 7, 2010, the Bankruptcy Court entered its order directing the appointment of a

22 Chapter 11 Trustee for Colony I and Colony II. The United States Trustee selected Richard

23 Kipperman and the Bankruptcy Court approved the appointment of Mr. Kipperman on June 6,

24 2010.  He has served as the Chapter 11 Trustee for Colony I and Colony II ever since.

25     On June 7, 2010, the Bankruptcy Court entered an order directing the appointment of an

26 Examiner in the Briarwood Chapter 11 Case to investigate Lennar's allegations regarding HCC.

27 The United States Trustee selected Mr. Bruggeman as the Examiner for Briarwood.  The

28 Bankruptcy Court approved that appointment on June 13, 2010.

DISCLOSURE STATEMENT

1          **2.**     **The Report of the Briarwood Examiner.**

2          The Briarwood Examiner reviewed over 1,100 pages of documents submitted by the

3    parties concerning the operational issues facing HCC, Marsch's role on its governing body and

4    the litigation among the parties.  He met with seventeen witnesses representing various

5    constituencies, including Marsch, Marsch's litigation and bankruptcy counsel, representatives of

6    Lennar, Lennar's litigation and bankruptcy counsel, the Chairman of the Board of Directors of the

7    Bridges Club, a member of the Board of Directors of the Bridges Club, current and former

8    members of the Advisory Board of Governors of the Bridges Club, and counsel to the Board of

9    Governors of the Bridges Club.

10          On July 8, 2010, Mr. Bruggeman issued his Interim Report.  In it he detailed a number of

11    proposals that had been considered and negotiated by HCC and the Bridges Club's Board of

12    Governors over several years, but which had not yet been adopted because of Marsch's refusal to

13    authorize HCC to do so.  The Examiner concluded that Marsch's conduct on the HCC Executive

14    Committee "rises, in the Examiner's view, to the level of a failure to faithfully exercise his duties

15    as a member of the HCC Executive Committee.  In addition, the Examiner believes Marsch's

16    actions, or failure to act, have reduced the value of HCC in the Debtors' estate."  The Examiner

17    concluded by recommending "to the Court that … Marsch be removed from the HCC Executive

18    Committee and that a knowledgeable and disinterested individual be appointed to replace

19    Marsch."

20          Marsch disagreed with these conclusions in pleadings filed on July 12 and 16, 2010.  At a

21    hearing held on July 12, 2010, Judge Bowie indicated that he found Marsch's attacks on the

22    Examiner inappropriate.  On July 16, 2010, the Examiner filed his response in which he

23    addressed Marsch's attacks and asserted that the Debtors' attacks are "replete with errors,

24    misstatements and partial statements."

25          Notwithstanding the fact that the Examiner urged the appointment of a replacement for

26    Marsch on the HCC governing body more than three months ago, the Trustees took no action

27    until recently.  On October 22, 2010, the Briarwood Trustee filed a Notice of Intended Action to

28    appoint the Examiner as Briarwood's representative.  Since the interests in HCC have been

DISCLOSURE STATEMENT

LA3:1169526

1    assigned to KRMW, it is also possible that KRMW could take action with respect to the HCC

2    Executive Committee.

3          The Plan addresses the dysfunctionality of HCC by assigning to Lennar all interests in

4    HCC.  Lennar can then appoint appropriate members to the HCC Executive Committee so that

5    there is a quorum, the HCC Executive Committee can work constructively and HCC can function.

6                    **3.      The Appointment of the Briarwood and Marsch Trustees.**

7          As noted above, the Bankruptcy Court set a continued hearing on KBR's motions to

8    appoint Chapter 11 Trustees in the Briarwood and Marsch Chapter 11 Cases for Monday, July 12,

9    2010.  On Friday, July 10, 2010, Lennar received from David Ortiz (the attorney for the United

10   States Trustee for the Southern District of California assigned to these cases) the transcript of the

11   341(a) meeting conducted in the MRP case in Colorado at which Marsch had testified on behalf

12   of MRP.  Mr. Ortiz had been alerted to the events in Colorado by his counterpart there who

13   warned Mr. Ortiz that Marsch's testimony and the pleadings in Colorado were different than what

14   Marsch had portrayed in California.  Neither Marsch nor anyone else affiliated with the California

15   Debtors or with MRP had advised the Bankruptcy Court or the creditors involved in the

16   California Chapter 11 Cases that MRP had filed for bankruptcy protection in Colorado or

17   provided any notice of anything that had transpired in the MRP bankruptcy case.

18         On July 12, 2010, Lennar filed a pleading that detailed these circumstances.  At the

19   hearing that afternoon, counsel for the Debtors in Possession attempted to explain these events,

20   but acknowledged that the Schedules and Statements filed in the California cases were wrong in a

21   number of material respects even though they had been signed by Marsch under penalty of

22   perjury.

23         At the end of this hearing, Judge Bowie indicated that he was "tremendously concerned"

24   by these revelations.  He gave the Debtors until that Friday, July 16, 2010, to file a written

25   response and to correct the erroneous Schedules and SOFAs that they had filed.  The Debtors

26   filed those pleadings as ordered.

27         On July 19, 2010, the Bankruptcy Court issued its order directing the appointment of

28   Chapter 11 Trustees in the Marsch and Briarwood Chapter 11 Cases.  The Bankruptcy Court

DISCLOSURE STATEMENT

1   based this conclusion on a number of factors, including the Bankruptcy Court's concern about

2   Marsch's "honesty with the Court as a debtor-in-possession in his own case, and as a managing

3   member of Briarwood."  The Bankruptcy Court detailed Marsch's changing testimony under

4   penalty of perjury and concluded that "movants have shown by clear and convincing evidence

5   that a trustee should be appointed in both the Marsch and Briarwood cases."  The Bankruptcy

6   Court observed that the responses that the Debtors had recently filed in response to the

7   Bankruptcy Court's order were an "unmitigated effort to deflect the impact of Marsch's apparent

8   dishonesty at the Briarwood 341(a)."  The Bankruptcy Court observed that Marsch's previously

9   undisclosed transfer of MRP to Messrs. Minkow and Sachs might be avoided as a fraudulent

10  transfer, but the Court did not need to decide that question in order to conclude that Marsch

11  should be removed from control of these Estates.  Rather, "the issue squarely presented to the

12  Court is Marsch's dishonest testimony, under oath, at the Briarwood 341(a) meeting.  This Court

13  has lost confidence in Marsch's capacity for candor and honesty, and concludes that a trustee

14  should be appointed in both the Marsch and Briarwood Chapter 11 cases, both for cause under §

15  1104(a)(1), and in the best interests of creditors and the estate under § 1104(a)(2)."

16          On July 30, 2010, the United States Trustee selected James Kennedy to serve as the

17  Trustee for Marsch and on August 4, 2010, the Bankruptcy Court approved that appointment. Mr.

18  Kennedy has served as the Marsch Trustee since that time.

19          On July 30, 2010, the United States Trustee selected Leslie Gladstone to serve as the

20  Briarwood Trustee.  Lennar objected to her appointment on the grounds that she had previously

21  done legal work for Marsch.  The Bankruptcy Court overruled that objection and on August 6,

22  2010 approved the appointment of Ms. Gladstone.  She has served as the Briarwood Trustee since

23  that time.

### 4.      Marsch's Motion to Reconsider the Appointment of a Chapter 11 Trustee in his Personal Bankruptcy.

26          On August 2, 2010, Marsch filed a motion to reconsider the appointment of a Chapter 11

27  Trustee in his personal Chapter 11 Case.  Marsch was represented in this motion by a new law

28  firm, Keehn & Associates.

LA3:1169526

1    KBR and Lennar opposed this motion on the grounds *inter alia* that the motion was an

2    improper attempt to reargue the contentions that prior counsel had argued the previous month and

3    which the Court had considered and rejected.  Lennar also argued that subsequent events

4    reinforced the need for a Chapter 11 Trustee—e.g., Judge Nevitt's July 16, 2010 tentative

5    decision in the Bridges Action in which he rejected Briarwood's contentions and concluded that

6    Marsch had repeatedly lied under oath, the filing of the MRP Plan that attempted to eviscerate the

7    rights of the Marsch Estate, and Marsch's declarations in connection with this motion for

8    reconsideration which attempted to explain away his perjury.

9    At a hearing on September 15, 2010, Judge Bowie denied this motion for reconsideration.

10    He observed that he had given this matter a lot of consideration since his July 19, 2010 decision

11    and was persuaded even more strongly that his decision to appoint a Chapter 11 Trustee was

12    correct.  Judge Bowie explained that this decision was based solely on the facts presented to him

13    at the time, but if he were to consider subsequent events, they enforced the wisdom of that

14    decision.

15    **F.    The Two Adversary Proceedings Filed by KBR.**

16    KBR filed two adversary proceedings in the Chapter 11 Cases designed to adjudicate that

17    it is properly in control of Briarwood, Colony I, Colony II and KRMW.

18    **1.    The First KBR Adversary Proceeding.**

19    On March 9, 2010, KBR filed an adversary proceeding in each of the four Chapter 11

20    Cases (Ad. Pro. No. 10-90133).  In this action, KBR sought a determination that KBR is in

21    control of Briarwood, KRMW, Colony I and Colony II and sought an injunction against Marsch

22    from asserting that he was in control of any of them.  The bases for KBR's contentions were

23    KBR's exercise of the proxies given to KBR II by Marsch to vote the member interests in

24    Briarwood, Colony I and Colony II, which KBR exercised before Marsch filed bankruptcy, and

25    the fact that KBR II holds 65% of the voting equity in KRMW and is free, as a matter of

26    agreement and non-bankruptcy law, to elect the manager of KRMW.

27    On March 25, 2010, KBR filed a motion for a preliminary injunction. KBR sought to

28    enjoin Marsch from exercising control over Briarwood, Colony I or Colony II.

DISCLOSURE STATEMENT

1    KBR's motion for a preliminary injunction was set for hearing on May 5, 2010, the same

2    day as KBR's motion for the appointment of a Chapter 11 Trustee for Briarwood, Colony I,

3    Colony II and Marsch.  In its pleadings, KBR explained that the trustee motions and this

4    preliminary injunction were essentially alternatives; KBR would be satisfied with either.

5        At the hearing on May 5, 2010, the Bankruptcy Court ordered the appointment of a

6    Chapter 11 Trustee for Colony I and Colony II, ordered the appointment of an Examiner for

7    Briarwood and set a continued hearing on the Briarwood and Marsch Trustee motions for July 12,

8    2010.  With respect to KBR's motion for a preliminary injunction in this adversary proceeding,

9    the Bankruptcy Court held that KBR had established that it was likely to prevail on the merits

10    (i.e., that it had properly exercised these proxies and voting rights), but that KBR had not

11    established irreparable injury if the status quo continued pending a final determination of the

12    merits, and thus failed the test for a preliminary injunction.

13        On August 2, 2010, KBR filed a motion for summary judgment in this adversary

14    proceeding.  In this summary judgment motion, KBR sought a determination that it is the

15    manager of KRMW by virtue of its 65% voting interest and that Marsch is no longer in control of

16    Colony I and Colony II.  KBR explained that seeking this relief was necessary because even

17    though a trustee had been approved, Marsch had purported to cause Colony I and Colony II, as

18    debtors-out-of-possession, to file chapter 11 plans.

19        The Marsch and Briarwood Trustees requested that this summary judgment motion be

20    continued to allow them time to analyze this matter.  As a result, the Bankruptcy Court has not

21    yet ruled on the summary judgment motion. The next status conference is set for January 5, 2011.

22            **2.**        **The Second Adversary Proceeding Filed by KBR.**

23        On July 12, 2010, KBR filed a second adversary proceeding (Ad. Pro. No. 10-90322)

24    seeking a determination that (i) KRMW owns all claims against Lennar and these claims are not

25    property of any of the bankruptcy estates, (ii) KRMW owns the 50% interest in HCC that was

26    previously owned by Briarwood and that neither the Marsch nor Briarwood Estates has any

27    interest in HCC, (iii) KRMW owns whatever interests in Lennar Bridges that Briarwood

28    previously owned and that neither the Marsch nor Briarwood Estates has any interest in Lennar

1  Bridges, (iv) KBR II properly exercised its Put Right under the KRMW Operating Agreement and

2  because neither Marsch nor Briarwood purchased the Preferred Units in KRMW, despite their

3  obligation to do so, KBR is free to pursue either collection of the Put Price or its economic

4  interests as the holder of the Preferred Units in KRMW.

5      KBR has not yet filed dispositive motions with respect to this second adversary

6  proceeding.

7          **3.      Resolution of the KBR Adversary Proceedings in the Plan.**

8      The Plan will avoid the need for any further litigation over the matters addressed in the

9  KBR adversary proceedings.  The Plan provides that the newly issued equity in Reorganized

10  Colony I and Reorganized Colony II will be distributed to KBR, all interests in HCC will be

11  assigned to Lennar and the claims against Lennar will be released.

12      **G.      Applications to Retain Counsel for the Debtors in Possession and Counsel for**

13          **the Trustees.**

14          **1.      Counsel for the Debtors in Possession.**

15      Prior to the appointment of the Chapter 11 Trustees, the Debtors, as Debtors in Possession

16  filed several applications to retain counsel.

17      Each of the Debtors in Possession proposed to retain Mintz Levin Cohn Ferris Glovsky

18  and Popeo, P.C. ("Mintz Levin") as its or his general bankruptcy counsel.  When the Chapter 11

19  Cases were first filed, Lennar advised Jeffry Davis, the lead lawyer at Mintz Levin involved in

20  this proposed representation, that Lennar believed that Mintz Levin and Mr. Davis had disabling

21  conflicts of interest resulting from their prior joint representation of HCC, Lennar Homes, Marsch

22  and Briarwood.  Lennar asserted that when Mr. Davis was with Gray Cary (which later merged

23  into DLA Piper), Mr. Davis worked with Brian Foster (one of the defendants in the DLA Piper

24  Cases) in jointly representing these parties.

25      Mintz Levin filed its retention applications on April 11, 2010.  The applications to retain

26  Mintz Levin were opposed by (i) the U.S. Trustee, which argued that it was inappropriate for a

27  single firm to represent each of these Debtors given the intercompany transfers and claims, (ii)

28  KBR, which made the same arguments as did the U.S. Trustee and also argued that Marsch was

1  no longer in control of Briarwood, Colony I or Colony II and, therefore, did not have authority to

2  propose Mintz Levin as counsel, and (iii) Lennar, which argued that Mintz Levin was disabled

3  from representing the Debtors in Possession because of the conflicts of interest mentioned above.

4      The Bankruptcy Court held a hearing on this application on May 26, 2010 and on July 20,

5  2010 issued its decision denying the Debtors in Possession's applications to retain Mintz Levin in

6  each of these cases.  The Bankruptcy Court noted that since the retention applications had been

7  filed, Chapter 11 Trustees had been appointed in the Colony I and Colony II cases so the Mintz

8  Levin retention applications were only of historic interest in those cases.  The Court concluded

9  that the intercompany debts and transfers that had been the basis of the U.S. Trustee's objection

10 precluded any single firm from representing all four of these Debtors in Possession.  The

11 Bankruptcy Court ruled that if any single Debtor in Possession sought to apply to retain Mintz

12 Levin, the Bankruptcy Court would consider the issues raised by Lennar in its objection.

13      None of the Debtors in Possession ever filed a renewed application to retain Mintz Levin.

14 Moreover, subsequent to the Bankruptcy Court's July 20, 2010 order, Chapter 11 Trustees were

15 appointed in the Marsch and Briarwood cases.  Thus, there are no Debtors in Possession that

16 could apply to retain Mintz Levin.  Mintz Levin did, however, file proofs of claim in the Colony I

17 and Colony II cases for postpetition fees of $78,898.69 against Colony I and $39,385.38 against

18 Colony II.  Lennar believes that these proofs of claim are improper, for professionals of this sort

19 are to be paid only if their retention is approved by the Bankruptcy Court under Bankruptcy Code

20 § 327 and the Bankruptcy Court approves a fee application under Bankruptcy Code § 330, neither

21 of which happened here.  The Plan provides that if, and to the extent Mintz Levin seeks

22 compensation, the Plan Proponents will oppose it.

23      Marsch and Briarwood, as Debtors in Possession, also sought to retain Gordon & Holmes

24 as special litigation counsel under Bankruptcy Code § 327(e) to handle the litigation with Lennar

25 and certain other specified litigation matters.  This retention application sought authority to pay

26 Gordon & Holmes a 50% contingency fee out of any collections in this litigation plus expenses,

27 also to be paid out of any such collections.  This application was unopposed and was approved by

28 the Bankruptcy Court on June 8, 2010.  Since the claims asserted in the litigation against Lennar

LA3:1169526

1  have been rejected by the courts trying these matters and the Plan releases all such claims,

2  nothing will be owed to Gordon & Holmes under this retention agreement.[16]

3      Briarwood, as Debtor in Possession, also applied to retain Jon R. Williams, APLC, as

4  special litigation counsel with respect to the appeal of Judge Nevitt's decision in the McCrink

5  Action.  This application was unopposed and the Bankruptcy Court approved it on June 8, 2010.

6      On April 28, 2010, Briarwood and Marsch filed applications with the Bankruptcy Court to

7  retain the Dimond Firm to represent them in the Florida Action as special litigation counsel.

8  These applications were filed late, for the Dimond Firm had been engaged, purportedly on behalf

9  of the Estates, in a series of jurisdictional maneuvers involving the Florida Action since late

10  February.  Lennar objected on the grounds, among others, that this application failed to disclose

11  the relations between the Dimond Firm and Mr. Macaluso or the fact that Mr. Macaluso had

12  guaranteed the fees to be incurred by the Dimond Firm.  Mr. Macaluso was the lead trial counsel

13  representing Briarwood and Marsch in the Florida Action until his license to practice law was

14  suspended.  The Bankruptcy Court deferred ruling on that application while Marsch was in

15  control of the Debtors.  At a hearing held on September 21, 2010, the Briarwood and Marsch

16  Trustees indicated that they were withdrawing the application to retain the Dimond Firm (without

17  prejudice to renewing it) both because of the issues raised in Lennar's objection and the fact that

18  they did not believe that it would be prudent for the Estates to incur fees on this matter at the

19  present time, particularly since the Estates have no resources to pay them.

20           **2.**    **Counsel for the Chapter 11 Trustees.**

21      Mr. Kipperman, the Chapter 11 Trustee for Colony I and Colony II, selected Foley &

22  Lardner LLP as his general bankruptcy counsel.  The Bankruptcy Court approved that application

23  on June 23, 2010.

24

25

---

26  [16] The Schedules filed in the Briarwood case also indicate that Gordon & Holmes is owed
$386,254.30; the Schedules do not set forth the basis for the claim.  The Schedules filed in the

27  Marsch case indicate that Gordon & Holmes is a creditor in an undetermined amount.  The Plan
Proponents reserve the right to object to these prepetition claims.  If, however, they are allowed,

28  Gordon & Holmes will share pro rata with other allowed claims in the distributions to be made
under the Plan.

DISCLOSURE STATEMENT

LA3:1169526

1    Mr. Kennedy, the Chapter 11 Trustee for Marsch, selected Pyle Sims Duncan &

2  Stevenson APC as his general bankruptcy counsel.  The Bankruptcy Court approved that

3  application on September 7, 2010.

4    Ms. Gladstone, the Chapter 11 Trustee for Briarwood, selected Sullivan Hill Lewin Rez &

5  Engel ("Sullivan Hill") as special litigation counsel to be retained under Bankruptcy Code §

6  327(e).  That retention application was filed on October 7, 2010 and was approved on October 14,

7  2010.  The application indicates that Sullivan Hill represented Marsch and Briarwood on a

8  number of litigations and transactions prior to the filing of these Chapter 11 Cases, including

9  litigation with KBR and negotiations of the leases between Colony I and Colony II and First

10  Place.  The Sullivan Hill retention application indicates that this firm will not be involved in

11  matters such as development of a bankruptcy plan or matters involving First Place.  Rather, its

12  work will be restricted to certain adversary proceedings.

13    The Sullivan Hill retention application indicates that Ms. Gladstone intends to use her

14  own firm as general bankruptcy counsel.  She has not yet filed an application to retain her firm for

15  those purposes.

16    **H.    The Bankruptcy Court's Order Vacating its Earlier Claims Bar Date Order.**

17    Shortly after filing for bankruptcy protection, the Debtors filed a motion to set a claims

18  bar date of April 30, 2010.  Such motions are usually routine and are granted ex parte.  The

19  Bankruptcy Court did so here.

20    However, on March 29, 2010, Lennar filed a motion to provide it with an open extension

21  of the bar date for filing proofs of claim.  Lennar argued that these Bankruptcy Cases are not

22  typical, that no additional information regarding Lennar's claims would be provided by filing

23  proofs of claim with the Bankruptcy Court (since these claims are detailed in the pending

24  litigation).  Lennar argued that even if it did file a proof of claim, it would not waive its right to a

25  jury trial in the Florida Action but contended that it was inappropriate to spend time and expenses

26  on such peripheral disputes.

27    The Bankruptcy Court agreed with Lennar and on May 7, 2010, the Bankruptcy Court

28  entered an order vacating its prior order setting a claims bar date in each of the Bankruptcy Cases.

LA3:1169526

1     After his appointment as Chapter 11 Trustee for Colony I and Colony II, Mr. Kipperman

2     filed a motion to set a new claims bar date of September 15, 2010 for the Colony I and Colony II

3     cases.  The Bankruptcy Court approved that motion.

4     Lennar recently filed a motion to set a claims bar date for the Marsch and Briarwood

5     cases.

6          **I.     Relief from the Stay with respect to the DLA Piper Cases.**

7     On May 7, 2010, Lennar filed a motion seeking relief from the automatic stay to allow it

8     to proceed against all the defendants in the DLA Piper Cases or, at a minimum against DLA Piper

9     and Mr. Foster.  At a hearing held on May 28, 2010, the Bankruptcy Court ruled that Lennar was

10    permitted to proceed against DLA Piper and Mr. Foster and that Lennar was permitted to take

11    discovery against Marsch as though he were a non-party to the action.  The Bankruptcy Court

12    denied Lennar's motion to proceed against Marsch as a defendant, without prejudice to Lennar

13    seeking to lift the stay at a later date.

14    **VII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**

15         **A.     Feasibility of the Plan.**

16    In connection with confirmation of the Plan, the Bankruptcy Court will be required to

17    determine that the Plan is feasible, as required by section 1129(a)(11) of the Bankruptcy Code.

18    Feasibility means that the confirmation of the Plan is not likely to be followed by liquidation or

19    the need for further financial reorganization, unless that is provided for in the Plan.

20    The Plan meets the feasibility test embodied in section 1129(a)(11) of the Bankruptcy

21    Code for several reasons.

22    With respect to the Marsch and Briarwood Estates, the Plan provides that Lennar will

23    provide the Estates with the $750,000 Lennar Loan, which the Plan Administrator will be able to

24    use to pay administrative costs, including pursuing assets that Marsch or Briarwood may have

25    hidden and transfers that may be avoided for the benefit of creditors.  The likely targets include

26    the MRP fraudulent conveyance actions against Messrs. Minkow and Sachs, the furnishings

27    located at the Colorado real property involved in the MRP bankruptcy, debts owed to the Marsch

28    Estate by MRP, an analysis and pursuit of what happened to the over $50 million of cash that

105

1  Marsch and Briarwood received prior to filing for bankruptcy, possible transfers of property into

2  Mrs. Marsch's name and avoidable preferences.

3      The Lennar Loan will have favorable terms for the Estates.  For example:

4      • It will have no stated maturity.

5      • No interest or principal will be owed until and unless the Plan Administrator

6          recovers assets.

7      • If the Plan Administrator fails to recover sufficient assets to repay this loan, it will

8          be forgiven.

9      The Lennar Loan should be adequate to allow the Plan Administrator to conduct

10  investigations and bring litigation claims to recover assets, as appropriate.  Moreover, if the Plan

11  Administrator recovers sufficient assets to pay this loan in full and believes that further

12  investigations or litigation are likely to bear fruit and justify the costs and risks, the Plan

13  Administrator can use those collections to pursue such claims further.

14      With respect to Colony I and Colony II, the Plan provides that KBR will make the

15  $250,000 KBR Loan on essentially the same terms as the Lennar Loan. This loan should be more

16  than sufficient to pay the administrative costs and Allowed Unsecured Claims in the Colony I and

17  Colony II cases.  As noted above, filed and scheduled unsecured claims in these cases total

18  approximately $55,000.

19      Accordingly, the Plan complies with the feasibility standard of § 1129(a)(11) of the

20  Bankruptcy Code.

21      **B.**      **Acceptance of the Plan.**

22      As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of

23  impaired claims vote to accept the Plan, except under certain circumstances.

24      Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of

25  impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more

26  than one-half (1/2) in number of claims in that class, but for that purpose counts only those who

27  actually vote to accept or to reject the Plan.  Thus, Claimholders in each of the impaired Classes

28  entitled to vote will have voted to accept the Plan only if two-thirds (2/3) in amount and a

DISCLOSURE STATEMENT

1  majority in number of the Claims actually voting in each Class cast their ballots in favor of

2  acceptance.  Claimholders who fail to vote are not counted as either accepting or rejecting the

3  Plan.

4       The Plan is a joint plan, which means that it is an integrated document that provides for

5  treatment of creditors of all four Debtors.  But the Plan does not provide for substantive

6  consolidation; in other words, the estates are not merged.  That also means that the confirmation

7  tests, including the voting standards described above, will be assessed for each case separately.

8  In other words, it is possible that Classes of Claimholders for one Debtor may accept the Plan, but

9  Classes of Claimholders for other Debtors may reject the Plan.

10      As noted below, a plan can be confirmed even if some Classes of Claimholders reject a

11 plan.  However, Bankruptcy Code §1129(a)(10) provides that if any classes in a plan are

12 impaired, at least one accepting class must accept the plan, not counting any acceptances by

13 insiders.  A number of courts have considered the application of this test to a joint plan that does

14 not provide for substantive consolidation, such as is the case here.  The courts that have expressly

15 considered the matter have uniformly held that compliance with section 1129(a)(10) is tested on a

16 per-plan basis, not on a per-debtor basis, and that section 1129(a)(10) therefore does not require

17 an accepting impaired class for each debtor under a joint plan. *See e.g., In re Station Casinos,*

18 *Inc.*, Case No. 09-52477 (Bankr. D. Nev. August 27, 2010 (joint plan for 18 debtors without

19 substantive consolidation); *In re Charter Communications, Inc.*, 419 B.R. 221, 266 (Bankr.

20 S.D.N.Y. 2009) (joint plan of 110 debtors that did not involve substantive consolidation; court

21 held that only a single accepting impaired class under the plan required to satisfy section

22 1129(a)(10)); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 at *234-

23 235 (Bankr. S.D.N.Y. July 15, 2004) (joint chapter 11 plan for 177 debtors confirmed although

24 majority of debtors lacked an impaired consenting class); *In re SGPA, Inc.*, Case No. 1-01-02609,

25 2001 WL 34750646, at p.7 (Bankr. M.D. Pa. Sept. 8, 2001) (bankruptcy court confirmed joint

26 plan for multiple debtors and held that "in a joint plan of reorganization it is not necessary to have

27 an impaired class of creditors of each Debtor vote to accept the Plan.").

28

DISCLOSURE STATEMENT

1
2

**C.      Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative.**

3      In the event any Class of Impaired Claims rejects the Plan, the Plan Proponents may seek

4  confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

5      Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the

6  plan is not accepted by all impaired classes, as long as at least one impaired class of claims has

7  accepted it.  The Bankruptcy Court may confirm a plan at the request of a proponent if the plan

8  "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not

9  accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy

10  Code if a dissenting class is treated equally with respect to other classes of equal rank.  Lennar

11  believes that the Plan does not discriminate unfairly with respect to any Class.

12      A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the

13  plan provides either that:  (a) each holder of a claim of such class receives or retains on account of

14  such claim property of a value, as of the effective date of the plan, equal to the allowed amount of

15  such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will

16  not receive or retain under the plan on account of such junior claim or interest any property.  The

17  Plan could satisfy the "fair and equitable" requirements of section 1129(b) of the Bankruptcy

18  Code will respect to all Classes of Claims, for no junior Classes are to receive anything.

19      A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan

20  provides (a) that each holder of an interest included in the rejecting class receive or retain on

21  account of that interest property that has a value, as of the effective date of the plan, equal to the

22  greatest of the allowed amount of any fixed liquidation preference to which such holder is

23  entitled, any fixed redemption price to which such holder is entitled or the value of such interest

24  or (b) that the holder of any interest that is junior to the interests of such class will not receive or

25  retain under the plan on account of such junior interest any property at all.  The Plan provides that

26  the equity interests in the Debtors will receive no distributions.  Since creditors will not be paid in

27  full and there are no junior equity interests, the Plan meets this test.

28

DISCLOSURE STATEMENT

1    As noted above, the Plan does not provide for substantive consolidation.  Thus, whether

2    the Plan Proponents need to seek confirmation under the "cramdown" standards will be evaluated

3    with respect to each Debtor separately.

4    **D.**     **Best Interests Test.**

5    Even if a plan is accepted by each class of claims and interests, the Bankruptcy Code

6    requires that the plan be in the "best interests" of all holders of claims or interests that are

7    impaired by the plan and that have not accepted the plan.  This "best interests" test, as set forth in

8    § 1129(a)(7) of the Bankruptcy Code, requires that all members of an impaired class of claims or

9    interests have accepted the plan or that the plan will provide a member who has not accepted the

10   plan with a recovery of property of a value, as of the effective date of the plan, that is not less

11   than the amount that such holder would recover if the debtor were liquidated under chapter 7 of

12   the Bankruptcy Code.

13   To calculate the probable distribution to holders of each impaired class of claims and

14   interests if the debtor were liquidated under chapter 7, one must first determine the aggregate

15   dollar amount that would be generated from the debtor's assets if its chapter 11 case were

16   converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist

17   primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

18   The amount of liquidation value available to unsecured creditors would be reduced by,

19   first, the claims of secured creditors to the extent of the value of their collateral and, second, by

20   the costs and expenses of liquidation, as well as by other administrative expenses and costs of

21   both the chapter 7 cases and the Chapter 11 Cases.  Costs of liquidation under chapter 7 of the

22   Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other

23   professionals retained by the trustee, asset disposition expenses, all unpaid administrative

24   expenses incurred by the debtors in their Chapter 11 Cases that are allowed in the chapter 7 cases,

25   litigation costs and claims arising rom the operations of the debtor during the pendency of the

26   chapter 11 case.  The liquidation itself would trigger certain priority payments that otherwise

27   would be due in the ordinary course of business.  Those priority claims would be paid in full from

28

DISCLOSURE STATEMENT

LA3:1169526

1    the liquidation proceeds before the balance would be made available to pay general unsecured

2    claims or to make any distribution in respect of equity security interests.

3         Once one ascertains the recoveries in liquidation of secured creditors and priority

4    claimants, it is necessary to determine the probable distribution to general unsecured creditors and

5    equity security holders from the remaining available proceeds in liquidation.  If such probable

6    distribution has a value greater than the distributions to be received by such creditors and equity

7    security holders under the plan, then the plan is not in the best interests of creditors and equity

8    security holders.

9         Lennar believes that the Plan meets the best interests test for several reasons.

10        With respect to Colony I and Colony II Estates, the Plan provides for the payment of

11   100% of all Allowed Claims. In contrast, in a chapter 7 liquidation, it is unlikely that unsecured

12   creditors would receive anything since the value of the Palmilla Properties is less than the amount

13   of KBR I's approximately $7 million secured claim.

14        With respect to the Marsch and Briarwood Estates, the Plan offers a superior recovery

15   than would be available under chapter 7 for several reasons.  First, a chapter 7 trustee would

16   probably realize significantly less on account of the MRP Claims than provided for in the Plan.

17   The Chapter 11 Trustee for Marsch has proposed settling for the MRP Claims for $425,000; it is

18   likely that a chapter 7 trustee for Marsch would do no better.  Moreover, it is likely that almost all

19   of this $425,000 recovery would go to pay Allowed Administrative Expense Claims; thus, very

20   little, if any of this recovery is likely to be available to pay unsecured creditors with Claims

21   against Marsch.  In contrast, the Plan provides that all Allowed Administrative Expense Claims

22   and Priority Claims against Marsch and Briarwood will be paid out of the Lennar Loan and

23   further guarantees that the Plan Administrator will realize a minimum of $450,000 (net of fees

24   and costs) on account of the MRP Claims all of which will be available for distribution to

25   creditors with Allowed unsecured Claims against Marsch.

26        Second, Marsch's earnings after the date of conversion to chapter 7 and any assets he

27   acquired after that date would not be property of the Marsch chapter 7 estate.  In contrast, a

28   chapter 11 estate for an individual, such as Marsch, includes all of the debtor's earnings and all

110

LA3:1169526

1  property that he acquires until the bankruptcy case is closed.  Thus, the Plan offers the prospects

2  for more assets to distribute to creditors.

3      Third, a chapter 7 trustee would not have the resources to pursue the other avenues of

4  potential recovery to be pursued by the Plan Administrator.

5      Fourth, converting to chapter 7 would likely entail additional administrative costs since

6  two chapter 7 trustees would need to be appointed, they would each retain counsel and each

7  would incur administrative costs that will be avoided under the Plan.

8      Thus, the assets to be distributed to unsecured creditors would likely be significantly less

9  since the pool of assets would likely be smaller and the administrative costs would be higher than

10  under the Plan.

11      Chapter 7 trustees could try to pursue the claims against Lennar and KBR.  If that

12  approach were taken, there would likely be no distributions to unsecured creditors.  Any effort to

13  pursue claims against Lennar and KBR would not be productive and would certainly be

14  extremely protracted, contentious and expensive.  The prospects and significant risks for the

15  estates of electing a litigation path have been set forth above in greater detail above.  In brief

16  summary, however, the Superior Court has ruled against Briarwood in the McCrink and Bridges

17  Actions.  A successful appeal in the Bridges Action is not likely given the detailed findings by the

18  court, including its conclusion that Marsch repeatedly lied during the trial.  Any appeal will take

19  years to get resolved.  In the unlikely event of a reversal and a new trial resulting in an award for

20  Briarwood, that award would be subject to offset against the substantial claims Lennar has against

21  Briarwood.  And any award is also subject to KBR's claim to it.  Likewise, in the McCrink

22  Action, even a successful appeal would result in years more of litigation to pursue a claim based

23  on the testimony of a witness who has been adjudicated to be untruthful and where any recovery

24  would be for the benefit, not of Briarwood, but of HCC.  Since Lennar is entitled to the profits

25  from HCC as a result of the Statement of Decision, pursuit of this claim will redound to Lennar's

26  benefit.  Lennar will aggressively defend itself in these matters and if the Superior Court's rulings

27  were overturned, resolution of the litigation will take years.  The Estates and creditors would have

28  to wait for the conclusion of all the lawsuits to sort out offsets and net recoveries – all of which

DISCLOSURE STATEMENT

1   could well take as much as five more years through trials of the DLA Piper Cases and the Florida

2   Action and various appeals.  Further pursuit of the claims against Lennar and KBR could also

3   subject the Estates to claims of malicious prosecution and abuse of process, among other

4   remedies.

5          Moreover, any recoveries on claims against Lennar would not be available for unsecured

6   creditors until KBR I is paid approximately $5 million (growing at 20% per annum)—since KBR

7   has a secured Put Right in this amount—during the many years that it would take to prosecute this

8   litigation and collect, even assuming for sake of argument that prevailing in claims against Lennar

9   was conceivable.  In addition, if chapter 7 trustees opted for this approach, neither Lennar nor

10  KBR would loan the trustees money to pursue the assets and claims that will be pursued by the

11  Plan Administrator, so it is likely that the chapter 7 trustees would not recover anything that could

12  be distributed to creditors.

13  **VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE**

14  **PLAN**

15         The Plan affords creditors the potential for the greatest realization of the Debtors' assets

16  and, therefore, is in the best interests of such holders.  If, however, the requisite acceptances are

17  not received, or the Plan is not confirmed and consummated, the likely alternatives will be either

18  (a) dismissal of the Chapter 11 Cases, or (b) liquidation under chapter 7 of the Bankruptcy Code.

19         If these cases are dismissed, Marsch and KBR could potentially resume their litigation

20  over who controls Briarwood, Colony I, Colony II, and KRMW and KBR will be free to continue

21  its foreclosures against the equity in Briarwood, Colony I, and Colony II and the assets that these

22  entities and Marsch pledged to them (including the Palmilla Properties and any claims against

23  Lennar).  KBR and Lennar believe that KBR will prevail and will be free then to implement many

24  of the essential elements of the Plan, but achieving that result will likely involve litigation with

25  Marsch.

26         Alternatively, if the cases are dismissed, Marsch may assert that he should return to

27  control of KRMW, Briarwood, Colony I and Colony II.  This is not the likely result, but Marsch

28  may advocate it.  Returning Marsch to control over these entities would not be in creditors'

DISCLOSURE STATEMENT

1   interests given his lack of honesty, candor and fair dealing, as found by numerous courts.  If he

2   managed to seize control of the litigation claims against Lennar and KBR (which is  unlikely), the

3   result would probably be many years of futile and expensive litigation as Marsch continued his

4   litigation vendetta, assuming that Marsch is able to find someone to finance it.  This result is

5   particularly inequitable because it would effectively have allowed Marsch to exploit the

6   bankruptcy procedures to gain a respite from the claims against him while avoiding any scrutiny

7   into the highly suspicious transactions set forth in this Disclosure Statement.

8       Nor would chapter 7 offer an attractive alternative.  The foregoing section of this

9   Disclosure Statement sets forth the relevant analysis.

10  **IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

11      THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S.

12  FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS

13  THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS SUMMARY

14  IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE

15  INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY

16  REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND

17  CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF

18  THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING

19  INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD

20  ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES

21  DESCRIBED BELOW.

22      THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL

23  INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A

24  CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO

25  CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT

26  UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL

27  INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT

28  ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR

DISCLOSURE STATEMENT

LA3:1169526

OTHER PASS-THROUGH ENTITY).  IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN.  EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER.  NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by Claimholders, for purposes of avoiding penalties that may be imposed on such Claimholders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each Claimholder should seek advice based on such Claimholder's particular circumstances from an independent tax advisor.**

**U.S. Federal Income Tax Consequences to the Debtors**

*Introduction.*

Colony I, Colony II and Briarwood are limited liability companies.   Lennar assumes that these Debtors have not elected to be treated as an association taxable as a corporation for U.S. federal income tax purposes.  Assuming that is correct, they are treated as disregarded entities for tax purposes.  Marsch owns directly, or indirectly, the member interests in these Debtors and should be allocated all the taxable income or losses attributable to these limited liability companies.

Lennar does not have access to information regarding Marsch's tax situation and does not purport to discuss the tax consequences to Marsch of the Plan.

**U.S. Federal Income Tax Consequences to Claimholders**

*Overview*

The U.S. federal income tax consequences to a Claimholder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimholder's method of accounting, and its own particular tax situation.  Because the holders' Claims and tax situations differ, Claimholders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the U.S. federal income tax consequences of a payment to a Claimholder may depend initially on the nature of the original transaction pursuant to which the Claim arose.  For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender.

The U.S. federal income tax consequences of a transfer to a Claimholder may also depend on whether the item to which the payment relates has previously been included in the Claimholder's gross income or has previously been subject to a loss or bad debt deduction.  For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a holder's trade or business, the holder had previously included the amount of such receivable payment in its gross income under its method of accounting, and had not previously claimed a

1   loss or bad debt deduction for that amount, the receipt of the payment should not result in

2   additional income to the Claimholder but may result in a loss.  Conversely, if the Claimholder had

3   previously claimed a loss or bad debt deduction with respect to the item previously included in

4   income, the holder generally would be required to include the amount of the payment in income.

5        A Claimholder receiving a payment under the Plan in satisfaction of its Claim generally

6   may recognize taxable income or loss measured by the difference between (i) the amount of cash

7   and the fair market value (if any) of any property received and (ii) its adjusted tax basis in the

8   Claim.  For this purpose, the adjusted tax basis may include amounts previously included in

9   income (less any bad debt or loss deduction) with respect to that item.  The character of any

10  income or loss that is recognized will depend upon a number of factors, including the status of the

11  creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount,

12  whether and to what extent the creditor has previously claimed a bad debt deduction with respect

13  to the Claim, and the creditor's holding period of the Claim.  This income or loss may be ordinary

14  income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the

15  ordinary course of the holder's trade or business for the performance of services or for the sale of

16  goods or merchandise.  Generally, the income or loss will be capital gain or loss if the Claim is a

17  capital asset in the holder's hands.

18       Market discount is the amount by which a Claimholder's tax basis in a debt obligation

19  immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at

20  such time, subject to a *de minimis* exception.  A Claimholder generally is required to include gain

21  on the disposition of a market discount debt instrument as ordinary income to the extent of the

22  accrued market discount on the debt instrument.

23  **Other Tax Matters**

24  *Information Reporting and Backup Withholding*

25       Certain payments or distributions pursuant to the Plan may be subject to information

26  reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding

27  (at the then applicable rate (currently 28%)) unless the taxpayer:  (i) comes within certain exempt

28  categories (which generally include corporations) and, when required, demonstrates this fact or

LA3:1169526

(ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

*Importance of Obtaining Professional Tax Assistance*

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**X.    CONCLUSION**

For these reasons, the Plan Proponents believe that the Plan should be confirmed and urge each Claimholder entitled to vote to vote **IN FAVOR** of the Plan.

[Signature page follows]

LA3:1169526

DISCLOSURE STATEMENT

1

Dated: November 8, 2010

2   LENNAR CORPORATION
    LENNAR HOMES OF CALIFORNIA, INC.

3

4   Bruce Gross, *Vice President*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28